```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT

DONNA PARRIS,                   .   Case No. 3:10-CV-01128
                                .   (WWE)
            Plaintiff,          .
                                .   Bridgeport, Connecticut
     v.                         .   March 27, 2012
                                .
CHARLES PAPPAS, ET AL.,         .
                                .
            Defendants.         .
. . . . . . . . . . . . . . .
```

```
                   HEARING ON PENDING MOTIONS
         BEFORE THE HONORABLE HOLLY B. FITZSIMMONS,
               UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

For the Plaintiff:      The Connecticut Fair
                        Housing Center
                        By:  TIMOTHY BENNETT-SMYTH, ESQ.
                        221 Main Street, 4th Floor
                        Hartford, CT 06106

                        Bingham McCutchen
                        By:  MICHAEL J. COOLICAN, ESQ.
                        One State Street
                        Hartford, CT 06103

For the Defendants:     Lynch, Traub, Keefe & Errante
                        By:  DONN A. SWIFT, ESQ.
                        52 Trumbull Street
                        P.O. Box 1612
                        New Haven, CT 06506

Electronic Court
Recorder Operator:      MS. SANDRA J. BALDWIN

_____
                     BOWLES REPORTING SERVICE
                          P.O. BOX 607
                   GALES FERRY, CONNECTICUT 06335
                          (860) 464-1083
```

1          (Proceedings commenced at 10:31 a.m.)

2              THE COURT:  Good morning.

3              MR. SWIFT:  Good morning, Your Honor.  I

4      apologize for being late.

5              THE COURT:  All right.  This is Civil Case

6      Number 10-CV-1128, Parris vs. Pappas, et al., and we're

7      here this morning for hearing and argument on pending

8      motions.  And before we move to the Motion for

9      Sanctions, several motions were filed yesterday by the

10     Plaintiff as to which I understand the Defendants don't

11     have an objection.  That would be 155 through 164?

12             MR. SWIFT:  That's the charge motions, Your

13     Honor?

14             THE COURT:  Yes.

15             MR. SWIFT:  Yes.  I guess --

16             THE COURT:  Okay.  So those can all be

17     granted on agreement.

18             MR. SWIFT:  Yes, Your Honor.  And Your Honor,

19     I don't know if you saw it, but last night or yesterday

20     Judge Eginton actually did rule on the Motion for Stay.

21             THE COURT:  I knew he was going to take a

22     look at it.

23             MR. SWIFT:  Oh, okay.

24             THE COURT:  So he did.  Okay.

25             So, Mr. Bennett-Smyth, you can go whenever

1     you're ready.

2          MR. COOLICAN:  Actually, Your Honor, Michael

3     Coolican, (inaudible).

4          THE COURT:  Mr. Coolican, of course.

5          MR. COOLICAN:  As Your Honor noted we're here

6     on Motion for Sanctions.  Looking at the parties'

7     papers, the objection to the motion and the motion

8     itself nicely captures the state of discovery at the

9     time of the Court's imposed deadlines on discovery.

10    Specifically a court order that by February 17th certain

11    interrogatories which would be supplemented by February

12    21st, the Defendants would produce documents.

13         The exhibits to parties' papers show the

14    status of discovery by those deadlines, and as outlined

15    in my papers the responses to discovery were wholly

16    inaccurate.

17         Now, since that time the Defendants have

18    continued to produce documents and it's become a

19    certain (inaudible) situation, so I think it may be

20    most helpful for the Court if we could update as to the

21    present status of a number of the interrogatories and

22    document requests.

23         THE COURT:  That would be very helpful.

24         MR. COOLICAN:  All right.  Beginning -- and

25    Your Honor, I'm going to group them by category which I

1    think will also be helpful.

2         Ms. Parris propounded the number of

3    interrogatories and documents requests concerning

4    sources to income and revenue, specifically

5    interrogatory 8, document requests 9, 11, 17 and 20.

6    In essence, these ask for the identification of sources

7    of revenue for all the Defendants, but also the

8    corporate entities in which the Defendants have any

9    interests.

10        At present the Defendants have disclosed

11   nothing about the income or revenue of Defendant

12   Charles Pappas, of Defendant Anna Alexis LLC, of Max

13   CT, LLC or Otis Street, LLC, the two latter entities

14   being limited liability companies that the Defendants

15   hold interest in.  There is no written statement under

16   oath disclaiming the existence of income for those

17   individuals and entities, and then there's been no

18   production of documents that would evidence any income

19   or revenue, and there's been no written statement

20   saying that those individuals and entities earned no

21   income or revenue.

22        In the ordinary course we look to tax

23   documents to see what type of income those people have.

24   The Defense have given us a written statement saying

25   that certain individuals and entities haven't filed tax

returns in the last three years, but they're tellingly
silent with respect to Defendant Normandies Properties,
LLC, again Max CT, LLC, and Otis Street, LLC.

Now, the Defendants are in the business of
renting real estate, and in the ordinary course we look
to leases to determine possible sources of income and
revenue.  And they disclose that Crystal Creek Farms,
LLC, a limited liability company that the Defendants
hold interest in, earns rental income but they produce
no lease for that particular LLC.

In addition, Your Honor, Mr. Pappas has
testified previously that he's in the business of -- in
the construction trade, in the business of building
homes.  And as a contractor we anticipated being able
to look at contracts to determine sources of revenue or
income, but the Defendants have produced no contracts
showing what type of engagements Mr. Pappas has entered
in the last three years.

Moving on to financial accounts, as recounted
in the Defendants filing on Friday, they have to be
certain bank records for certain entities, but they
produced no bank records and they haven't said in a
written statement under oath that there are no bank
records for Defendant Anna Alexis, LLC or for Max CT,
LLC, or Otis Street, LLC.

1              In addition to that, Your Honor, we didn't

2      just simply ask for bank records, we asked for the

3      identification or documents, the production of

4      documents concerning accounts at financial

5      institutions, which plainly encompasses more than

6      checking accounts.  It would include savings accounts,

7      investment accounts, lines of credit, credit cards.

8      We've received none of these documents and we've

9      received no written statement under oath saying that

10     they don't exist.

11             Moving on to the category of property, Your

12     Honor, we served interrogatories 5, 9 and 12, and

13     document requests 8, 10, 15 and 16, which generally

14     call for the identification of property interests and

15     the production of documents concerning property

16     interests, be it title documents.  We've also asked for

17     mortgages and liens or documents concerning mortgages

18     and liens.

19             At present we know there's certain real

20     property that the Defendants own or that their LLCs

21     own, and we've received no title documents, no mortgage

22     documents, no documents concerning any outstanding

23     balances on indebtedness associated with mortgages.

24     And those properties include 16 to 22 Center Street,

25     347 Putnam Pike, 35, 47 and 53 Attawaugan Crossing

1    property, 123 Park Road property, and the Defendant's

2    own home, 241 Church Street.

3          Obviously knowing whether and the extent of

4    the encumbrances on these properties is key to Ms.

5    Parris because if we have to go down the road of

6    executing on judgment liens, knowing the extent of

7    equity in this property is going to be key to Ms.

8    Parris in determining which of these properties to

9    execute judgment against.

10          Also under the category of property would be

11   the Defendants' interests in various limited liability

12   companies.  We asked for articles of incorporation and

13   governing documents for those entities.  At this point

14   there's been no production with respect to Anna Alexis,

15   LLC, which is a Defendant, Max CT, LLC or Otis Street,

16   LLC.

17          That's the status of discovery at this point,

18   Your Honor.  The Defendants aren't even close to

19   complying with Ms. Parris' discovery request or

20   certainly the Court's order.

21          Now, I think there's at least one point on

22   which Ms. Parris and the Defendants can agree, or at

23   least counsel can agree, and that's Defendants'

24   statement in their brief on Friday that in determining

25   an appropriate sanction and examination of all the

1    circumstances is required.  On this point we agree, and

2    there's a few relevant circumstances in the procedural

3    history of this case that I think are worth noting for

4    the Court.

5         Last week marked the one-year anniversary of

6    Ms. Parris filing for a Motion for Disclosure of

7    Assets.  It's been over a year since we've sought the

8    information that we're still trying to get today.

9    Almost a year ago, on April 14$^{th}$, 2011 from the bench

10   the Court ordered the Defendants to make a disclosure

11   of assets and Defendants' counsel responded that they

12   intended to do so within 30 days, and that can be found

13   in the transcript of that April 14$^{th}$ hearing on pages

14   207-208.

15        In the interim Ms. Parris obtained an order

16   from the Court that the Defendants were not to

17   dissipate assets.

18        May 17$^{th}$, at docket number 70, the Defendants

19   made their first disclosure of assets.  The made no

20   disclosure as to the corporate Defendants, and as to

21   the individual Defendants they disclosed only that they

22   held interests in LLCs.

23        Now, with some prompting from Ms. Parris they

24   supplemented that disclosure at docket number 76, and

25   this time they listed certain real property owned by

1   the corporate entities, but again listed no personal

2   property, no cash, no other holdings by the individual

3   Defendants.  With further prompting, they supplemented

4   a second time at docket number 86, and a third time at

5   docket number 87.  And then these disclosures, for the

6   first time they confirmed the extent of their ownership

7   interests in these LLCs, providing a percentage of how

8   much of the equity in these companies they own.

9          And they also make an incredible statement,

10  and these disclosures are sworn under oath, disclosures

11  state each, quote, does not own any other assets as are

12  set forth in the Motion for Disclosure of Assets,

13  unquote.

14         Now, the Motion for Disclosure of Assets

15  lists every conceivable type of personal or real

16  property that one can own.  This statement is

17  incredible and it's already been proven to be false.

18         Months later at the December 8th hearing on

19  Ms. Parris' prejudgment remedy, a lot of information

20  came out.  For the first time it came out that

21  Defendant Pappas owns interests in the limited

22  liability company known as Northeast Waste, LLC, an

23  interest that was never previously disclosed.  It came

24  out that the Defendants' LLCs own 35 and 47 Attawaugan

25  Crossing, Dayville, Connecticut.  It came out they also

owned 9 through 11 Robin Way, Brooklyn, Connecticut.
It came out that they owned 282 and 284 Putnam Pike,
Dayville, Connecticut.  These are all properties found
nowhere in the disclosures that they filed with the
Court.

And it's noted in the Defendants' brief on
Friday they've now produced bank records showing cash
holdings that were never previously disclosed.  And
we've not attained further evidence that we'll put on
today that their disclosures are not only incomplete
but false.  And when I say disclosures, I mean the most
recent disclosures made in 2012.

Further events at that December 8th hearing
that bear on the Court's decision on sanctions are that
the Defendants admitted that the properties they
disclosed largely did not have any equity in them.
They were high encumbered.  They admitted that
notwithstanding the non-dissipation order that
properties were for sale, both disclosed properties and
undisclosed properties.  And in fact on the day of the
hearing there was one property still listed for sale.

The Court received evidence of non-payment of
taxes and of waste of property.  And at the conclusion
of that hearing the Court granted Ms. Parris leave to
take discovery as to assets and ordered -- and this is

1    at page 100 of the transcript of that December 8th

2    hearing -- ordered, quote, the Defendants to make a

3    complete and up to date disclosure of their current

4    assets.  They have never updated their disclosure of

5    assets.  Simply ignored that court order.

6          Well, in the interim Ms. Parris served

7    discovery, and when the responses to discovery were due

8    on January 26th of this year, the Defendants produced

9    nothing.  They answered no interrogatories and produced

10   no documents.  And it was only after Ms. Parris sought

11   the intervention of the Court and the Court scheduled

12   the telephone conference, that was the last time we had

13   the opportunity to meet with the Court, it was only

14   after that conference was scheduled that answers to

15   interrogatories were served and the documents began to

16   trickle in.

17        (Pause.)

18          Coming out of that telephone conference is

19   the aforementioned order regarding production of

20   interrogatory responses by February 17th and the

21   production of documents by the 21st.  And the Court also

22   ordered Ms. Parris to update the Court as to the status

23   of discovery on February 24th.  We did that, filed a

24   notice identifying the (inaudible) requesting

25   interrogatories that had not been answered in full.

1   And still the Defendants produced no documents and did

2   not supplement any interrogatories.

3          As discussed in the affidavit attached to or

4   Motion for Sanctions, there was then some exchange

5   between counsel where counsel for Ms. Parris provided

6   further information on the manner in which the

7   discovery responses were inadequate at this point, in

8   fact providing excerpts from the intended Motions for

9   Sanctions brief.  And still the Defendants produced no

10  documents and they didn't supplement.  Left with no

11  other recourse, Ms. Parris moved for sanctions and

12  that's where we are today.

13         At this point my colleague, Mr. Bennett-

14  Smyth, would like to take the proceedings.  We have

15  some evidence and some witnesses we'd like to address.

16         THE COURT:  Thank you.

17      (Pause.)

18         MR. BENNETT-SMYTH:  Good morning, Your Honor,

19  Timothy Bennett-Smyth from the Connecticut Fair Housing

20  Center for the Plaintiff, Donna Parris.

21         By agreement I've already given the Clerk

22  Exhibits 1 through 9 for today's hearing, Your Honor,

23  and I have 10 and 11 which are also by agreement which

24  I'd like to give to the Clerk.  May I approach?

25         THE COURT:  You may.  Yes, thank you.

1       (Pause.)

2           THE COURT:  Mr. Bennett-Smyth, excuse me.

3   There's an emergency that's come up that I need to see

4   an agent.  I'll be right back.

5           MR. BENNETT-SMYTH:  Sure.

6           THE COURT:  Thank you.  Court will be in

7   recess.

8       (Recess:  10:47 a.m. to 11:00 a.m.)

9           THE COURT:  Thank you.  Sorry for that delay.

10  And Mr. Bennett-Smyth, whenever you're ready.

11          MR. BENNETT-SMYTH:  Yes, Your Honor.  So --

12          THE COURT:  1 through 9.

13          MR. BENNETT-SMYTH:  1 through 9 have been

14  provided to the Court.  I also provided the Court 10

15  and 11, which are full exhibits by agreement.

16          And I'd now like to call Robin Delaney for

17  some questioning, Your Honor.

18          THE COURT:  All right.  Ms. Delaney.

19      ROBIN DELANEY, PLAINTIFF'S WITNESS, SWORN

20          THE CLERK:  Please be seated.  Please state

21  your name, spell your last name and state your business

22  address.

23          THE WITNESS:  Robin Delaney, D-E-L-A-N-E-Y,

24  241 Church Street, Brooklyn, Connecticut 06234.

25          THE COURT:  Thank you, Ms. Delaney.

1          Mr. Bennett-Smyth, whenever you're ready.

2          MR. BENNETT-SMYTH:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4    BY MR. BENNETT-SMYTH:

5    Q.   Good morning, Ms. Delaney.  My name is Tim Smyth.

6    I represent Donna Parris.  We've spoken before.  I have

7    a few questions for you this morning.

8         Your attorney provided me with what's been entered

9    as Exhibit 10, which is the certification of Robin

10   Delaney.

11          MR. BENNETT-SMYTH:  I'd ask the Court if I

12   can hand you the exhibit.

13          THE COURT:  Certainly.

14          MR. BENNETT-SMYTH:  May I?

15          THE COURT:  Yes.

16        (Pause.)

17   BY MR. BENNETT-SMYTH:

18   Q.   So the Plaintiff in this matter propounded

19   discovery on December 27, 2011, and since that time

20   you, Ms. Delaney, and the other Defendants have filed

21   several responses to that discovery; is that correct?

22   A.   Yes.

23   Q.   And this certification here is you certifying that

24   those responses, which include the original partial

25   compliance, the supplemental compliance, the second

1  supplemental compliance, the third supplemental

2  compliance, the fourth supplemental compliance, the

3  fifth supplemental compliance, the sixth compliance and

4  seventh compliance, that those are all true and

5  accurate --

6  A.   Yes.

7  Q.   -- based on your personal knowledge?

8  A.   Yes.

9  Q.   And did you have a part in each of those

10  productions, in each of those responses?

11  A.   Yes.

12  Q.   And you've reviewed them all?

13  A.   Yes.

14  Q.   And are they complete?

15  A.   Yes.

16  Q.   Is there any information that we've asked for that

17  you're aware of that you have not provided?

18  A.   No.

19  Q.   Specifically, Ms. Delaney, we've asked in our

20  discovery responses whether or not you have any

21  interests in real property.  You understand what I mean

22  by real property?

23  A.   Yes.

24  Q.   And you're a realtor, that's what you do, right?

25  A.   Yes.

1   Q.   Do you, Ms. Delaney, have an interest in any real
2   property that you have not disclosed in this case?
3   A.   No.
4   Q.   When is the last time that you purchased or took
5   an interest in any real property?
6   A.   I think it was in -- I don't know, I'd have to
7   look.  I think it was in 2006, it was like 280 Putnam
8   Pike.  I really don't remember.  It was foreclosed on
9   in like 2008.
10  Q.   Okay.  So that was all before this lawsuit.
11  A.   Yeah.  I honestly don't know the dates.  I'd have
12  to look.
13  Q.   You don't know the date --
14  A.   I provided the foreclosure documents though.
15  Q.   And you believe that property is 280 Putnam Pike?
16  A.   I believe it was.  They were in the paperwork that
17  I gave them.
18  Q.   Since you purchased 280 Putnam Pike, have you
19  purchased or taken an interest in any other real
20  property?
21  A.   No.
22  Q.   Since the filing of this lawsuit --
23  A.   No.
24  Q.   -- in 2010, have you purchased or taken an
25  interest in any --

1    A.   No.

2             MR. BENNETT-SMYTH:  Your Honor, may I

3    approach?  I have --

4             THE COURT:  Of course.  You don't need

5    permission to do that.  Thank you.

6        (Pause.)

7    BY MR. BENNETT-SMYTH:

8    Q.   Ms. Delaney, you've never disclosed any interest

9    in any property in the state of Maine, have you?

10   A.   No.

11   Q.   And you do have an interest in a property in the

12   state of Maine, don't you?

13   A.   No.

14            MR. BENNETT-SMYTH:  I've offered into

15   evidence a certified copy, Your Honor, from the Maine

16   land records of a land installment contract dated

17   August 18, 2010.  It's filed in the land records,

18   document 9005, Book 4623, pages 3, 4, 5, 6, 7, 8, 9.

19            THE COURT:  This is Exhibit 12 for

20   Identification?

21            MR. BENNETT-SMYTH:  It's a self-

22   authenticating document, Your Honor.

23            THE COURT:  So you're offering it as --

24            MR. BENNETT-SMYTH:  A certified copy, I'm

25   offering it as a full exhibit.

1          THE COURT:  All right.  Any objection?

2          MR. SWIFT:  Yes, Your Honor.  There's no

3    foundation laid.  The witness was asked if she had an

4    interest in property, she said no, so it's irrelevant

5    unless he wants to lay some further foundation for the

6    witness.

7          MR. BENNETT-SMYTH:  It's for impeachment

8    purposes, Your Honor.  The document itself evidences an

9    interest in real property and it's signed by Ms.

10   Delaney.

11         MR. SWIFT:  That's his interpretation of the

12   document, Your Honor.  It's not true.  The witness is

13   here to be asked.

14         THE COURT:  I think you need to ask her if

15   it's her signature.

16   BY MR. BENNETT-SMYTH:

17   Q.   Ms. Delaney, could you look at page 8 of the

18   document?  I'm sorry, when I say page 8 I'm referring

19   to the upper right-hand corner.  In the upper left-hand

20   corner it's marked as page 6.  And do you see there

21   where it says Robin L. Delaney, purchaser?

22   A.   Yes.

23   Q.   And is that your signature?

24   A.   Yes.

25   Q.   Could you look at the -- in the upper left-hand

1   corner, the page marked page 3, which is marked page 5

2   in the upper right-hand corner?

3       (Pause.)

4   A.   What page?

5   Q.   You know what actually -- withdrawn.

6       Let's start with the first page of the land

7   installment contract.

8           THE COURT:  All right.  Well, before you talk

9   to her about the content, now do you have an objection

10  to the marking of the document as a full exhibit?

11          MR. SWIFT:  Yes, Your Honor.  I still haven't

12  -- I think the foundation's been laid.  The claim is

13  that this indicates she has an ownership in a piece of

14  property.  I don't think that's been established.

15          THE COURT:  Well, the objection is overruled

16  and the document may be marked as a full exhibit.

17          And now, Mr. Bennett-Smyth, you can inquire.

18  BY MR. BENNETT-SMYTH:

19  Q.   So, Ms. Delaney, in the first paragraph of the

20  document it lists Charles Pappas and Robin L. Delaney

21  of PO Box 544, Danielson, Connecticut 06239, and it

22  defines you and Mr. Pappas as purchaser.  Do you see

23  that in the document?

24  A.   I do.

25  Q.   Okay.  And now if you turn to that page marked

1  page 3 in the upper left-hand corner, paragraph number

2  two, it says that the price -- do you see where I'm

3  referring to, Ms. Delaney?

4  A.   Well, not the document page 3, page 3 of the

5  order?

6  Q.   I'm going to refer -- going forward I'm going to

7  refer to the page numbers in the upper left-hand

8  corner, okay?

9  A.   Oh.

10  Q.   Could you refer to page 3 of the land installment

11  contract?

12  A.   Okay.

13  Q.   And at the bottom of that page you see paragraph

14  number two, the very bottom of that page?

15  A.   Yeah.

16  Q.   Okay.  That the price shall be $160,000 payable by

17  the purchaser to the vendor.

18  A.   Correct.

19  Q.   That's payable by you and Mr. Pappas to the

20  vendor, correct?  You're the purchaser.

21  A.   That's -- yeah.

22  Q.   Okay.  The sum of 15 dollars (sic) at or prior to

23  the date hereof, meaning the date of the contract.  So

24  that means that you and Mr. Pappas gave $15,000 on the

25  date of the contract to the vendor, correct?

1    A.   Correct.

2    Q.   And if you look at paragraph 2b which is at the

3    top of page 4, the balance of $145,000 or the balance

4    remaining due on a certain mortgage held by Franklin

5    Savings Bank recorded in the Oxford County Registry of

6    Deeds in Book 4343 at pages 283 to 308, whichever

7    amount is smaller, payment shall be made by the

8    purchaser, which is you and Mr. Pappas, in accordance

9    with the payments due Franklin Savings Bank and to

10   continue for a period not to exceed 48 months after the

11   date herewith, with a final balloon payment due and

12   payable on that date.  Is that correct?

13   A.   Correct.

14   Q.   And that is your signature on the last page of the

15   document, correct?

16   A.   Yes.

17   Q.   So you agreed to these obligations?

18   A.   Yes.

19   Q.   Paragraph number 3, which is still on that page 4

20   that you were looking at, do you see where I'm

21   referring to?  Right after where I was just reading,

22   Ms. Delaney.

23   A.   Okay.

24   Q.   That the purchaser hereby assumes the payment of

25   all real estate taxes that may be levied upon the

1    above-described property by the Town of Roxbury,

2    beginning with the taxes assessed on April 1, 2010 for

3    the 2010 calendar year.  Is that what that says?

4    Paragraph 3.

5    A.    Yes.

6    Q.    Okay.  So you agreed to assume the obligation to

7    pay those property taxes in 2010.

8    A.    At that time, yes.

9    Q.    Okay.

10         Paragraph 5 on the same page, that the purchaser

11   agrees to make promptly all payments and does bind

12   themselves as joint tenants (inaudible) signs

13   faithfully to do so.

14   A.    Yes.

15   Q.    Paragraph 11, which is on the next page, page 5,

16   that the purchaser shall have possession of said

17   property during the period this land installment

18   contract is in force and agrees to keep the property in

19   good repair and not suffer any waste thereof during the

20   period of this contract.

21         So in return for what you've agreed to do, you

22   were given possession of this property, weren't you?

23   A.    Yup.  Yes.

24   Q.    And you've never disclosed this obligation --

25   these obligations, this contract or your interest in

1    this property in any of your disclosures in this case.

2    A.   No.

3         (Pause.)

4    Q.   I'm going to take that exhibit back from you and

5    give it to the Court.

6         (Pause.)

7    Q.   Ms. Delaney, one of the things that's been asked

8    in the discovery is to identify any interest that the

9    Defendants have in any business entities.  And that's a

10   broad term as lawyers use it is that entities includes

11   limited liability companies, trusts, partnerships,

12   corporations, any sort of ongoing business enterprise,

13   okay?  Do you understand that?

14   A.   Yes.

15   Q.   Any sort of business organization.  And you've

16   identified certain limited liability companies that

17   you're a member of in this case, correct?

18   A.   Yes.

19   Q.   You're a member of Crystal Creek Farms, LLC?

20   A.   Yes.

21   Q.   And Anna Alexis, LLC?

22   A.   Yes.

23   Q.   And Normandies Park, LLC?

24   A.   Yes.

25   Q.   Are you a member of any other limited liability

1   companies?

2   A.   Yes.   Northeast Waste.

3   Q.   Northeast Waste, LLC?

4   A.   Yes.

5   Q.   Are you a member of any other liability companies?

6   A.   No.

7   Q.   Not just in the state of Connecticut.   Are you a

8   member of any limited liability companies anywhere?

9   A.   No.

10   Q.   You are a member of Elite Real Estate, LLC, aren't

11   you?

12   A.   That -- may I answer or do I have to answer yes or

13   no?

14   Q.   It is a yes or no question.

15   A.   Yes.

16        MR. BENNETT-SMYTH:   Your Honor, I'd like to

17   offer the Article of Organization for Elite Real

18   Estate, LLC as a full exhibit, a certified copy.

19        THE COURT:   This will be Exhibit 13?

20        MR. BENNETT-SMYTH:   Yes, Your Honor.

21      (Pause.)

22        MR. SWIFT:   No objection.

23        THE COURT:   Thank you.   Exhibit 13 may be

24   marked as a full exhibit by agreement.

25   BY MR. BENNETT-SMYTH:

1    Q.   Ms. Delaney, you've previously testified that you
2    are a real estate broker; is that correct?
3    A.   Yes.
4    Q.   As I understand it, real estate brokers buy and
5    sell properties and represent buyers or sellers and
6    they're paid by commission, which is a portion of the
7    sale price; is that correct?
8    A.   Yes.
9    Q.   Could you just briefly explain how that works in
10   your experience?
11   A.   What do you mean?
12   Q.   How are you compensated as a real estate broker
13   when you buy or sell property?
14   A.   When the property closes?
15   Q.   Yes.
16   A.   When the property closes.
17   Q.   Yes.  How are you compensated as a real estate
18   broker when a property closes when you're the listed
19   broker?
20   A.   You get a percentage of what the property sold
21   for.
22   Q.   Do you ever do it for free?
23   A.   Yes.
24   Q.   When is the last time you did it for free?
25   A.   Last year.

1    Q.    What property is that?

2    A.    I don't know.  I probably did like six of them

3    last year for free.  I'd have to look.

4    Q.    Okay.

5    A.    It was an elderly gentleman and he didn't have any

6    money.  I would have to go through my records, been

7    quite a few.

8    Q.    Okay.

9          (Pause.)

10              MR. BENNETT-SMYTH:  Your Honor, I'd like to

11   show the witness Exhibit 5.

12              THE COURT:  Yes.

13          (Pause.)

14   BY MR. BENNETT-SMYTH:

15   Q.    Ms. Delaney, could you turn to page 4 of Exhibit

16   5?

17          (Pause.)

18   Q.    Did you provide that answer to interrogatory

19   number 8?

20   A.    Number what?

21   Q.    Interrogatory number 8 on page 4.

22   A.    Yes.

23   Q.    That answer says, "At one time Robin Delaney had a

24   successful real estate business.  However, she recently

25   had to go through two different surgeries and between

1  this and the current housing conditions she has been

2  unable to do any business since the third quarter of

3  2010."

4      The third quarter of 2010 ends on September 1st,

5  2010; is that correct?

6  A.   Correct.

7  Q.   Okay.  But you have continued to buy and sell real

8  estate since September 1st, 2010, correct?

9  A.   Myself, no.

10 Q.   No?  As a broker?  Have you participated in any

11 real estate transactions since September 1st, 2010?

12 A.   You mean as a real estate broker?

13 Q.   Yes.

14 A.   I've listed properties, yes.

15 Q.   Have you closed properties since September 1st,

16 2010?

17 A.   I closed one a few months ago, it was a HUD

18 property.  I made a couple hundred dollars.

19 Q.   Okay.  What property was that?

20 A.   I don't -- I don't know.  It wasn't my listing, it

21 was just -- I'd have to look out and remember the

22 address, but it was a HUD property that sold like

23 $32,000, and I think I made a couple hundred.  I'd have

24 to look.

25 Q.   Okay.  But you've never disclosed that transaction

1    in this case, have you?

2    A.    No.

3    Q.    No.  In any of the supplemental compliances that

4    you've filed and sworn to the truth of, you've never

5    disclosed that transaction, have you?

6    A.    No.

7    Q.    Is the couple of hundred dollars that you made on

8    that transaction, is it evidenced in any of the bank

9    records which you've produced in this case?

10   A.    It would probably show up in the deposit.  I --

11   Q.    In which bank account?

12   A.    Yeah.  It would have been in the Robin Delaney

13   Real Estate account, yeah.

14   Q.    Robin Delaney Real Estate account.

15   A.    When I gave you the statement, yeah.

16   Q.    Other than this property you sold, that you sold a

17   few months ago, this HUD property you just referred to,

18   have you participated as a realtor or real estate

19   broker in any other transactions since --

20   A.    Yes.

21   Q.    -- September 1st, 2010?

22   A.    Yes.  I just started getting back into the

23   business and I recently listed some properties, yes.  I

24   have not sold anything but I've listed them.

25   Q.    Have you sold or bought any other properties as a

1   realtor or real estate broker since September 1st, 2010?

2   A.   No.

3        (Pause.)

4   Q.   Isn't it true that you were the broker on a

5   property located at 285 Freedly Road, Pomfret,

6   Connecticut, and that that transaction --

7   A.   Yes.

8   Q.   -- closed on October 4, 2010?

9   A.   I didn't know the date.  I know I did not take a

10  commission.

11  Q.   Okay.  But that was a transaction that --

12  A.   It was, but I did not make money off of the

13  transaction.

14  Q.   And who was your client?

15  A.   An attorney in Rhode Island.

16  Q.   And is his name Mr. DeAngelis?

17  A.   It is.

18  Q.   Okay.  But you did that work for free.

19  A.   I did, because he's an investor that I've been

20  working with for five years and I had the property

21  listed for almost two years and he didn't make any

22  money, so yes, I did it for nothing.

23  Q.   So if I subpoena him and I ask him, he'll testify

24  --

25  A.   Yes.

1   Q.   -- under oath that you received no money for that

2   transaction.

3   A.   Yes, he would.

4   Q.   Isn't it true that you also participated in the

5   sale of 353 Pasay in North Grosvenor Dale on July 29,

6   2011?

7   A.   I don't understand what you're saying.

8   Q.   Were you the realtor or real estate broker in the

9   transaction involving a property located at 353 Pasay

10  for $194,000 on July 29, 2011?

11  A.   Oh, yes.  I did.

12  Q.   You did?

13  A.   Yes, I did.

14  Q.   And who was your client in that case?

15  A.   A referral I got from the mortgage broker.

16  Q.   And did you receive compensation for that?

17  A.   Yes.  That was my one sale in 2011.  I forgot

18  about that.  Yes.

19  Q.   How much compensation did you receive?

20  A.   I think I received a couple of thousand dollars.

21  Q.   Okay.  And will that be evidenced in the bank

22  records?

23  A.   It would be, yes.

24  Q    But you've never identified that transaction in

25  your responses, have you?

1    A.    No.  I honestly forgot about it, but it is in my

2    Robin Delaney Real Estate bank statement.  It would

3    show as a deposit if there was --

4    Q.    This was in July, on July 29 of 2011.

5    A.    Yes.

6    Q.    And you forgot about it?

7    A.    When I was recently doing this, yes.  But when the

8    check is made out to me it's not made out to me

9    individually.  It's made out to Robin Delaney Real

10   Estate, so it would show up in my bank statements.

11   Q.    And I believe you just testified a minute ago that

12   that's the only property that you transacted in 2011;

13   is that correct?

14   A.    Yeah, I think it was.  I haven't done my tax

15   returns, but anything, like I said, any commissions

16   that I make are not made out to me, so they go into my

17   bank account.  So when I go back to remember what I did

18   I just look at my bank statements.

19   Q.    Isn't it true that you also participated in

20   another transaction involving 285 Freedly Road,

21   Pomfret, Connecticut which closed on August 15, 2011?

22   A.    Correct.

23   Q.    Okay.  But when I just asked you if you

24   participated in any other transactions in 2011 you

25   stated --

1    A.    I didn't make any money with that one either.

2    It's the same -- I didn't, I didn't make any --

3    Q.    That's Mr. DeAngelis also?

4    A.    Yes.

5    Q.    So did you sell it to him and then buy it back

6    from him?

7    A.    No, I did not sell it to -- I sold it to him and I

8    sold -- someone else purchased it.

9    Q.    What I'm trying to understand is in October of

10   2010 --

11   A.    He purchased it as a renovation to flip it.

12   Q.    Okay.

13   A.    And then he -- then I was the agent to resell it

14   for him.  In neither one of those transactions did I

15   collect, did I make money.

16   Q.    Did he do those renovations himself?

17   A.    There were no -- really no -- no, there wasn't any

18   renovations that needed to be done.

19   Q.    (Inaudible.)

20   A.    (Inaudible) purchased it as is.

21   Q.    I thought you just testified that he bought it,

22   did some renovations and then flipped it.

23   A.    He bought to, yeah, to flip it.

24   Q.    Okay.  Did he, did Mr. DeAngelis do the

25   renovations before he flipped it?

1    A.   No, there were no renovations that were done.

2    Q.   I thought you just testified that he bought it,

3    did some renovations and then sold it.

4    A.   He bought it to flip it, yes.  It was purchased at

5    a short sale, and because the economy was so bad he did

6    not do any renovations and he sold it at a reduced

7    price to just get rid of it.  So no renovations were

8    done.

9    Q.   Okay.

10        Did you participate in any other real estate

11   transactions in 2011?

12   A.   Not that I recall, no.

13   Q.   Okay.  What about 127 Daggett Street in Moosup,

14   Connecticut?

15   A.   That's the one I just told you about that I made a

16   couple hundred dollars on that's --

17   Q.   That's the HUD one.

18   A.   Yeah.

19   Q.   Okay.

20        MR. BENNETT-SMYTH:  Nothing further, Your

21   Honor.

22        THE COURT:  Mr. Swift.

23        MR. SWIFT:  Thank you, Your Honor.

24                    CROSS EXAMINATION

25   BY MR. SWIFT:

1   Q.   Ms. Delaney, I wanted to ask you first about

2   Articles of Organization for Elite Real Estate, LLC.

3   A.   Yes.

4   Q.   That's Exhibit 13, and it says it was filed April

5   24, 2008.  Did you form that LLC?

6   A.   Yes.

7   Q.   And then from that point in time to today, how

8   much money has Elite Real Estate, LLC made?

9   A.   None.  It never operated.  I opened it because

10  when I left Remax and went out on my own, in order to

11  open up a bank account I had to have like a tax ID

12  number, so I opened it.  I was going to start a

13  business.  Never started it, never operated it.  Never

14  filed tax returns, never opened up a bank account,

15  nothing.

16  Q.   Okay.  So how much money did Elite Real Estate,

17  LLC make from '08 to now?

18  A.   Nothing.

19  Q.   Okay.  And how much activity did you do as that

20  company?

21  A.   None.

22  Q.   Okay.  So did you disclose this as an asset of

23  yours or as an interest of yours?

24  A.   No, because I never operated.  It was just

25  something I did on line and --

1    Q.    Okay.

2         Exhibit 12 is a land installment contract that was

3    done in Maine, August 18 (inaudible).  Do you own the

4    piece of property involved in Maine?

5    A.    No.

6    Q.    I'm sorry, I didn't hear you.

7    A.    No.

8    Q.    No?  What is this piece of -- what is this

9    document, land installment contract, what is this?

10   A.    That was a property that Charlie and I had planned

11   on purchasing that -- before all this happened, and we

12   could not purchase it, so it's basically if we don't

13   pay the note, the balloon payment, it's gone.

14   Q.    Okay.

15   A.    It was something that we had, already had in the

16   plan.  It's not an actual purchase.

17   Q.    So it --

18   A.    So I didn't list it because I don't own it.

19   Q.    Okay.  Did you become the owner of the -- well, is

20   there a piece of property actually that -- is there a

21   name for this property that you use?  What do you call

22   it?

23   A.    Maine house.

24   Q.    Okay.  And is there a house on that piece of

25   property?

1    A.   There is.

2    Q.   Okay.  And then you're intention was to enter --

3    and when you entered this agreement to buy the property

4    --

5    A.   We were going to move to Maine until all of this

6    happened, yes.

7    Q.   Okay.  And so what happened to change the plan?  I

8    mean --

9    A.   I have no money.  There just -- you have to come

10   up with $145,000.

11   Q.   Okay.  There's a reference in here to you getting

12   a mortgage --

13   A.   I'm not going to be able to get a mortgage.

14   Q.   Pardon me?

15   A.   I'm not going to be able to get a mortgage.

16   Q.   Did you actually get a mortgage as part of this

17   agreement?

18   A.   No.

19   Q.   Okay.  So, in other words, there's a reference in

20   here that you would be getting a mortgage with a bank

21   when you signed this.  It says on the page 4 that you

22   were going to get a mortgage at Franklin Savings Bank

23   --

24   A.   Yeah.

25   Q.   -- for $145,000?

1   A.   Yeah.

2   Q.   Did you get a mortgage from Franklin Savings Bank?

3   A.   No.

4   Q.   Did you get $145,000?

5   A.   No.

6   Q.   So you didn't, there's no $145,000 amount you were

7   never provided.

8   A.   No.

9   Q.   So you never had the money to buy the property.

10  A.   No.

11  Q.   And you don't own the property.

12  A.   No.

13  Q.   It's not an asset of yours.

14  A.   No.

15  Q.   Okay.

16          THE COURT:  Have you paid any money toward

17  the installment contract, Ms. Delaney?

18          THE WITNESS:  There was a payment made the

19  day we closed.

20          THE COURT:  That was the $15,000?

21          THE WITNESS:  Yes.

22  BY MR. SWIFT:

23  Q.   And on page 3 of the contract, it does indicate

24  that you would provide $15,000 at the date of the

25  signing?

1  A.   Yes.

2  Q.   Was that done?

3  A.   Yes, it was.

4  Q.   And was any payment made after that?

5  A.   No.

6  Q.   All right.  So you don't have an ownership

7  interest now.

8  A.   I do not.  I haven't even been there.

9  Q.   Okay.  I want to ask you about some of those real

10  estate transactions.  You were asked for information

11  about your income.

12  A.   Yes.

13  Q.   And then there was a transaction you mentioned in

14  2010 where you made a couple of hundred dollars, you

15  didn't disclose it.  Why didn't you disclose as a list

16  of your income?

17  A.   Because it was a minimal amount.  It was -- it

18  cost more -- it wasn't an income by the time -- the

19  expenses takes the income.

20  Q.   Okay.  Did you actually make any money in the

21  transaction?

22  A.   No.

23  Q.   In the 2011 transaction you mentioned that you did

24  have some income.  I didn't hear what you said in terms

25  of what your commission --

1   A.   The one on Pasay Road I honestly forgot to list.

2   Q.   Okay.

3   A.   But it is in my bank records.  It will show as a

4   deposit.

5   Q.   Okay.  So on the bank account record you disclosed

6   it.

7   A.   Yes.

8   Q.   And you got the fee, it was deposited.

9   A.   Yes.

10  Q.   Okay.

11       Not in the questions that you were asked, but when

12  counsel was making an argument before the Judge they

13  made reference to certain issues I want to talk to you

14  about.  They made an issue of Anna Alexis, that you

15  hadn't given them the documents showing all the income

16  that's coming out of Anna Alexis.  Is Anna Alexis an

17  operating business?

18  A.   No.

19  Q.   Does Anna Alexis make any money?

20  A.   No.

21  Q.   Has it made any money in the last three years?

22  A.   Last year of operation was 2009.

23  Q.   Okay.  Do you have a bank account since 2009 for

24  Anna Alexis?

25  A.   No.  I closed it.

1   Q.   (Inaudible.)

2   A.   No.

3   Q.   Does Anna Alexis have an ownership interest in the

4   property at 347 Putnam Pike?

5   A.   Yes.

6   Q.   What's the status of that property now?

7   A.   I thought it was sold for a tax sale, but we just

8   found out this week that 16 Center Street was sold and

9   I don't -- obviously they didn't sell 347 Putnam Pike,

10   but it's going to be sold at tax sale.

11   Q.   So there's a claim by the municipality that taxes

12   are due?

13   A.   Yes.

14   Q.   Have you paid the taxes?

15   A.   No.

16   Q.   Has Anna Alexis paid them?

17   A.   No.

18   Q.   Has anybody else paid them?

19   A.   No.

20   Q.   Why not?

21   A.   Because there's no money.

22   Q.   Okay.

23       Now, there was some questions, there was some

24   comments made about Otis Street, LLC and Max

25   Connecticut, LLC.  And I should have asked you before,

1   in regard to you and Mr. Pappas, is there one of you

2   that does more of the paperwork than the other in terms

3   of your various entities?

4   A.   Yes.

5   Q.   Who is that?

6   A.   Me.

7   Q.   Okay.  So in terms of documentation, you over the

8   years have been the one that sort of kept track of

9   things?

10  A.   Yes.

11  Q.   And Otis, LLC, you're aware of that LLC, correct?

12  A.   Yes.

13  Q.   Does that LLC have any interest in property?

14  A.   Does it have interest in property?

15  Q.   Yeah.

16  A.   Yes.

17  Q.   Okay.

18  A.   Park Street --

19  Q.   Who is the person that's sort of a controller in

20  charge of the information on Otis?

21  A.   Korina Peltak.

22  Q.   Do you have access to any information?

23  A.   No.

24  Q.   Okay.  But are you aware of any income that Otis

25  has?

1    A.    No.  It's just raw land.

2    Q.    Okay.  So there's a piece of land.

3    A.    Yes.

4    Q.    Any income coming off of that land?

5    A.    No.

6    Q.    So there's expenses I would assume in maintaining

7    it.

8    A.    Correct.

9    Q.    Taxes, things like that, insurance?

10   A.    Yes.

11   Q.    But there's no income.

12   A.    No.

13   Q.    Okay.  And so there's been no distributions,

14   there's no income coming out of it.

15   A.    No.

16   Q.    Okay.

17         Max Connecticut, is that in the same situation?

18   A.    Yes.

19   Q.    Same person that the LLC the documentation is

20   with, Korina?

21   A.    Yes.

22   Q.    Okay.  And have you made efforts to try and see if

23   you could get documentation through them, for them?

24   A.    We have.

25   Q.    What was the response?

1    A.    She's unresponsive.  She says she's busy, she'll

2    call back, and she never calls back.

3    Q.    Do you have in your possession any documentation

4    on either Otis or Max?

5    A.    No, I never have.  She has all corporation

6    documentation, all tax records.  I have nothing.

7    Q.    Okay.  There was a comment made that although

8    you've given information about bank accounts, you

9    haven't given information about all of your IRAs, all

10   your savings accounts, all your investment accounts,

11   all your other transactions, all your financial

12   institutions that would show all this other money you

13   have.

14        Why is it that you haven't produced any

15   information like that?

16   A.    Because I've been self-employed for 20 years and I

17   don't have any IRAs or any savings.  I never have.

18   Q.    Okay.  And are you aware of any -- aside from the

19   bank information provided that the entities involved in

20   this case, Anna Alexis, Normandies Park, had any other

21   bank or financial records or documents aside from what

22   you already provided?

23   A.    No.

24   Q.    There's nothing else.

25   A.    No.

1   Q.   Okay.  You were asked about Crystal Creek Farms,

2   and that's an LLC?

3   A.   Yes.

4   Q.   You and Mr. Pappas have an interest in it?

5   A.   Yes.

6   Q.   What is the business of Crystal Creek Farms?

7   A.   There is no business.  That's our primary

8   residence.

9   Q.   Okay.  So it's a house?

10  A.   Correct.

11  Q.   Is there more than one house?

12  A.   There is.

13  Q.   Okay.  In one of the discovery responses you

14  indicated that there is some rental income that comes

15  from that?

16  A.   Yes.

17  Q.   And where is the lease that the Plaintiff has

18  requested for this other piece of property, Crystal

19  Creek?

20  A.   I never had a lease.

21  Q.   There's no lease.

22  A.   No leases.

23  Q.   So there's no lease for you to produce for the

24  other property, Crystal Creek Farms, because there is

25  no lease.

1    A.    Correct.

2    Q.    Okay.  In terms of Crystal Creek Farms, you

3    provided information of a bank account; is that

4    correct?

5    A.    Yes.

6    Q.    And is that the only documentation that exists

7    that would give any information as to the bank interest

8    for Crystal Creek?

9    A.    Yes.

10   Q.    Okay.  And in terms of Crystal Creek Farms, do you

11   know what the value is of that piece of -- of those

12   pieces of property?

13   A.    I haven't had an appraisal done.

14   Q.    But you don't have documentation saying what the

15   value is.

16   A.    No.

17   Q.    So you have not produced information as to what

18   it's worth.

19   A.    No.

20   Q.    You have produced information as to the mortgage

21   on the property?

22   A.    Yes.

23   Q.    And that mortgage is now over $500,000?

24   A.    Yes, it's like seven.

25   Q.    Well, do you remember what financial institution

1    it was with?

2    A.    There's two.  There's Hudson Savings Bank, which

3    is now Avidia Bank, and then the other one is a hard

4    lender, Landmark Lending.

5    Q.    And on the list of your debts that you provided in

6    discovery, you provided the information on both of

7    those.

8    A.    Yes.

9    Q.    Okay.  You were -- I think there was some comments

10   being made about Northeast Waste.  It's another LLC.

11   Do you have an interest in that one as well as Mr.

12   Pappas?

13   A.    Yes.

14   Q.    Okay.  And is Northeast Waste an active entity?

15   A.    No.

16   Q.    Does it bring in any money?

17   A.    It trickles in a little bit.  It had some like

18   money that had been owed, you know, like I don't know,

19   maybe there was a thousand dollars in the last six

20   months.  But no, we're not operating it.  It was a

21   manure removal business, and we lost our driver and

22   fuel prices went up so much that we lost all our

23   clients.

24   Q.    Okay.  So is there any active business, so to

25   speak, of Northeast Waste?

A.   No.

Q.   Okay.  There was a comment made that Mr. Pappas
has not provided information about his income.  In
terms of tax returns, I think you mentioned in
discovery that you had not filed them recently,
correct?

A.   No, no.

Q.   Do you know of any income that Mr. Pappas has of
any type?

A.   He's had none.

     (Pause.)

Q.   In terms of your activities as a realtor, have you
had health issues that have prevented you from becoming
fully involved?

A.   Yes.

Q.   And you're in the process of trying to get back
into the business, so to speak?

A.   Yes.

Q.   Okay.  There was a comment made again today about
you listing properties even after the court order.  You
testified at the last hearing on that, remember you
were shown the documents that said that one was active
and one wasn't?

A.   Yes.

Q.   Was it your intention to actively list property

1    and sell it in spite of the court order?

2    A.    No, they weren't listed after the court order.

3    They were listed before the court order and I removed

4    them off of the market because of the court order.

5    Q.    Okay.  And in terms of the situation at Normandies

6    Park, you obviously get some rental income in from the

7    tenants, correct?

8    A.    Yes.

9    Q.    Do any of the tenants, have they currently signed

10   leases?

11   A.    No, they haven't signed leases.  Two, in 2009 and

12   the other one is 2008.

13   Q.    Have they given you a reason why they're not

14   signing the new leases?

15   A.    No.  They just won't sign them.

16   Q.    Okay.  But income has been paid under the -- or

17   rental has been paid under the old leases?

18   A.    It's been paid under the -- yes.

19   Q.    Okay.  So in other words, you had a set amount of

20   rental income per month --

21   A.    Yes.

22   Q.    -- for each of the units?

23   A.    Yes.

24   Q.    And the leases that you provided in one of the

25   discovery responses the last couple days were the last

1   effective leases?

2   A.    Yes.

3   Q.    And in terms of whatever the dollar amounts listed

4   there, that's that the income is coming in?

5   A.    Yes.

6   Q.    And what is that income used for?

7   A.    Living expenses, to pay the mortgage on Church

8   Street, pay the electric bill, pay the phone bill.

9   Q.    Okay.  Outstanding expenses that are incurred on a

10  monthly basis for Normandies Park?

11  A.    Yup.  Normandies Park has maintenance, rubbish

12  removal, snow plowing.  Not much this year, but snow

13  plowing, lawn maintenance, maintenance of the

14  properties.  There's two houses on the properties that

15  needed a lot of maintenance that we've had to do in the

16  last two years.

17  Q.    Could you estimate for the Court how much time you

18  have spent in trying to provide information in the

19  various requests for documents about properties,

20  income, bank accounts, things of that type?

21  A.    Since we were here in December, over 70 hours.

22  Q.    Okay.  Was there also time spent before that that

23  you didn't necessarily keep track of?

24  A.    Yes.  Yes.

25  Q.    Okay.  And in terms of searches for requests of

1    information, when you were made aware of additional

2    requests for information, did you make attempts to

3    comply to provide information requests?

4    A.    Yes.

5    Q.    And when you found information, did you disclose

6    it?

7    A.    Yes.

8    Q.    Okay.  Have you ever intentionally decided that

9    there were certain things that you were not going to

10   seek or certain things that you were not going to

11   produce?

12   A.    No.

13   Q.    Is there anything that you're aware of, any asset

14   or income that you have, that the entities have or that

15   Mr. Pappas has that you have not disclosed when you

16   were aware of it?

17   A.    No.

18   Q.    Okay.

19              MR. SWIFT:  I have nothing further, Your

20   Honor.

21              THE COURT:  Mr. Bennett-Smyth?

22                    REDIRECT EXAMINATION

23   BY MR. BENNETT-SMYTH:

24   Q.    Ms. Delaney, you and Mr. Pappas live at 241 Church

25   Street, correct?

1   A.   Yes.

2   Q.   And that property is owned by Crystal Creek Farms,

3   LLC.

4   A.   Yes.

5   Q.   How much rent do you and Mr. Pappas pay to the

6   owner of that property?

7   A.   How much do we what?

8   Q.   How much rent do you and Mr. Pappas pay to the

9   owner, to Crystal Creek Farms?

10  A.   How much rent do we pay to Crystal Creek?

11  Q.   Yes.

12  A.   We do not.

13  Q.   You do not.  So you live there for free?

14  A.   We pay the mortgage on the property.

15  Q.   Okay.

16  A.   The mortgage is under Charlie's name, so it gets

17  -- he pays the mortgage.

18  Q.   How much is the mortgage each month?

19  A.   It's 1,730 plus -- that's without the taxes.

20  Q.   Okay.  So it's -- and do you pay the taxes on that

21  property?

22  A.   They're overdue.  I have not.

23  Q.   Okay.  But do you pay the mortgage on that

24  property?

25  A.   The mortgage does get paid on that property, yes.

1    Q.    You pay on that part.

2    A.    Yes.

3    Q.    And I believe that you just testified that you use

4    the rents from Normandies Park to pay that mortgage; is

5    that --

6    A.    That's our only source of income.

7    Q.    That's what Mr. Pappas does, he takes those rents

8    and he pays the mortgage on your property?

9    A.    And operates the park, and then what's left we'll

10   pay the mortgage.  We haven't been on time in the last

11   year or so.  We've been trying to keep it current so we

12   don't lose our residence.  But we have the note now

13   back for the taxes that we borrowed from Normandies

14   Park, that was a $35,000 note.  That money has to be

15   paid.  The rubbish removal is like $170 a month.  Then

16   there's the maintenance, we have two houses that -- the

17   trailers are owned by the tenants, but there's two

18   houses on the property that are not owned by the

19   tenants, and those two individual properties need to be

20   maintained.  So the money also goes into that.

21        If there's money left to pay the mortgage, then we

22   do.  So the mortgage has not always been on time.

23   Q.    What bank account does the money to pay that

24   mortgage come from?  You said Mr. Pappas pays that

25   mortgage.  Where does -- what bank account does he pay

1    it from?

2    A.    We pay -- we've been paying it with a bank check.

3    Q.    With a bank check.  Explain that to me.

4    A.    He cashes the checks from Normandies Park and then

5    pays the bills with it.

6    Q.    Every month.

7    A.    Yes.

8          (Pause.)

9    Q.    When we were here in December there was a tax sale

10   pending on the property.

11   A.    Yes.

12   Q.    And there no longer is, correct?

13   A.    No.   That's where some of the money has to go

14   every month.  We have to pay that money back.  He

15   borrowed it.

16   Q.    And who did you borrow it from?

17   A.    He borrowed it from his sister.

18   Q.    From your sister-in-law.

19   A.    Yeah.

20   Q.    And is there any documents evidencing that loan?

21   A.    No.

22   Q.    And how much do you pay back each month?

23   A.    How much do we pay back this month?

24   Q.    Each month.  Each month.

25   A.    I don't -- I don't handle that.

1    Q.    Okay.  Who handles that?

2    A.    Charlie does.

3    Q.    Okay.

4          (Pause.)

5              MR. BENNETT-SMYTH:  Nothing further, Your

6    Honor.

7              THE COURT:  Thank you.

8              Mr. Swift, anything further from Ms. Delaney?

9              MR. SWIFT:  Yes, Your Honor.  Thank you.

10                        RECROSS EXAMINATION

11   BY MR. SWIFT:

12   Q.   Ms. Delaney, in the disclosure information where

13   you listed debts of Charles Pappas, there's a reference

14   to item number 11, Patricia Hogan, $35,000?

15   A.    Yes.

16   Q.    Is that the money that was borrowed to pay the

17   taxes at Normandies Park so there wasn't a foreclosure?

18   A.    Yes.

19   Q.    And who was Patricia Hogan?

20   A.    Charlie's sister.

21   Q.    Okay.  So Charlie spoke to his sister, got the

22   money so that there wouldn't be a foreclosure.

23   A.    Yes.

24   Q.    And because it's brother and sister there was no

25   document signed?

1    A.    Correct.

2    Q.    So there's not a note, a document that can be

3    signed and provided.

4    A.    No.

5    Q.    And Charlie, because it's his sister, has made

6    arrangements with her that he'll pay her as he can.

7    A.    Yes.

8              MR. SWIFT:  I have nothing further.

9              THE COURT:  Thank you.

10             Anything else?

11             MR. BENNETT-SMYTH:  Oh.  Northing further,

12   Your Honor.

13             THE COURT:  Thank you.

14             Thank you, Ms. Delaney.  You can step down.

15        (Witness excused.)

16             THE COURT:  We need to take a brief recess so

17   I can take a grand jury return.  So counsel are excused

18   if you'd like, and this should be about five minutes or

19   so.

20             MR. BENNETT-SMYTH:  Thank you, Your Honor.

21        (Recess:  11:47 a.m. to 11:59 a.m.)

22             THE COURT:  Thank you.  Mr. Bennett-Smyth, do

23   you have another witness?

24             MR. BENNETT-SMYTH:  Yes, Your Honor.  We

25   would like to call Charlie Pappas to the stand.

1          THE COURT:  Mr. Pappas, okay, please.

2      (Pause.)

3      CHARLES PAPPAS, PLAINTIFF'S WITNESS, SWORN

4          THE CLERK:  Please be seated.  State your

5  name and spell your last name and state your business

6  address.

7          THE WITNESS:  Charles Pappas, P-A-P-P-A-S,

8  241 Church Street, Brooklyn, Connecticut.

9          THE COURT:  Thank you, Mr. Pappas.  If you

10  could keep your voice up I think it would make it a lot

11  easier for all of us here.

12          THE WITNESS:  Okay.

13          THE COURT:  The acoustics are really bad.

14          Mr. Bennett-Smyth?

15          MR. BENNETT-SMYTH:  Thank you, Your Honor.

16          I'd like to show Mr. Pappas Exhibit 11.

17          THE COURT:  Yes.

18      (Pause.)

19          MR. BENNETT-SMYTH:  Your Honor, I'm handing

20  Mr. Pappas Exhibit 11.  It looks like I forgot to ask

21  Ms. Delaney for the exhibits back before she stepped

22  down.  Could I ask Mr. Pappas to hand those to Your

23  Honor?

24          THE COURT:  Certainly.

25          THE WITNESS:  Here you go.  Thank you.

1          MR. BENNETT-SMYTH:  And I think one of those

2    is an original and one is a copy.

3                    DIRECT EXAMINATION

4    BY MR. BENNETT-SMYTH:

5    Q.   Mr. Pappas, you have a -- I apologize.  Good

6    morning, Mr. Pappas.  My name is Tim Smyth, we've

7    spoken before.  I represent Ms. Parris in this case.

8         You have Exhibit 11 in front of you.

9    A.   Yes, I do.

10   Q.   And that document says, "I, Charles Pappas, have

11   reviewed compliances filed on my behalf including all

12   partial compliances, and the second supplemental

13   compliance, third supplemental compliance, fourth

14   compliance, fifth compliance, sixth compliance, and

15   seventh compliance, and they are true and accurate to

16   the best of my knowledge."

17        And that document is signed by you and notarized,

18   correct?

19   A.   That's correct.

20   Q.   So the Plaintiff propounded discovery on December

21   27, 2011, and all of these compliances and supplemental

22   compliances are your attempts to respond to that

23   discovery.  And you've -- is that correct?

24   A.   Yeah.

25   Q.   And would you just slide that microphone over, Mr.

 1   Pappas?  There we go.

 2   A.   Yeah.

 3   Q.   And you've reviewed them and you've done the best

 4   you can to be truthful in responding to them?

 5   A.   To the best of my knowledge, yeah.  I believe it

 6   is.

 7        (Pause.)

 8           MR. BENNETT-SMYTH:  Your Honor, I believe

 9   it's Exhibit 13, it's the Maine installment contract.

10   No, Your Honor.  It must be 12.  Yeah, it must be 12.

11   Sorry.

12   BY MR. BENNETT-SMYTH:

13   Q.   And Mr. Pappas, could you hand 11 --

14   A.   Yeah, yeah.

15           MR. BENNETT-SMYTH:  So the Court has provided

16   Mr. Pappas Exhibit 12, which is the Maine installment

17   contract that Ms. Delaney previously testified

18   concerning.

19   BY MR. BENNETT-SMYTH:

20   Q.   Mr. Pappas, could you look at the last, the second

21   to the last page of that document?  And it says there

22   -- are you looking at the second to the last page?

23   It's marked page 6 in the upper left-hand corner.

24   A.   Yes, I am.  Yup.

25   Q.   And it says there Charles Pappas, purchaser, and

1   there's your signature.

2   A.    That's correct.

3   Q.    And you signed this document?

4   A.    Yes, I did.

5   Q.    And you paid the vendor, Todd B. Fay and Jennifer

6   J. Fay, you paid them $15,000; is that correct?

7   A.    Yes, we did.

8   Q.    And what bank account did that $15,000 check come

9   from?

10  A.    Oh, I don't know.  I have no idea.  I have no

11  idea.

12  Q.    And did you provide that check and execute that

13  agreement?  This was the Maine home as Ms. Delaney

14  testified.  You had planned to move there?

15  A.    Well, eventually we were going to.

16  Q.    Were you going to use it as like a second home or

17  a vacation home until that time?

18  A.    No.  I think we were going to move there

19  permanently.

20  Q.    You were going to move there permanently.

21  A.    Yup.

22  Q.    Okay.  So that was going to be your personal

23  residence.

24  A.    Probably.

25  Q.    Okay.

1      One of the things that we asked in our discovery

2  and you've responded to several times concerns the

3  property you owned and when you sold or conveyed that

4  property.  When is the last time you, Mr. Pappas, or

5  any business that you have an interest in, sold or

6  conveyed real property?

7  A.   I don't know.  It's been a long -- I don't know.

8  Q.   Has it been more than a year?

9  A.   I don't know.  I -- not that I know of.  I don't

10  know.

11  Q.   Mr. Pappas, in the last 12 months have you

12  personally sold any real property?

13  A.   I really -- I can't remember, to be honest with

14  you.

15  Q.   You can't remember?

16  A.   No.

17  Q.   You may have forgotten selling real property in

18  the last 12 months?

19  A.   Yeah.

20  Q.   Do you know whether you sold or conveyed any real

21  property in the last two years?

22  A.   In the last two years it would be even -- I don't

23  know.

24  Q.   Okay.

25  A.   I really don't.

1    Q.   What is the last piece of real property that you

2    remember selling or conveying?

3    A.   Oh, Jesus.  I don't know.  Honestly I can't

4    remember right now.  My mind is blank.  I can't

5    remember.

6         (Pause.)

7         MR. BENNETT-SMYTH:  Your Honor, I'd like to

8    show the witness Exhibit 6, which is the Defendants'

9    fourth supplemental compliance.

10        (Pause.)

11   BY MR. BENNETT-SMYTH:

12   Q.   Mr. Pappas, this document, Exhibit 6, the fourth

13   supplemental compliance of the Defendants to the

14   Plaintiff's first set of interrogatories and request

15   for production, you've sworn to the truth of this

16   document based on your personal knowledge.

17        Do you see paragraph 8 on page 2?

18   A.   Paragraph 8?

19   Q.   Page 2, paragraph 8.  The second page of the

20   document, paragraph number 8.

21   A.   Okay.  Yup.

22   Q.   What does that say?

23   A.   It says the Defendants haven't sold any assets.

24   Q.   Okay.  And would that include any real property?

25   A.   I imagine.  I don't know what you're talking --

1   what you're getting at.

2   Q.   I'm asking you when you swore to the truth of the

3   statement the Defendants have not sold any assets, were

4   you stating that the Defendants have not sold any real

5   property?

6   A.   I imagine, yeah.

7   Q.   Well, do you know?

8   A.   Do I know what?

9   Q.   Do you know whether or not that's what you were

10  swearing to?

11  A.   I guess.  I really -- I don't know.  I guess

12  that's what I said.

13  Q.   And you didn't say I don't remember when I last

14  sold real property, did you?

15  A.   No.

16  Q.   But your testimony here today is you have no

17  recollection of when the last time you sold real

18  property is.

19  A.   Honestly, I can't remember when the last time it

20  was, no.

21  Q.   Isn't it true that you sold real property located

22  at 44-48 Barber Street in Providence, Rhode Island on

23  November 29, 2011 by warranty deed?

24  A.   2011?

25  Q.   Yes.  Approximately four months ago.

1    A.    Okay.  I'm not sure if that's when it was.

2    Q.    Did you ever own a property located 44 to 48

3    Barber Street in Providence, Rhode Island?

4    A.    Yup.

5    Q.    Okay.  And you sold that property, didn't you?

6    A.    I don't remember when it went through.

7    Q.    Okay.

8          (Pause.)

9          MR. BENNETT-SMYTH:  Your Honor, I've marked

10   as Exhibit 14 a certified copy of a warranty deed.  I'd

11   like to offer that as a full exhibit.  It's a warranty

12   deed, Charles Pappas selling the property located at 44

13   to 48 Barber Street in Rhode Island to the Housing

14   Preservation Group, LLC.  It's dated November 29, 2011

15   and it was filed with the Office of Land Records on

16   December 7, 2011.

17         THE COURT:  Mr. Swift?

18         MR. SWIFT:  There's been no authentication by

19   the witness yet, so I think he should show it to him

20   and if he can identify it, then it could be an exhibit,

21   Your Honor.

22         MR. BENNETT-SMYTH:  It's self-authenticating,

23   Your Honor.  It's a certified copy.

24         MR. SWIFT:  Well, I don't know which Charles

25   Pappas it is.  It doesn't mean it's this Charles

1    Pappas.

2              THE COURT:  Well, this Charles Pappas said he

3    owned that property, so the objection is overruled.  14

4    can be marked as a full exhibit.

5         (Pause.)

6    BY MR. BENNETT-SMYTH:

7    Q.   Mr. Pappas, isn't it true that you sold the

8    property located at 44-48 Barber Street on November 29,

9    2011 for consideration of $80,000 to the Housing

10   Preservation Group, LLC?

11   A.   Yes, I did.

12   Q.   And you've never disclosed that sale in this case,

13   have you?

14   A.   Nope.

15   Q.   And you've never disclosed that property in this

16   case, have you?

17   A.   Nope.

18   Q.   And you never disclosed any records evidencing

19   your payment of $80,000, have you?

20   A.   Nope.

21   Q.   Do you see in the middle of the first page of the

22   warranty deed where it says, "I, Charles Pappas, do

23   hereby covenant that I am a resident of Rhode Island in

24   compliance with RIGL 4430-71.3"?  Do you see that?

25   A.   Um-hum.

1    Q.    Where in Rhode Island do you reside?

2    A.    It was saying it was 44 Barber Street.

3    Q.    Did you reside there?

4    A.    No.

5    Q.    Okay.  Are you familiar with Rhode Island General

6    Law 4430-71.3?

7    A.    No.

8          (Pause.)

9              MR. BENNETT-SMYTH:  Your Honor, I would like

10   to offer Rhode Island General Law 4430-71 as a full

11   exhibit.

12             THE COURT:  This will be Exhibit 15.

13             MR. BENNETT-SMYTH:  15.

14             THE COURT:  Mr. Swift?

15             MR. SWIFT:  I haven't seen it.

16         (Pause.)

17             MR. SWIFT:  No objection, Your Honor.

18             THE COURT:  Thank you.  Exhibit 15 to be

19   marked as a full exhibit by agreement.

20         (Pause.)

21   BY MR. BENNETT-SMYTH:

22   Q.   Mr. Pappas, can you read subsection A there, the

23   first paragraph on the first page of Exhibit 15.  Sale

24   of real property by non-residents withholding

25   requirements.  Can you read subsection A please?

1          MR. SWIFT:  Are you asking him to read it out

2    loud?

3          MR. BENNETT-SMYTH:  Yes.

4          MR. SWIFT:  I object.  It's a full exhibit.

5    The Court and review it and look at it.  I don't know

6    what the purpose of having him read that --

7          THE COURT:  Objection is overruled.

8          You can read it, Mr. Pappas.

9    A.   Okay.  In the sale of real property, associated

10   tangible property owned by a non-resident, the buyer

11   shall be (inaudible) payments in the amount of equal to

12   6 percent of the total payment for non-residential

13   individuals (inaudible) partnerships in trust, and 9

14   percent of total for non-resident corporations.  The

15   purpose of this section, a non-resident corporation is

16   a corporation that is neither incorporated in the state

17   nor authorized by the Secretary of State or the banking

18   corporations to do business in the state.

19   BY MR. BENNETT-SMYTH:

20   Q.   And with respect to the sale of 44 to 48 Barber

21   Street on November 29, 2011, that sales tax was not

22   withheld, was it?

23   A.   I don't know if it was.

24   Q.   Before selling 44 to 48 Barber Street, you

25   collected the rents on that property, didn't you?

1   A.   On occasion, yup.

2   Q.   What bank account did you put those rents in?

3   A.   We didn't.

4   Q.   Who's "we"?

5   A.   I didn't.

6   Q.   What did you do with it?

7   A.   They usually paid us in cash, if there was even

8   tenants there.  A lot of times there was no tenants

9   there.

10  Q.   What did you do with the cash?

11  A.   Paid bills.

12  Q.   What bills?

13  A.   Whatever bills needed to be paid.

14  Q.   On December 29, 2011 you paid the City of

15  Providence $14,880.75 in back taxes, didn't you?

16  A.   I -- maybe, yup.  When was that?

17  Q.   December 29, 2011.

18  A.   Oh, I don't know.  2011?  I don't know.

19  Q.   Well, Mr. Pappas, we're talking about four months

20  ago.

21  A.   Oh, I don't know.  I don't know.

22  Q.   So you sold the property on November 29, 2011, a

23  week before the last hearing we had here.  And that

24  document was registered with the land records the day

25  before the last hearing we had here on December 7,

1    2011.  And then a few weeks later you paid the City of

2    Providence 14,000 --

3    A.   I didn't pay the City of Providence nothing.  I

4    didn't pay any taxes.  I didn't pay the City of

5    Providence nothing.

6            MR. BENNETT-SMYTH:  Your Honor, I have a

7    certified copy, a treasurer's certificate of receipt of

8    money paid for purpose of redemption, the State of

9    Rhode Island, Providence Office of the Treasurer.  This

10   document evidences that $14,880.75 were paid by Charles

11   Pappas, PO Box 544, Danielson, Connecticut 06239 on

12   December 29, 2011.  I offer it as a full exhibit.

13           THE COURT:  This will be 16?

14           MR. BENNETT-SMYTH:  16, Your Honor.

15           THE COURT:  Show it to Mr. Swift.

16       (Pause.)

17           MR. SWIFT:  No objection, Your Honor.

18           THE COURT:  Thank you.  16 will be a full

19   exhibit absent objection.

20       (Pause.)

21   BY MR. BENNETT-SMYTH:

22   Q.   Mr. Pappas, please review the document, Exhibit

23   16, that I've just placed in front of you.

24           THE WITNESS:  Your Honor, I didn't do this.

25   BY MR. BENNETT-SMYTH:

1  Q.   Mr. Pappas, has this payment of $14,880.75 ever

2  been disclosed in this case in any of your responses to

3  our discovery?

4  A.   No, it hasn't.

5  Q.   Mr. Pappas, one of the things you've disclosed

6  several times in this case are you interests in various

7  LLCs.  I'm sorry, actually, I'll give that document

8  back to the Clerk.

9       So dating back to last spring when you began

10 disclosing assets in this case, you disclosed various

11 membership interests in various LLCs.  Is that correct?

12 A.   Yeah.

13 Q.   To date you've disclosed interests in Crystal

14 Creek Farms, LLC; Northeast Waste, LLC; Anna Alexis,

15 LLC; Normandies Park, LLC; Max CT, LLC; and Otis

16 Street, LLC.  Is that correct?

17 A.   That's correct.

18 Q.   Do you have a membership interest in any other

19 LLCs?

20 A.   Not to the best of my knowledge, unless you pull

21 up something that's never been worked or used or

22 something.  Not to my best of my knowledge.

23 Q.   Are you a member of any LLCs that -- are you a

24 member of any limited liability companies outside the

25 State of Connecticut, in other states?

1   A.   In other states?  Not that I know of.

2   Q.   What about within the state of Connecticut, are

3   you a member of any other limited liability companies?

4   A.   Not to the best of my knowledge.

5   Q.   And have you tried to determine all of the limited

6   liability companies in which you're a member?

7   A.   Yeah.  The ones that are operational, you know

8   them all.

9   Q.   You're also a member in Plainfield Transfer, LLC,

10  correct?

11  A.   Plainfield Transfer?

12  Q.   Yes.

13  A.   There was never any Plainfield Transfer, sir.

14  Q.   Plainfield Transfer Limited Liability Company.

15  A.   It was just something that was set up but never in

16  use.

17  Q.   And it was filed with the Secretary of State,

18  correct?

19  A.   I have no idea.

20  Q.   What about Pappas Family Limited Liability

21  Company?

22  A.   Never used.

23  Q.   That's not my question, Mr. Pappas.  My question

24  is does the limited liability company exist and are you

25  a member.

1    A.   I don't think it exists.  It's like -- I don't

2    think those even exist.  I don't even know.  I know

3    they don't exist.  I mean there's never been anything

4    done with them.

5              MR. BENNETT-SMYTH:  Your Honor, with respect

6    to Plainfield Transfer, LLC and Pappas Family, LLC, our

7    investigation of the Defendants in this case is

8    ongoing.  We've been able to obtain from the Commercial

9    Recording Division, Secretary of State of Connecticut,

10   business inquiries through the Concord system.  We've

11   been able to obtain evidence that these LLCs exist and

12   Mr. Pappas is a member.  I don't have certified copies

13   from the Secretary of State, Your Honor.  I request

14   permission to file those with the Court after this

15   hearing.

16             MR. SWIFT:  I'm not sure what the point is,

17   but if he wants to ask the witness if he opened the

18   businesses in those LLCs, he can say.  It sounds like

19   he's going to say he did, so then their existence will

20   be confirmed I think by Mr. Pappas.  I don't know if we

21   need anything further than that.  I think he can

22   authenticate they're --

23             THE WITNESS:  No, no business was ever --

24             MR. SWIFT:  No, Mr. Pappas, he has to ask you

25   a question.

1          THE WITNESS:  Oh.

2    BY MR. BENNETT-SMYTH:

3    Q.    Was Plainfield Transfer, LLC ever registered with

4    the Secretary of State?

5    A.    I don't know if it was.  Obviously it was, but

6    there was no business or nothing that has to do with

7    that.  Nothing.

8    Q.    Okay.

9    A.    It was a dream.

10   Q.    And Pappas Family, LLC?

11   A.    Same thing.

12   Q.    So just to your attorney's point, is it fair to

13   say that you admit that they were created but you're

14   saying no business was ever done?

15   A.    That's correct.

16   Q.    And is it fair to say that you're listed as a

17   member for both of them?

18   A.    Yup.

19   Q.    Okay.

20         (Pause.)

21   Q.    Mr. Pappas, Robin Delaney testified earlier today

22   that she has performed work for a man named Joseph J.

23   DeAngelis in the past.  Do you know that man?

24   A.    Well, I know of him from her, yeah.

25   Q.    Do you know him?

1   A.   Yeah, I know him as a person, yeah.

2   Q.   Okay.  Has he ever been your attorney?

3   A.   Has he ever been my attorney?

4   Q.   Yes.

5   A.   I think so, yeah.

6   Q.   And have you ever done any business with him?

7   A.   I think so, yeah.

8   Q.   What business have you done with him?

9   A.   Just a couple of closings here and there that I

10  can remember.

11  Q.   Could you explain that answer?

12  A.   It might have been something that we bought or

13  sold.  I mean it's been -- I don't know what business

14  that I've done other than he's been an attorney for --

15  he's a real estate attorney.

16  Q.   Okay.  Are you familiar with the company Turning

17  Stone Realty, LLC?

18  A.   I believe it's his company.

19  Q.   Are you familiar with it?

20  A.   Not really.

21  Q.   Did you own a house at 24 Bunny Trail in Hope,

22  Rhode Island with Turning Stone Realty, LLC?

23  A.   I can't recall.  24 Bunny Trail, I don't recall

24  that.

25  Q.   In Hope, Rhode Island.

1   A.   I can't recall.

2   Q.   Have you ever performed any construction or

3   renovation work for Turning Stone Realty, LLC?

4   A.   I could have.

5   Q.   When was the last time you did?

6   A.   Oh, a long time ago.  I don't remember.

7   Q.   More than a year ago?

8   A.   I don't know.  Yeah, I would say so.  I'm not

9   sure.  I can't answer that.

10       (Pause.)

11           MR. BENNETT-SMYTH:  Nothing further, Your

12   Honor.

13           THE COURT:  Thank you, Mr. Bennett-Smyth.

14           Mr. Swift?

15           MR. SWIFT:  Thank you, Your Honor.

16                    CROSS EXAMINATION

17   BY MR. SWIFT:

18   Q.   Mr. Pappas, let me first ask you about how you're

19   feeling.

20   A.   How am I feeling?

21   Q.   Yeah.  What's the affect of all this lawsuit been

22   on you, the asset issues?

23   A.   Oh, I'm seeing psychiatric things now.  I got the

24   appointments -- I haven't slept in months.

25   Q.   What has been -- what's started this whole process

1    with you in terms of your condition and going to seek

2    care?

3                MR. BENNETT-SMYTH:   Objection, Your Honor.

4    Relevance.

5                THE COURT:   Overruled.

6    A.    It's just the pressure.   Every day it's just the

7    pressure.   I wake up and all I think about is this

8    lawsuit and it just -- I told the (inaudible) I can't

9    do it anymore.

10   BY MR. SWIFT:

11   Q.    You gave testimony before when you were asked

12   questions that your mind was blank.   What did you mean

13   by that?   When you were asked the question about trying

14   to remember transactions and events.

15   A.    I just can't, I can't even do it anymore, Your

16   Honor.   I just can't.   I can't even think if anything.

17   My life is just -- it's -- I just, I can't do it.

18   Q.    Let me ask you this.   In terms of paperwork

19   between you and Ms. Delaney over the years, who's been

20   the one that's handled the transaction end of things?

21   A.    Yeah.   Robin does all the paperwork.   I don't do

22   any of that.

23   Q.    Okay.   In terms of your memory of a day you did a

24   certain project or the day you dealt with Mr. DeAngelis

25   or those kind of things, are you a date type of person?

1    A.    No, no.

2    Q.    I have to ask you about this Exhibit 16 and 14.

3    There was a reference to a transaction in Providence, a

4    piece of property on Barber Street.  Were you the owner

5    of that property?

6    A.    Yeah.

7    Q.    Did you have somebody, a lawyer or somebody else

8    handle the transaction, or did you handle it

9    personally?

10   A.    No.  No, they did.  They did.

11   Q.    And when you say "they," was it an attorney?

12   A.    Yeah, it was Mr. DeAngelis.

13   Q.    Okay.  And in terms of the paperwork, you were

14   asked about this warranty deed that listed you as being

15   a Rhode Island resident.  Did you read the statutes

16   before you signed this deed?

17   A.    I didn't, no.  No.

18   Q.    Who prepared the deed for you?

19   A.    Probably Mr. -- I don't know who did it.  To be

20   honest with you, I don't know.

21   Q.    Whoever was handling the transaction, in other

22   words?

23   A.    I imagine, yeah.

24   Q.    It wasn't you.

25   A.    No.

1    Q.   Okay.  You were asked before about paying

2    Providence.  You said you didn't pay Providence

3    anything.

4    A.   No.

5    Q.   We certainly have a piece of paper here --

6    A.   I didn't, I didn't.  I didn't do any of that.

7    Q.   You had somebody sell the property.

8    A.   Yup.

9    Q.   And then whatever their debts were, somebody paid

10   them off.

11   A.   Yup.

12   Q.   In terms of the -- it lists here a purchase, on

13   Exhibit 14, a sales price of $80,000.  How much was

14   left after all the expenses were paid?

15   A.   None.  I didn't -- none.  There's nothing.

16   Q.   Okay.  So in other words, at the end of the

17   transaction -- you're familiar with closings where

18   there's sort of a settlement statement --

19   A.   Yeah.

20   Q.   -- that says on one side purchase price 80,000,

21   then on the next side it has expenses or whatever.

22   A.   Yeah.

23   Q.   And that at the bottom it says an amount, and then

24   it says an amount that goes to the person that sold, in

25   this case you.  What was the amount that was listed

1   that you got because of the sale?

2   A.   It wasn't much.  I can't remember, honestly I

3   can't, but it wasn't much.  It wasn't much.

4   Q.   It was less than a thousand dollars?

5   A.   What?

6   Q.   Less than a thousand dollars?

7   A.   No, no, it was more than that, but we owed a hard

8   lender, so all the money that I got went away to the

9   lender.

10  Q.   Okay.  So at the end of this transaction in regard

11  to the property on Barber Street, zero dollars went to

12  you?

13  A.   That's correct.

14  Q.   Okay.  And then you still had an ongoing

15  obligation to the hard lender?

16  A.   I -- no, not for that property, no, because they

17  were foreclosing on that property.  That property was

18  being foreclosed on.

19  Q.   Okay.

20  A.   Okay.

21  Q.   So the property was sold when there was a --

22  A.   They had a tax sale, that property was sold at tax

23  sale to -- the town took that, the City of Providence

24  took that house.

25  Q.   Okay.  And then a payment was --

1              THE COURT:  They bought the Barber Street
2    house?
3              THE WITNESS:  That's correct.  There was a
4    tax sale on that house, okay?
5    BY MR. SWIFT:
6    Q.   So then the tax was obviously paid off and the
7    rest went to the hard lender?
8    A.   Yeah, and I don't think that -- I can't remember
9    exactly what happened there, but I know that they had a
10   tax sale on the house.
11   Q.   Okay.
12        Now, you're familiar with a lawsuit that's been
13   filed against Attorney Lenardo?
14   A.   Yes, I am.
15   Q.   And was that lawsuit filed because of the issues
16   with how this particular case, the Parris case, was
17   handled or not handled by him?
18   A.   That's correct.
19   Q.   And is it your claim through that case that if the
20   appeal in this case is not successful, the Parris case,
21   that your hope is that this lawsuit is going to be the
22   vehicle that's going to provide the compensation to Ms.
23   Parris as well as to you and Ms. Delaney for your
24   losses?
25   A.   That's correct.

1    Q.   And that case was just recently filed.

2    A.   I'm not sure it's recently.  I don't even know.  I

3    don't know.

4    Q.   In other words, it hasn't been something that's

5    gone on a long time.  It's something that's just in its

6    early stage.

7    A.   No, no, yeah, yeah.  Yeah.

8    Q.   Okay.

9         You were asked some questions about that Maine

10   installment contract.

11   A.   Yup.

12   Q.   Did you ever get a mortgage to buy that property?

13   A.   No, no.

14   Q.   Did you ever purchase that property?

15   A.   No.

16   Q.   Is that property owned by you or Ms. Delaney?

17   A.   No.

18   Q.   Or any of your entities.

19   A.   Nope.

20   Q.   And you had said that your plan was to move there.

21   What happened as to why that didn't take place?

22   A.   Because we can't get a mortgage and we don't have

23   any money.

24        (Pause.)

25   Q.   Mr. Pappas, you used to build homes, sell them,

1    make profit?

2    A.    Yeah.

3    Q.    In the past?

4    A.    Yup.

5    Q.    Have you done that in the last several years?

6    A.    Nope.

7    Q.    There was an issue about Crystal Creek Farms owned

8    some vehicles, vehicles that were owned by Crystal

9    Creek Farm?

10   A.    Um-hum.

11   Q.    Were they used for the purposes of Crystal Creek

12   Farm?

13   A.    Um-hum.

14   Q.    And you mentioned -- I think you filed disclosures

15   that two of the vehicles had a value of about a

16   thousand dollars, and one was about six thousand?

17   A.    Yeah, I guess.  Yup.

18   Q.    I mean we look at book value --

19   A.    Everything I have is old.  It's -- everything,

20   it's 1998, my truck that I'm driving now is a 1998.

21   And the other two trucks is a '96 and the other one is

22   a 1990 I think.  I don't even know.

23   Q.    Okay.  You had -- there was some information

24   provided about bank accounts.  Ms. Delaney, some of the

25   LLCs.  Do you maintain your own bank account?

1   A.   No, I don't.  I don't have any bank accounts.

2   Q.   Okay.

3   (Pause.)

4   Q.   Max Connecticut, LLC and Otis Street, LLC, you

5   have interest in both of those?

6   A.   Yes, I do.

7   Q.   Do they have any income producing assets?

8   A.   No, they don't.  That I know of, no.

9   Q.   Okay.  You're in that LLC with -- there was a

10   gentleman I think from Massachusetts; is that right?

11   A.   That's correct.

12   Q.   His name escapes me.

13   A.   It's Guenter Zisler.

14   Q.   Okay.  And Mr. -- is it Visler?

15   A.   Zisler.

16   Q.   Zisler.  He passed away at the end of last year?

17   A.   He passed away, yeah, he passed away about a month

18   and a half ago and that's -- I've been trying to get a

19   hold of his daughter to get the stuff, you know, to

20   send it down to you, and I called her once, she said

21   she was busy, and then I've called and I got no

22   response.  So I know it's in the interim of, I don't

23   know, something must be up, but as soon as I get a hold

24   of her I'll have her get the stuff to you.

25   Q.   Is that Katrina that we listed in the information?

1    A.    Yeah, Korina.  Korina.

2    Q.    Korina, I'm sorry.

3    A.    Yeah.

4    Q.    And she's in Massachusetts?

5    A.    Yes, she is.

6    Q.    Okay.  So you've asked her for information but you

7    don't have any records yourself for either Max CT --

8    A.    No.  No, I never did.  No, no.

9    Q.    Okay.  So any information that might exist on that

10   is not in your possession.

11   A.    No, it's not.

12   Q.    It's in Corbina's.

13   A.    Yeah.

14   Q.    Okay.

15          THE COURT:  What were those LLCs created to

16   do?

17          THE WITNESS:  Just to buy property.  Just,

18   you know, we have like three pieces of property, they

19   were just to buy the land, you know.  It was just --

20   that was it I guess.

21          THE COURT:  So do you know if those LLCs

22   still (inaudible)?

23          THE WITNESS:  They own the land, yeah.

24   That's all.

25          THE COURT:  The two of them.

84

1          THE WITNESS:  Yeah, they own the land.  Yup.

2     BY MR. SWIFT:

3     Q.    And the property that they own, it was listed in

4     the disclosures?

5     A.    Yeah, yeah.  Yeah, you know the land, yeah.

6     Q.    And if there's any mortgages or whatever on them,

7     those are there.

8     A.    Yeah, oh, yeah.

9     Q.    And do you know to your knowledge are any of those

10    properties for sale?

11    A.    No, there's nothing, no.  Not now, no.

12    Q.    Because of the economy?

13    A.    Yeah, yeah.

14    Q.    Okay.  In terms of the -- in Crystal Creek Farms,

15    there's two houses, one that's being rented; is that

16    right?

17    A.    Yeah.

18    Q.    And one where you live.

19    A.    No.  There's two houses that are rentals that are

20    on the other side of my property.

21    Q.    Right.

22    A.    Yup.

23    Q.    And those, there's no leases for those but there's

24    some agreement with rentals.

25    A.    No, there's no leases.  No, there's no leases.

1   Q.   And those properties are not for sale because of

2   the current market conditions?

3   A.   That's correct.

4          MR. SWIFT:  I have no other questions, Your

5   Honor.  Thank you.

6          THE COURT:  The property that's referenced in

7   Exhibit 15, Mr. Pappas?

8          THE WITNESS:  Yeah.

9          THE COURT:  On which taxes were apparently

10  paid at the end of December.  What property is that?

11          THE WITNESS:  That's -- I don't know.  It

12  says Providence.  It must be -- I don't know.  I didn't

13  even own the property they're saying that I paid the

14  taxes.  That was a tax sale there six months before

15  that.  I don't understand how it just showed up then.

16          THE COURT:  Well, did you own any other

17  property in Providence?

18          THE WITNESS:  No.  No.  Nope.

19          THE COURT:  Did you get a copy of the closing

20  statement for the Barber Street property?

21          THE WITNESS:  I don't think I even did, to be

22  honest with you.

23      (Pause.)

24          THE COURT:  Mr. Bennett-Smyth, anything else

25  for Mr. Pappas?

1          MR. BENNETT-SMYTH:  Yes, Your Honor.  May I

2     have a minute?  I'm going to try to piece together --

3          THE COURT:  Yes, certainly.

4        (Pause.)

5          MR. BENNETT-SMYTH:  Your Honor, I'd just like

6     the witness to have Exhibits 15 and 16.  And 14 too.

7        (Pause.)

8          MR. BENNETT-SMYTH:  Your Honor, the witness

9     has Exhibits 14 and 16.  I misspoke a moment ago.

10     Exhibit 14 is the warranty deed, Exhibit 16 is the

11     Treasurer's certificate of receipt of money paid for

12     purposes of redemption.

13                    REDIRECT EXAMINATION

14     BY MR. BENNETT-SMYTH:

15     Q.    Mr. Pappas, on Exhibit 14, the warranty deed, on

16     the bottom left-hand corner, you see where it says

17     property address?

18     A.    Um-hum.

19     Q.    Can you read the full property address, please?

20     A.    44-48 Barber Street.

21     Q.    Can you read the entire property address?

22     A.    Providence, Rhode Island, AP113, lot 387.

23     Q.    If you could look at Exhibit 16.  Do you see about

24     three-quarters of the down the document where it says,

25     "Description of Land"?  It's the middle of the

1  document, three-quarters of the way down.

2  A.    Um-hum.

3  Q.    In all capital letters.  Do you see that?

4  Description of Land?

5  A.    Yup.

6  Q.    Can you answer audibly for the microphone?

7  A.    Providence received for a record January 3$^{rd}$, 2012.

8  John, theirs -- I don't know him.

9  Q.    I'm sorry, Mr. Pappas --

10  A.    Oh, oh, assessor plan 113, lot 387.

11  Q.    Yeah.  That's the same piece of property, correct?

12  A.    That's what it, yeah, appears.  Yeah.

13  Q.    How many acres -- you referred to the property

14  where you live at Church Street and the Robin Way

15  properties, and you said this a couple of times, Mr.

16  Pappas.  You said that they're on the same piece of

17  property.

18  A.    That's true.

19  Q.    How many acres is that piece of property?

20  A.    Total?

21  Q.    Yes.

22  A.    130, 130-something.

23  Q.    130-something acres.

24  A.    Yeah.

25  Q.    And it has two residences which you rent out.

1   A.   Two residences which I rent out.

2   Q.   And how much do you rent those out for?

3   A.   900 apiece.

4   Q.   And what bank account do those rental payments go

5   into?

6   A.   They were going into Normandies Park or something,

7   or I just cashed them.  No, I just cashed those.  I --

8   Q.   Where do you cash them?

9   A.   Just go right to the Savings Institute and cash

10  them.

11  Q.   And what do you do with that cash each month,

12  $1,800?

13  A.   I pay the mortgage for Crystal Creek most of the

14  time.  Just to live.

15  Q.   Ms. Delaney testified earlier today and you

16  testified that you've requested the documents for Max

17  CT, LLC and Otis Street, LLC.

18  A.   Yes.

19  Q.   And what's the woman's name that you requested

20  those from?

21  A.   Corbina Peltak.

22  Q.   Peltak.  And did Corbina take an interest in those

23  limited liability company's when Mr. Visler passed?  Is

24  that what happened?

25  A.   I don't know.  I haven't --

1   Q.   Were you doing business with Corbina before Mr.
2   Visler passed?
3   A.   Just as a, you know, his daughter.  I mean I don't
4   believe, I don't know what they did on the corporations
5   because I never saw them.
6   Q.   Has your attorney ever subpoenaed those documents
7   from Ms. Peltak?
8   A.   Not that -- I don't know.  You have to ask him.  I
9   don't know.
10  Q.   And the house that you live at on that 130-acre
11  plot of land, how many square feet is your home?
12  A.   I want to say about 2,400, 2,300 square feet.  I
13  don't, you know, roughly 23, 2,000 maybe.  I don't
14  know.
15  Q.   Who was the hard lender on the 44-48 Barber Street
16  property?
17  A.   Who was the hard lender?
18  Q.   Yes.
19  A.   I believe it was a guy named D'Amico.  I don't
20  know his first name.
21  Q.   Was it Norma D'Amico?
22  A.   It could have been.  Yeah, it could have been.
23  Yeah, it could have been.
24  Q.   And did Mr. D'Amico have a mortgage deed on that
25  property?

A.   I don't even know what a mortgage deed is.

Q.   Did he have a mortgage on that property?

A.   No, I don't think so.

Q.   Was there any document memorializing your obligation to pay him?

A.   I don't know.  What does it mean?  I don't know.

Q.   Do you not understand the question?

A.   Yeah, but I don't know, what do you mean?

Q.   Your testimony, as I understand it, is that you owed Mr. D'Amico some money when you --

A.   Um-hum, yeah.

Q.   I'm asking you whether there was a contract or a mortgage or a document that evidences that --

A.   I don't know if there was.  I don't think there was.  But I don't think there was, but I don't know if there was.  But I think they put a lien on my place of 241 Church Street.  I think that's how they did it. They just put a lien on it or something.

          MR. BENNETT-SMYTH:  Nothing further, Your Honor.

          THE COURT:  Mr. Pappas, when you take the rental payments for the properties at Crystal Creek, did I understand you to say that you cashed them at the Savings Institute?

          THE WITNESS:  Yeah, I cashed them.

1              THE COURT:  Is that a bank in Danielson or --

2              THE WITNESS:  Yeah.  Yeah.

3              THE COURT:  In Danielson.

4              THE WITNESS:  Yeah.

5              THE COURT:  And then now did you pay the

6     expenses that you were paying with the money?  Did you

7     pay it in cash?

8              THE WITNESS:  Sometimes.  Most of the time I

9     paid in cash.

10             THE COURT:  And Ms. Delaney made a reference

11    to a bank check.  Did you get bank checks from the

12    Savings --

13             THE WITNESS:  Yeah, yeah.

14             THE COURT:  -- from the Savings Institute?

15             THE WITNESS:  Yeah, sometimes.  Sometimes.

16             THE COURT:  And did you, when you paid off

17    these expenses, did you receive a receipt?

18             THE WITNESS:  Most of the time, yeah.  Yeah,

19    most of the time.  You have to -- I mean Robin would

20    know that.

21         (Pause.)

22             THE COURT:  Mr. Bennett-Smyth, anything

23    further of Mr. Pappas?

24             MR. BENNETT-SMYTH:  No, Your Honor.  Thank

25    you.

1          THE COURT:  Mr. Swift?

2          MR. BENNETT-SMYTH:  Just one follow-up based

3     on your question.

4          THE COURT:  Um-hum.

5     BY MR. BENNETT-SMYTH:

6     Q.   Have you produced any receipts of any payments

7     made by bank check in this case?  Have you produced any

8     of those receipts?

9     A.   You have to ask Robin.  I don't know.  Me, I

10    didn't produce anything, no.

11    Q.   Okay.  But you swore to the truth of all the

12    productions in this case and you testified that you

13    reviewed them.  Have you produced any receipts

14    evidencing these payments by bank checks on expenses?

15    A.   I don't know.  What was the question again?  Have

16    I produced any receipts?

17    Q.   As I understand your testimony, every month you

18    get $1,800 from your two tenants (inaudible).

19    A.   Yeah.

20    Q.   And you go to the bank and you get a bank check or

21    bank checks presumably, and you made payments with

22    them; is that your testimony?

23    A.   Well, yeah, it goes to Avidia Bank to pay my

24    mortgage.  I just go right up there and I pay my

25    mortgage with it.  The mortgage I think is 1,756 and

1    the income is 1,800 or something.

2    Q.   So do you cash those checks and write a -- and get

3    a bank check through Avidia, or do you --

4    A.   Yeah, I take either the cash or bank check or

5    whatever.  I don't know.  Sometimes it's cash,

6    sometimes it's a bank check.  I don't know.

7    Q.   Sometimes you pay your mortgage by cash?

8    A.   Yeah.

9    Q.   And for those bank checks that generate receipts,

10   have you produced any of those receipts in this case?

11   A.   I don't have any record of that, no.

12            MR. BENNETT-SMYTH:  Nothing further, Your

13   Honor.

14            THE COURT:  Mr. Swift, anything else?

15            MR. SWIFT:  No, Your Honor.  Thank you.

16            THE COURT:  Thank you.

17            Thank you, Mr. Pappas.  You can step down.

18        (Witness excused.)

19        (Pause.)

20            THE COURT:  Mr. Coolican.

21            MR. COOLICAN:  Your Honor, the Defendants

22   aren't credible.  They've made disclosures, they've

23   sworn to the truth of them, and yet today we're finding

24   out for the first time about LLCs that have never been

25   disclosed, real estate transactions that have never

1    been disclosed, about property interests they've held

2    that have never been disclosed and that can't be

3    explained.  And to the extent -- they can't be

4    explained credibly.  To the extent that the incredible

5    explanations are to be believed, it's not up to the

6    Defendants to decide which LLCs to disclose, which

7    properties to disclose, how much income is worthy of

8    disclosure or not.

9           We asked for all, fulsome, complete

10   disclosures.  It's not up to them to decide what is

11   worth mentioning or not.

12          But even if it were, even if these

13   explanations they gave on the stand today were

14   acceptable, and it's their right to do that, they've

15   wasted Ms. Pappas' (sic) time, they've wasted the

16   Court's time.  They could have put all of this in sworn

17   declarations that the Court ordered a month ago, but

18   they declined to do so.  They have dragged things out

19   and they've come here today and taken the stand to give

20   these explanations.  It's completely unnecessary.  For

21   that reason alone sanctions are warranted.

22          Now, I mentioned this morning that there was

23   one thing the Defendants and Ms. Pappas -- Ms. Parris

24   can agree on, and that was the need to examine all the

25   circumstances in deciding what sanction is warranted.

1    There's a second thing we can agree on, and that's the

2    standard for a finding of contempt.  We agree with the

3    Defendants that in order for the Court to find the

4    Defendants in contempt, which we think should happen,

5    three elements must be met.  There needs to have been

6    an unambiguous order, clear and convincing evidence

7    showing that the order was violated, and that the

8    Defendants did not diligently attempt to comply with

9    that order.

10         We've easily met these three elements this

11   morning.  I don't understand the Defense to be arguing

12   that your order was in any way ambiguous.  It's crystal

13   clear on its face that over a month ago they were

14   required to make fulsome disclosures to our discovery

15   requests.  In terms of whether there is clear and

16   convincing evidence that the orders were violated, the

17   fact that discovery -- that documents continued to

18   trickle in a month after the deadline you set evidence

19   that, but more serious are the blatant falsehoods that

20   were in sworn declarations regarding the disclosure of

21   interest in LLCs and property.  And particularly

22   egregious is the sale of real property three months ago

23   on the eve of the PJR hearing, and we're hearing about

24   it today for the first time.  That alone is clear and

25   convincing evidence that the Defendants did not comply

1   with your order.

2           In terms of diligence, it's hard to

3   countenance stories of 70 hours of work in complying

4   with this discovery in light of the fact that a Motion

5   for Sanctions is now on the table.  Rushing to produce

6   documents at the last minute on the eve of a sanctions

7   hearing is not diligence, it's self-preservation.

8           Given these circumstances, we stand by the

9   request in our papers that the Court find the

10  Defendants in contempt and confine them until such time

11  as they comply in full with our discovery requests.

12          If some lesser sanction is deemed appropriate

13  in this case, we would ask that the Court appoint a

14  Special Master at the cost of the Defendants to

15  investigate their finances in full to make a

16  determination of what assets they actually have.  In

17  our view, we're not sure what assets the Defendants

18  have.  That's the point of this discovery.  We can't

19  determine what assets they have until we get a

20  complete, fulsome and truthful disclosure.  We haven't

21  gotten that yet.

22          We would also ask the Court to reconsider our

23  pending request that the Defendants, as an alternative

24  remedy, post a bond in the amount of the judgment in

25  this case.  And as we requested in our papers we think

1   we're certainly entitled to our attorneys' fees at this

2   point, not only in bringing the sanctions motion, but

3   throughout the course of asset discovery.

4          If the Court doesn't have any questions --

5          THE COURT:  Let me hear from Mr. Swift.

6          MR. SWIFT:  Your Honor, in the Motion for

7   Sanctions the overriding theme of counsel has been that

8   there's been a dissipation of assets and there's hiding

9   of assets.  There's no evidence of any dissipation of

10  assets.  The argument they made at one time was because

11  mechanics liens were placed on the property, that's

12  dissipation.  That was done by contractors who did work

13  on the premises at Normandies Park.  And we were here

14  one time where the Plaintiffs were arguing how come

15  they're not spending any money to maintain the

16  premises.  Well, they spent $300,000 maintaining the

17  premises and those parties who were not paid because

18  there's no money put mechanics liens on the property.

19         So the Plaintiffs can't have it both ways.

20  To protect the property, keep it up, but don't spend

21  any money.  That's what's happened.  The reality here

22  is, and I know the Plaintiff is frustrated and so is

23  Mr. Pappas, but the issue is there aren't money --

24  there isn't money.  There's not a pot of gold sitting

25  here.

1          Counsel just made reference to not being told

2     about a sale made by Mr. Pappas.  Mr. Pappas just

3     testified it was a foreclosure sale.  He didn't sell

4     anything.  It was a foreclosure sale and he received no

5     money.  This issue of --

6          THE COURT:  No, he didn't actually say he

7     received no money.  He said he didn't receive much

8     money.

9          MR. SWIFT:  Right, and he said that there was

10    a hard lender that had to be paid or expenses paid,

11    yeah, that's what he testified to.

12         The standard at this -- there's three claims

13    for relief sought.  First they want confinement, which

14    serves no purpose because there's no way if in fact

15    there is any more information (inaudible) can be

16    provided from a jail cell.

17         Second, they want a Special Master appointed

18    at the expense of the Defendants.  The Defendants don't

19    have any money to pay their taxes.  They certainly

20    don't have money to pay a Special Master to go through

21    and look at more information.

22         We have provided, Your Honor, a mountain of

23    evidence.  Your Honor has a notebook full of

24    information provided.  Bank accounts which show minimal

25    amounts, property along with lists of all the debts on

1    them would show that they haven't gone out and spent

2    the money to appraise all these properties where they

3    have liens on it which in their opinion is worth more

4    than the property.  They haven't spent the money to

5    appraise them.  One of the issues in the motion is that

6    we should have to provide them what the value of the

7    property is.  My clients don't know because they're not

8    going to go out with the money they don't have to have

9    an appraisal.  They do know what the debts are, they do

10   know what's happened in the economy, they know what

11   happened in the last hearing.  I think we had testimony

12   what happened with Normandies Park in term of its

13   value, how that's reduced.

14           So the standard is clearly they have to show

15   that there was no diligence on the part of the

16   Defendants.  The efforts that have been made and the

17   materials provided to Your Honor and the number of

18   potential sources of information, including Corbina,

19   Katrina in Massachusetts who hasn't responded.  There's

20   a number of sources.  They have tried to get

21   information.

22           All of the information that's coming in is

23   not showing an asset that's going to satisfy this

24   judgment.  That's the problem and that's why I believe

25   the motions fail, because somehow the Plaintiff thinks

1    by coming to Court they going to force the Defendants

2    to give them an asset which they don't have.  That's

3    the problem.  The paperwork that Your Honor has, you

4    can see all the different pieces of information

5    provided, the LLCs that don't have anything, it's a

6    piece of property sitting on nothing.

7            You heard about LLCs today that were opened

8    and never acted on and they never furnished business,

9    never did anything, and then a complaint saying, well,

10   why isn't that disclosed as an asset.  There is no

11   asset.  So there's been nothing that's been disclosed

12   by all of the efforts by the Plaintiff in these Motions

13   for Sanctions and everything that's followed, that

14   there's anything that is being withheld.

15           They cite the cases where they talk about

16   situations where corporations are spending millions of

17   dollars and passing it around and say they have no

18   money.  That's not the case.  Like the last time we

19   were here they cited to Your Honor a case that said we

20   want a civil penalty against the Defendants.  Well, the

21   facts of that case were -- in that case the Defendant

22   admitted in a statement under oath where there was an

23   attempt to disclose assets, which hasn't happened in

24   this case, and they said they took money from

25   Connecticut, took it out of the bank and put it in New

1   York.  There was money that they admitted they moved

2   from one place to another.  And then the Court ordered

3   them to bring it back.

4          Then the Plaintiffs come into Court and say,

5   Your Honor, this is the authority for you to order a

6   civil penalty against the Defendants, which is not what

7   that case stood for.  Just as we look at the cases that

8   they've cited in support of their argument that Your

9   Honor should order confinement.  None of the facts of

10  the case meet this particular case.  They cite Energy

11  Capital, the Defendants distributed a million six

12  dollars in assets when there was a court order not to

13  dissipate, obviously a clear situation where money is

14  being passed out that they admitted existed for another

15  purpose when there's an order of the Court.  None of

16  that exists here.

17         They talk about the Andrews case where there

18  was an indication that assets that were asked about

19  over a period of 12 years, it was blatantly false,

20  answers given at a deposition.  There's never been any

21  deposition testimony, any issue of that.  There's never

22  been any issue even with these disclosures.  There's

23  something out there, an asset that has in any way been

24  hidden.

25         Every argument that they make they cite to a

1   case or an authority which talks about a situation

2   where there's a clear attempt on the part of the

3   Defendants not to diligently comply, but they do

4   nothing.

5          Here we have just the opposite.  The more

6   information that we provide just shows that.  You heard

7   the testimony from both Ms. Delaney and Mr. Pappas that

8   they have produced information available.  The problem

9   is the information doesn't add up to a lawsuit -- or it

10  doesn't add up to a bounty of money.  That's why I

11  mentioned the lawsuit involving Mr. Lenardo and I have

12  advised counsel that because it appears that that is

13  the asset that not only is the Plaintiff going to be

14  compensated from, but Mr. Pappas and Ms. Delaney,

15  because they have suffered because of everything that

16  we believe was started by Mr. Lenardo's lack of

17  representation of them in the beginning of this case.

18  And that's where I believe if the appeal is not

19  successful and this judgment stands, that's where the

20  funding is going to come.

21         We had a concern about insurance but recently

22  found out that there is insurance.  We haven't seen a

23  disclosure yet of the amount and I looked at the

24  judicial info website yesterday to see on the status.

25  There's only recently been an appearance filed on

1   behalf of Mr. Lenardo, but there was a phone call by an

2   adjuster saying that there was coverage.  The amount

3   will not be known until we get the answers to

4   interrogatories, but that obviously is something that

5   there is an interrogatory asking for information about

6   the Lenardo case, which as information develops -- I

7   saw last night that there was an amended complaint, I

8   got it last night, sent it to counsel this morning, and

9   that just incorporated that in fact the judgment had

10  entered in this case.  Because when the writ was filed

11  the ruling had not been received, so it updated that to

12  list as an element of damages the judgment entered.

13         So it seems to me, Your Honor, that is the

14  hope of all parties if this judgment stands as to where

15  the payment is going to come, that is the,

16  quote/unquote, asset.  Once we find out that there's

17  insurance and hopefully there's a million dollars of

18  insurance, then we'll have some assurance that there is

19  a corpus there once the case is proven.

20         So the other avenues appear to be -- that are

21  not fruitful in terms of providing an asset that will

22  satisfy this judgment.  And I know that's the

23  frustration of all parties but that's not a reason for

24  entering sanctions.

25         I think the information that's been given is

a good faith attempt to provide information.  There's a
lot of detail showing their bank record, showing
there's no large sum of money sitting there.  There's
no other information showing this piece of property,
but the way the economy is going there's tax
obligations to them.  Some of the properties, as Your
Honor has heard, have gone to tax foreclosures.  Others
they -- in one case Mr. Pappas has borrowed money from
his sister so that that property would not go to
foreclosure, so there is a hope that that property can
be maintained.

That's the reality of what the Defendants are
going through.  It's not that they have all these
assets and all this money that they're not producing it
or they're hiding it, it's just that there's things out
there that maybe ten years ago if the economy was the
way it was those would be assets where there could be
funds available, but at this time there aren't.  So
they're giving the information, they're just not
satisfying the Plaintiffs to show that there's equity
of $400,000 in anything.  So that's more the root of
the problem, not the any kind of willful intent on the
part of the Defendants, and if anything they've shown
their diligence by the supplemental disclosures by
providing information.

1      THE COURT:  Well, I'm really troubled by the

2  sale of the property (inaudible).  I'm troubled a lot,

3  but there was property as to which the Plaintiff had no

4  knowledge.  The property was apparently sold for

5  $80,000.  It was apparently redeemed for a tax payment

6  of $14,000.  If this disclosure had been made in a

7  timely way there might have been some recourse for the

8  Plaintiff with respect to some of the proceeds of the

9  sale.

10      There's been no satisfactory -- no

11  explanation about why this information wasn't disclosed

12  in a timely way to the Plaintiff.

13      MR. SWIFT:  And I think the key Your Honor

14  said is might.  Until I find out and try to determine

15  what, if we can get some kind of a statement or closing

16  statement, whatever, to see if there was any money that

17  would answer that question whether might could be yes,

18  there was some money that could have been available to

19  the Plaintiffs.  Right now we don't know and we're

20  going to try and find out if there is some kind of

21  statement saying -- I would assume there's a closing

22  and every closing has got some kind of statement that

23  shows a distribution of funds.  And then once we see

24  that that will tell us.  Right now we don't have it.

25      THE COURT:  But this happened in December and

1    we're only hearing about it today.  And why --

2           MR. SWIFT:  Well, we're not hearing about it

3    today.  Obviously counsel knew about it long before

4    because they had to get this document.  They didn't

5    mention it to me, they saved that to bring up here as

6    an element of surprise.  I understand.  But they were

7    aware of it.  If they really had a concern, Your Honor,

8    I would think they would have asked me about it and say

9    what's the story about this.  No, they wanted to make a

10   dramatic splash before Your Honor.  That's why it's

11   only been heard about today.  I mean it was a strategic

12   decision they made, but that tells me that they're not

13   trying to find assets, they're trying to find ways to

14   show to you, look at this, how dare these Defendants do

15   that.  That's what they're trying to do.  But what is

16   the next effect of it?  We don't know.

17          THE COURT:  Well, it just -- it doesn't seem

18   to have any significance to you that this sale occurred

19   before the PJR hearing?  I mean I just --

20          MR. SWIFT:  Tell me what if they've got -- if

21   there was money that went to the hands of the

22   Defendants then absolutely.  If there's money that

23   should have been available to the Plaintiff, yes, then

24   that has to be a concern because that's a whole --

25          THE COURT:  Well, but Mr. Pappas said there

1   was money owed to Mr. D'Amico, whose name he doesn't

2   know, as to whom he has no documentation about owing

3   any money whatsoever.

4          MR. SWIFT:  Right.

5          THE COURT:  And so you subtract the 14,000-

6   some-odd from the $80,000 and the result is that Mr.

7   Unknown D'Amico gets the remainder of the funds from

8   this closing based on no documented debt whatsoever?

9   You don't find that troublesome?

10          MR. SWIFT:  Your Honor, that's why I said I

11   would need to see the paperwork.  I asked Mr. Pappas

12   the questions that I did about his health condition

13   because that's the way it is.  Ms. Delaney was not

14   asked about this when she was here, and Ms. Delaney, as

15   Mr. Pappas and she both testified, is the one that

16   would handle paperwork.  I don't know if she's aware of

17   this or not.

18          THE COURT:  Well, her name is not anywhere on

19   this document.

20          MR. SWIFT:  Right.  But I don't know the

21   answer to that question and I don't know the answer to

22   the question of whether or not there was anything that

23   came out of that that should have been made available

24   to the Plaintiff, because if that's the case then

25   obviously that's a problem because the order of the

1    Court was in place.

2        THE COURT:  Well, it's a problem anyway

3    because the order of the Court was in place, because

4    they were entitled to know about this before it

5    occurred.

6        MR. SWIFT:  If it was a foreclosure sale and

7    there was no money coming out of it, I guess they could

8    be told about it, but there would be no effect.

9        THE COURT:  A foreclosure by whom?  For what?

10   They haven't disclosed -- he hasn't disclosed any

11   interest or any debt as to which this property would

12   have been foreclosed on.

13       MR. SWIFT:  I agree, Your Honor.  That's why

14   we have to find out.  I don't know the answer to that.

15       THE COURT:  I know you don't, but I still

16   haven't heard an explanation for why this information

17   wasn't provided in a timely way in accordance with the

18   Court's order.  And I realize you can't testify, but

19   there's been no explanation.

20       MR. SWIFT:  I agree, Your Honor.  And part of

21   the problem is that it was Ms. Delaney who was here and

22   is the one that did the paperwork, was not asked about

23   it.  So I couldn't ask about something I didn't know

24   existed and I don't know if she will have an answer.

25   But I can't find out until I speak to her.

1          THE COURT:  So you don't think he should be

2     locked up, and they don't have any money to pay

3     sanctions or attorneys' fees or a Master or anybody.

4     So what do you suggest that I do with respect to the

5     Motion for Sanctions?

6          MR. SWIFT:  I think, Your Honor, they have to

7     produce the information about this transaction in

8     Providence, and if -- I don't know what other

9     information we need to provide in terms of those LLCs

10    that didn't do anything or have no money, so in terms

11    of the goal here is to see if there's an asset that

12    will satisfy the Plaintiff's request.  That's the goal,

13    and I don't see how any of that is going to be

14    accomplished by any of the orders sought.

15         THE COURT:  But you don't have an alternative

16    to suggest.  I mean what is it that I can do to make

17    Mr. Pappas and Ms. Delaney be serious about this

18    disclosure?

19         MR. SWIFT:  Your Honor, I think that they've

20    shown by everything they provided that they are serious

21    about it.  Mr. Pappas has testified that it bothers

22    him, this whole thing has bothered him emotionally, but

23    he doesn't have a solution to it because he doesn't

24    have any assets to take care of it.  That's why I think

25    this lawsuit -- I mean what my -- our hope is that this

1    lawsuit is going to be the answer to both parties'

2    problems.  And so that's not going to -- there's

3    nothing we can order that would change that.  That

4    lawsuit is pending and it's going to be resolved.

5           Each time that I have asked for information

6    from my clients we get more information they provided.

7    So I have always seen that -- if they ignored it and

8    there was nothing provided, then you could say, well,

9    gee, something has got to be done to tell them this is

10    serious.  Their continuous responses show me that

11    they're serious about it.

12           THE COURT:  Yeah, but they haven't told you

13    about anything important like this property in Rhode

14    Island, or I assume they haven't told you.  I mean I

15    know you can't --

16           MR. SWIFT:  Well, we have disclosed

17    properties that -- 130 acres of property.  The problem

18    with if of course is there's a $500,000 mortgage on it.

19    But that's much more significant than an $80,000 sale,

20    gross.  We're talking -- so that's the hope.

21    Normandies Park has a value of probably $300,000.  Now,

22    it's indebted and who knows what it would it be worth

23    if we tried to sell it because obviously it's reduced.

24    But that's worth substantially more than anything at

25    Barber.

1          So the significant pieces of property are

2     there, unfortunately there's no equity in them.  But

3     those properties to me dwarf -- Barber Street gets

4     dwarfed in the process because it's such a small amount

5     of money compared to the overall scheme.  It's still

6     not enough to satisfy the situation obviously.  That's

7     the problem.  It's the lack of assets anywhere that are

8     going to satisfy the judgment that has been entered.

9     And that's why I don't see anything that would --

10    that's going to change that by any kind of sanctions

11    against Mr. Pappas.  If he's had the asset that has

12    equity in it that would satisfy the problem, it would

13    be disclosed, attached and whatever would happen to it

14    happens to it.  That's the problem.  There's not a

15    solution to this problem.  There's nothing out there

16    that exists except for this lawsuit.

17          THE COURT:  Well, what about the $2,000 in

18    income every month from the rental property?  What

19    about the rents from Normandies Park?

20          MR. SWIFT:  Well, I think Mr. Pappas

21    eloquently stated it.  There's a $1,750 mortgage,

22    there's $1,800 that come in.  That leaves $50.  That's

23    just covering the mortgage.

24          THE COURT:  Yes, but --

25          MR. SWIFT:  Normandies Park is the same

1    situation with the amount of money that comes in is

2    minimal and the expenses to pay, it ends up being a

3    wash.  Those pieces of property don't bring up anything

4    of any significance when looking at the -- if there

5    were no expenses of any type, then it would be looking

6    at income coming in with nowhere to go, but it's not

7    happening.  And the bank accounts show that, Your

8    Honor, that we produced with the minimal amounts that

9    are in them.  Money going in and, you know, minimal

10    amounts going in, minimal amounts coming out.  That's

11    the bank account records that we provided that show

12    that.

13         The Savings Institute is a place where all

14    those are.  That's why Mr. Pappas goes there, but all

15    the accounts are through that institute.  It's on one

16    of the disclosures.  So that's the bank that those

17    accounts are in.

18         But that's the problem.  There's just --

19    there's not enough to go around, and that's why these

20    tax foreclosures come up on various pieces of property

21    when the property taxes aren't being paid and the

22    municipalities are taking action.  They've waited for X

23    number of years and now they're not waiting anymore.

24         So that's my thought, Your Honor, is they are

25    showing diligence in trying to respond and give

1   information and that they're not subject to sanctions

2   because of that.  That's not a given.  The standard of

3   law, if there had been no disclosures then I'd say one

4   thing, you could say that the Defendants are not

5   recognizing the court order.  But the significant

6   number of disclosures and number of documents provided

7   show that they do take this seriously and they are

8   providing information but there's just not enough to

9   satisfy the Plaintiffs.

10          If we get the information on that and there

11  was $1,200 net, that's not going to satisfy the

12  Plaintiffs.  So what, now we got $1,200, okay, where is

13  the rest of it?

14          THE COURT:  Well, but $1,200 is better than

15  nothing.

16          MR. SWIFT:  Oh, absolutely.

17          THE COURT:  And again, you know, all we've

18  seen here is a tax, a tax lien or a tax redemption in

19  the amount of about $15,000.  There's been no evidence

20  produced of any other -- any other indebtedness with

21  respect to this property.

22          MR. SWIFT:  With all due respect, Your Honor,

23  that's because that's what the Plaintiffs have

24  provided.  I don't know what else there is because I

25  wasn't aware of it until --

1            THE COURT:  I know, but --

2            MR. SWIFT:  -- within the last hour.

3            THE COURT:  -- it's Mr. Pappas' property.  He

4    should have made you aware of it.  He should have made

5    us aware of it, us being the Court.

6            MR. SWIFT:  Right.

7            THE COURT:  And the Plaintiffs.

8            MR. SWIFT:  I agree, Your Honor.  But all I'm

9    saying is I can't respond to that until I find out of

10   there is a document that shows on the land records that

11   a mortgage was released in a certain amount.  That's

12   one other piece of paper that would give some

13   explanation as to what happened.

14           THE COURT:  And it also would have been

15   another debt that Mr. Pappas didn't disclose when he

16   was supposed to.

17           MR. SWIFT:  Yes.

18           THE COURT:  Okay.  Anything else?

19           MR. SWIFT:  No, Your Honor.

20           THE COURT:  Mr. Coolican?

21           MR. COOLICAN:  Nothing further, Your Honor.

22           THE COURT:  Mr. Coolican, have you given any

23   thought to doing judgment debtor examinations of Mr.

24   Pappas and Ms. Delaney under oath?

25           MR. COOLICAN:  Yes, Your Honor.  We are very

much looking forward to that opportunity.  We had hoped

to obtain a full production of documents in advance of

that examination so that we could adequately prepare,

and pending the outcome of this motion we'll be moving

forward with a motion for examination of debts.

THE COURT:  Well, I think it's clear that a

full disclosure has not been made, and I've heard no

explanation, no legitimate explanation for why.  So I'm

going to grant the Plaintiff's Motion for Sanctions.

I'm going to leave the issue of what the sanctions

should be open.  I'm going to let Mr. Swift have a week

to see what he can come up with with respect to these

properties and interests which have been uncovered by

the Plaintiffs and not disclosed by Mr. Pappas and Ms.

Delaney.

I think that that perhaps, and again, this is

your case, Mr. Coolican and Mr. Bennett-Smyth, so I'm

not telling you how to litigate it, but it may be that

the better way to proceed after that might be to

schedule the judgment debtor examination and put the

Defendants under oath and ask them the hard questions

and see what kind of responses you get in terms of

cooperation, because I think that would very much

influence the nature of the sanction that the Court

would be inclined to order.

1    It's a frustrating situation obviously

2 because locking the Defendants up until they comply

3 doesn't under the circumstances offer a lot of

4 assurance that there's going to be compliance because

5 the records are not, it sounds like, well kept or

6 readily obtainable.  And -- I mean I'm reserving the

7 right to that, but it seems to me that this is one of

8 those cases where Mr. Pappas and Ms. Delaney need to

9 understand that a full disclosure means a full

10 disclosure.  It means every interest in property; it

11 means every specific answer to the questions that are

12 asked even if the result of that is that there's no net

13 money for the Plaintiffs to necessarily seize at that

14 moment.

15    You know, the whole purpose of this process

16 is to give the Plaintiffs the information that they

17 need, and I know you know this, Mr. Swift, maybe Mr.

18 Pappas doesn't, so that they can make some informed

19 judgments about how to pursue the money that they're

20 owed.  It may be if they have a complete disclosure

21 that they will decide that their best chance is the

22 lawsuit.  It may be that they will decide that they

23 want to garnish the rents because there's no prospect

24 of anything else.  I mean that's a decision they're

25 going to have to make based on a sort of cost benefit

1    analysis, which they can't make unless they know what

2    the landscape looks like.  And that's why the failure

3    to disclose this piece of property was so troubling and

4    that's why it's, you know, I think so important that

5    information be obtained with respect to these LLCs as

6    to which the member has recently died.  I mean it's

7    important to know whether Mr. Pappas now is the only

8    member of the LLC and therefore in essence owns those

9    properties or whether there's some ownership interest

10   that was passed along to the daughter of the other

11   member, and what the current state of the property is.

12   And I think Mr. Pappas should need to do a whole lot

13   more than just call her on the phone.  I understand,

14   you know, perhaps it's a difficult time for her and

15   maybe she's overwhelmed, but Mr. Swift has legal

16   recourse that he can use to get these documents if he

17   needs to.

18          And right now, Mr. Pappas, you and Ms.

19   Delaney are on really thin ice and it's very important

20   that you do more than make a sort of half-hearted

21   attempt to get this information for the Plaintiffs.

22          Do I make myself clear?

23          Anything else, Mr. Coolican, that you'd like

24   to request at this time?

25          MR. COOLICAN:  No, Your Honor.

1          THE COURT:  All right.

2          Mr. Swift?

3          MR. SWIFT:  Thank you, Your Honor.

4          THE COURT:  All right.  Thank you.

5          Court will be in recess.

6     (Proceedings concluded at 1:20 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| WITNESSES FOR | | | | | |
| THE PLAINTIFF: | | | | | |
| ROBIN DELANEY | 13 | 33 | 50 | 54 | -- |
| CHARLES PAPPAS | 57 | 74 | 86 | -- | -- |

| EXHIBITS: | | Offered | Admitted |
|---|---|---|---|
| P-12 | Land Installment Contract | -- | 19 |
| P-13 | Article of Organization | -- | 24 |
| P-14 | Warranty Deed | -- | 64 |
| P-15 | RI General Law 4430-71 | -- | 65 |
| P-16 | Treasurer's Certificate | -- | 68 |

C E R T I F I C A T E

I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings
in the above-entitled matter.


/s/_____          April 6, 2012
STEPHEN C. BOWLES