UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DONNA PARRIS,                    .    Case No. 3:10-CV-01128
                                 .    (WWE)
              Plaintiff,         .
                                 .    Bridgeport, Connecticut
       v.                        .    July 19, 2012
                                 .
CHARLES PAPPAS, ET AL.,          .
                                 .
              Defendants.        .
. . . . . . . . . . . . . . .

EXAMINATION OF JUDGMENT DEBTOR
BEFORE THE HONORABLE HOLLY B. FITZSIMMONS,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:      Connecticut Fair Housing Center
                        By: TIMOTHY BENNETT-SMYTH, ESQ.
                        221 Main Street, 4th Floor
                        Hartford, CT 06106

                        Bracewell & Giuliani, LLP
                        By: MICHAEL J. COOLICAN, ESQ.
                        225 Asylum Street, Suite 2600
                        Hartford, CT 06103

For the Defendants:     Lynch, Traub, Keefe & Errante
                        By: DONN A. SWIFT, ESQ.
                        52 Trumbull Street
                        P.O. Box 1612
                        New Haven, CT 06506

_____

1          (Proceedings commenced 10:24 a.m.)

2               THE COURT:  Good morning.

3               MR. SWIFT:  Good morning, Your Honor.

4               MR. BENNETT-SMYTH:  Good morning, Your Honor.

5               THE COURT:  Everyone can have a seat.

6               This is Civil Case Number 10-CV-1128, <u>Parris</u>

7    <u>v. Pappas et al.</u>, a matter assigned to Judge Eginton,

8    and we're here this morning for the examination of

9    judgment debtor pursuant to the motions filed by the

10   Plaintiffs.  That's Number 171, which was granted.

11              So what I would propose to do is to swear in

12   the witness and then allow counsel the opportunity to

13   do the judgment debtor examination if -- and I'll be in

14   the other room doing something else.  But if you need

15   me, you should just come.

16              If there's an issue about a question or the

17   propriety of an answer, or anything like that, feel

18   free to just come and inquire, and that way you'll have

19   the opportunity to pick whatever time you need in order

20   to do a complete examination.

21              All right?  So who's going to be first?

22              MR. BENNETT-SMYTH:  Your Honor, we did have a

23   few preliminary things for you, just a few minutes.

24              THE COURT:  All right.

25              MR. BENNETT-SMYTH:  Go ahead, Mike.

1              MR. COOLICAN:  Your Honor, I'll be brief.

2         We appreciate the guidance on how this is to

3    proceed.  Two issues.

4         One is that, first, we would ask that -- we

5    understand -- We're going to call Ms. Delaney first.

6    We would ask that Mr. Pappas be excused from the

7    courtroom while we conduct the examination of Ms.

8    Delaney, and vice versa.

9         Second, we would ask, to the extent that your

10   schedule would permit, after we complete the first

11   examination, to the extent that this proceeding is

12   going to inform your motion for sanctions, we'd like an

13   opportunity to just review with you, any developments

14   in the case --

15             THE COURT:  Certainly.

16             MR. COOLICAN:  -- that come out of that.

17             THE COURT:  Okay.

18             MR. COOLICAN:  The second thing is I

19   understand you're pressed for time and I don't

20   understand Plaintiff's motion for an appeal bond to

21   have been assigned to Your Honor, but we're obviously

22   here to -- we could address any questions that the

23   Court might have on that motion, which has now been

24   fully briefed.

25             And then the third thing, and maybe this

4

1   could wait until later, would be just an update on the

2   status of discovery since the last time we met with the

3   Court in March, and I'd be happy to update you now or

4   we can address that at a different time.

5           THE COURT:  Why don't we do it now.  That's

6   probably -- It's probably the most convenient time to

7   do it.

8           MR. COOLICAN:  All right, Your Honor.

9           The sum total of new production is the 20

10  pages found in the record at 75-1, a handful of

11  documents that the Defendants have produced after the

12  motion for sanctions hearing.  I'm sorry, that's 175-1.

13          There, otherwise, have been no updates or

14  revisions to the interrogatories, despite the fact that

15  there was a showing at the last hearing, that those

16  interrogatory answers were incomplete at best, false at

17  worst.

18          There have been no additional bank records

19  produced, despite the fact that four months have

20  passed, and the Defendants have undoubtedly received

21  additional account statements.  There have been no

22  documents produced evincing any debts that the

23  Defendants claimed to have, secured or unsecured.

24          And again, this is crucial because in order

25  to permit Ms. Parris to select which properties to levy

1    against or to execute judgment liens against, she needs

2    to know what the underlying debts are, how much equity

3    is in those properties, and to date, there has been no

4    document production that shows exactly how much the

5    Defendants owe to other creditors.

6           And finally, there've been no documents

7    produced, or pleadings filed, that address or explain

8    to the Court, why it is that Mr. Pappas sold that

9    property at 44-48 Barbara Street in Providence, Rhode

10   Island.  This was a, you'll recall, an item of

11   particular concern for the Court.

12          The Defendants were given seven days to

13   explain that transaction and they produced a

14   transaction -- a document demonstrating the cash flow

15   relating to that transaction, but all -- that document

16   just shows that Mr. Pappas walked away from that sale

17   with $47,000 in cash.  There's been no explanation as

18   to what happened with that cash or why Mr. Pappas

19   thought he was free to sell that property in violation

20   of court order.  And that's where we stand today.

21          Hopefully, this -- today's proceedings will

22   clear up some of these questions, but after conducting

23   discovery essentially for a year, that's where we

24   stand.

25          THE COURT:  All right.  Thank you.

1          Mr. Swift, is there anything that you would

2    like to add on any of these issues at this time?

3          MR. SWIFT:  No, Your Honor.  My understanding

4    was we're here for examination of judgment debtor.

5    There was no advice to me from counsel we were going to

6    deal with any other issues, so I was not prepared to

7    deal with any of the things that they've just presented

8    to the Court.

9          THE COURT:  All right.

10         So at this time then, why don't you call Ms.

11   Delaney and I'll swear her in and -- or I'll have her

12   sworn in, and then you can proceed.

13         And I will hear you later, to the extent that

14   you want to raise issues with respect to the motion for

15   sanctions, okay?

16         MR. BENNETT-SMYTH:  And can we have Mr.

17   Pappas excused from the courtroom at this time?

18         THE COURT:  Yes.

19         MR. BENNETT-SMYTH:  Yes.

20         Ms. Delaney, if you could take the stand?

21         MR. SWIFT:  Do you want to swear them -- both

22   of them, Your Honor, so that if you're not available

23   later, we start (unintelligible) or we do that later

24   for --

25         THE COURT:  I'll do it later.

1          MR. SWIFT:  Okay.

2          THE COURT:  No, I'll make sure I'm available

3    to do that.

4          MR. SWIFT:  Okay.

5          THE COURT:  All right.

6          Ms. Delaney, you want to come right up here,

7    please?

8          MS. DELANEY:  Good morning.

9         ROBIN DELANEY, PLAINTIFF'S WITNESS, SWORN

10          THE CLERK:  Thank you.  Please, be seated,

11    and please state your name for the record.

12          THE WITNESS:  Robin Delaney.

13          THE CLERK:  Please give us your city and your

14    state, please.

15          THE WITNESS:  Brooklyn, Connecticut.

16          THE CLERK:  Thank you.

17          THE COURT:  Thank you, Ms. Delaney.

18          MR. BENNETT-SMYTH:  Thank you, Your Honor.

19          THE COURT:  Thank you, and you know where to

20    find me if you need me.

21                      EXAMINATION

22    BY MR. BENNETT-SMYTH:

23    Q.  Good morning, Ms. Delaney.  My name is Tim Smyth.

24    We've spoken several times now.  I'm going to try to

25    move through this as quickly as I can, so I'm going to

1  ask you the questions as quickly as I can.

2       You shouldn't feel rushed.  If you want to go back

3  and explain something, you should tell me that.  If you

4  don't understand something, you should tell me that.

5  If you don't understand the question asked, please tell

6  me that and I'll try to add some clarity.  Let's start

7  with your knowledge and relationship with Mr. Pappas.

8       What is your relationship with Charles Pappas?

9  A.   I have none.

10  Q.   You have no relationship with him?

11  A.   No.

12  Q.   Have you ever been married to Charles Pappas?

13  A.   No.

14  Q.   Have you ever been romantically involved with

15  Charles Pappas?

16  A.   Yes.

17  Q.   Okay.

18       During what time period, roughly?

19  A.   2000 to two years ago.

20  Q.   So roughly 2000 to 2010?

21  A.   Correct.

22  Q.   Did your, I'll just call it your relationship with

23  him.  I mean, did your relationship with him in 2010,

24  did that end before or after this lawsuit began?

25  A.   It ended because of the lawsuit.

1    Q.   It ended -- Could you explain that?

2    A.   No.

3    Q.   I'm sorry.

4    A.   No.

5    Q.   Why not?

6          MR. COOLICAN:   He's just trying to understand

7    what the -- if there was a reason related to the

8    lawsuit and what it was about the lawsuit.

9    A.   The stress of the lawsuit.

10   BY MR. BENNETT-SMYTH:

11   Q.   Caused your relationship with Mr. Pappas --

12   A.   Yes.

13   Q.   -- to end.

14        Do you still live at 241 Church Street?

15   A.   Yes.

16   Q.   Okay.

17        And Mr. Pappas no longer lives there; is that

18   correct?

19   A.   No, he does not.

20   Q.   Where does he live?

21   A.   I don't know.

22   Q.   Okay.

23        When did he move out of 241 Church Street?

24   A.   I don't know.

25   Q.   When is the last time you saw him at 241 Church

1    Street?

2    A.    Today.

3    Q.    When is the last time before today that you saw

4    him at 241 Church Street?

5    A.    I don't know.

6    Q.    Was it a week ago?

7    A.    No.  I don't -- I don't know.  I don't --

8    Q.    Was it a month ago?

9    A.    I don't know.

10   Q.    Was it a year ago?

11   A.    No.

12   Q.    So it was less than a year ago?

13   A.    Yes.

14   Q.    Does he come to 241 Church Street more than once a

15   month?

16   A.    No.  I do -- I don't know.  I don't keep track of

17   when he's there.

18   Q.    Okay.

19   A.    He could be there and I don't even know he's

20   there.  I don't know.

21   Q.    When you say that the stress of this lawsuit

22   caused you to break up, do you think that this lawsuit

23   is Mr. Pappas' fault?

24   A.    No.

25   Q.    Does Mr. Pappas think that this lawsuit is your

1    fault?

2    A.    No.

3    Q.    The last time we were here, we were here in March.

4    We came here on March 27th and you testified.  At that

5    hearing -- That was a hearing on our motion for

6    sanctions.  You testified that you do most of the

7    paperwork for the business ventures that you have with

8    Mr. Pappas.

9    A.    I did.

10   Q.    You did.

11         When did you stop doing that paperwork?

12   A.    I don't know.

13   Q.    Do you currently do that paperwork?

14   A.    No.

15   Q.    Did you do that paperwork last month?

16   A.    No.

17   Q.    Did you do it three months ago?

18   A.    No.

19   Q.    Six months ago?

20   A.    There are no businesses to do paperwork for.  I do

21   not know when I stopped doing it.

22   Q.    Was it more than a year ago?

23   A.    I don't know.

24   Q.    Mr. Pappas -- The last time you were here in

25   March, Mr. Pappas also testified.  You had to leave.

1   After you left, Mr. Pappas testified, and he testified

2   that you're the one that put all the paperwork together

3   for the discovery responses, the interrogatory

4   responses.

5   A.   Yes.

6   Q.   That was all work done by you?

7   A.   Yes.

8   Q.   And did you show that stuff to Mr. Pappas or did

9   you just give it to the lawyer?

10  A.   I don't remember.

11  Q.   Did you discuss it with him?

12  A.   Not much.  Maybe a little bit.

13  Q.   What would -- What were those discussions?

14  A.   I don't remember.

15  Q.   Do you think he was aware of what you produced and

16  he signed and swore to?

17  A.   Yes.

18  Q.   During the March 27th hearing you admitted to

19  being a member of several limited liability companies,

20  so I want to just go through those with you and ask you

21  a few questions about each one.

22       So the first one is Normandies Park, LLC.

23       You're a one percent owner of Normandies Park,

24  LLC, correct?

25  A.   Yes.

1   Q.   And this business owns and operates the mobile

2   home park known as "Normandies Park", located in

3   Dayville, Connecticut, correct?

4   A.   Yes.

5   Q.   Okay.

6        Does that business do anything else other than own

7   and operate that mobile home park?

8   A.   No.

9   Q.   And Normandies Park owns property at 282, 284 and

10  286 Putnam Pike in Dayville, Connecticut?

11  A.   Yes.

12  Q.   Mr. Pappas told us on December 8th, 2011, when we

13  met here -- when we met in the courtroom next door,

14  that those properties are heavily encumbered, meaning

15  there's a lot of liens on those properties, and he

16  talked about tax deficiencies on those properties.

17       Do you know what the amount of the liens against

18  those properties currently is?

19  A.   No.

20  Q.   No.

21       Do you have documentation that says what the

22  current balance is on those liens?

23  A.   No.

24  Q.   Have you endeavored to obtain that documentation?

25  A.   Have I what?

1    Q.   Have you tried to get those documents in response

2    --

3    A.   No.

4    Q.   -- to the interrogatories in this case?

5    A.   No.

6    Q.   And do you understand that those documents were

7    sought in our interrogatories in response to this case?

8    A.   I -- You said -- You just asked me if any -- if I

9    recently know what the balance is and have I obtained

10   documentation for it.  I'm under the understanding the

11   question was -- you're asking me currently, have I

12   sought the balances of those liens.  No, currently I

13   have not.  When they were asked for me -- from me

14   previously from you, then they were provided, but since

15   then nothing has been asked for and I have not

16   attempted.

17        But the original request that you -- for those

18   documents, I did provide them to you.

19             (Pause.)

20   Q.   And it's true that you've never produced any

21   documents showing the balance owed on those liens, have

22   you?

23   A.   No, that's not true.

24   Q.   When did you produce those documents?

25   A.   I do not recall the date.  You would have to

1   consult with my attorney.  I do not know the date.

2   Q.   But it's your position that you have given us

3   those documents?

4   A.   Yes.

5   Q.   Normandies Park is currently being foreclosed on.

6        Are you aware of that?

7   A.   I -- No -- I -- I'm not involved in it.

8   Q.   I understand your answer, but my question is are

9   you aware of the fact that a foreclosure action --

10  A.   I was aware of the fact that it was -- could

11  potentially be foreclosed on.  I am not aware of a fact

12  of it being foreclosed on.  I have not been notified of

13  anything.

14  Q.   So even though you're a member of the LLC that

15  owns that property, you haven't been notified that

16  there's a foreclosure action?

17  A.   No, I have not.

18  Q.   Okay.

19       And that foreclosure action concerns two rather

20  large mechanics liens.  There's mechanics liens on

21  Normandies Park.

22       There's an 80s, excuse me, an $86,500 lien and

23  another lien for $226,000; is that correct?

24  A.   I do not know the exact amounts.

25  Q.   Do those amounts sound roughly correct?

1    A.   Yes.

2    Q.   Why are those liens on the property?

3    A.   I do not know.  I do not handle any of that.

4    Q.   Do you have any knowledge concerning the work that

5    was done to incur those debts?

6    A.   No.  That was all handled by Charlie.

7    Q.   What is the remaining balance on those liens now?

8    A.   I do not know.

9    Q.   Do you have any documentation that can tell us

10   that?

11   A.   No, I do not know.

12   Q.   The interrogatories that we sent you, and the

13   request for production, they asked for a lot of things.

14   One of the things they asked for was all contracts that

15   were made or are in effect after March 20, 2010.

16   You've not produced any contract with Leo Crane

17   Services for any work or services performed at

18   Normandies Park.

19        Does such a contract exist?

20   A.   I do not know.

21   Q.   Are you aware of any contract?

22   A.   No, I do not know.

23   Q.   Are you aware of any oral agreement with Leo Crane

24   Services?

25   A.   I do not know.

1   Q.   Has Leo Crane Services ever sent Normandies Park,
2   LLC any invoices?
3   A.   I do not know.
4   Q.   Do you personally know anyone who worked for, or
5   is affiliated with Leo Crane Services?
6   A.   I know of him.
7   Q.   Of who?
8   A.   Of the -- who owns Leo Crane Service.
9   Q.   Who is it?
10   A.   Tony Leo.
11   Q.   How do you know who Tony Leo is?
12   A.   I know of him through Charles.
13   Q.   Have you met him?
14   A.   Yes.
15   Q.   How many times?
16   A.   I do not know.
17   Q.   More than five?
18   A.   I do not know.
19   Q.   More than ten?
20   A.   I do not know.
21   Q.   How would you describe his relationship with Mr.
22   Pappas?
23   A.   I do not know.
24   Q.   There's also a lien on Normandies Park from a
25   company called "Mackie & Sons."  You might remember Mr.

1   Mackie testified at the trial in this case.

2       Do you know Mr. Mackie?

3   A.   I do.

4   Q.   How do you know him?

5           MR. SWIFT:  You can tell him.

6   BY MR. BENNETT-SMYTH:

7   Q.   I'm sorry, are you communicating with your

8   attorney?

9   A.   I would like to speak with my attorney.

10  Q.   Would you like to take a break?

11  A.   Yes.

12          MR. BENNETT-SMYTH:  I'm sorry, Don, there's a

13  question pending.

14          MR. SWIFT:  Oh, you want her to answer the

15  question first.

16          Mr. BENNETT-SMYTH:  Yeah.

17          MR. SWIFT:  He wants you to answer the

18  question first.

19          UNIDENTIFIED SPEAKER:  (Inaudible.)

20          MR. SWIFT:  Oh, sorry.  He wants you to

21  answer the question first.

22  BY MR. BENNETT-SMYTH:

23  Q.   How do you know Mr. Mackie?

24  A.   At this point, I assert my Fifth Amendment

25  privilege.  I refuse to answer the grounds on that may

1   tend to incriminate me.

2        (Pause.)

3            MR. SWIFT:  Should I go up and ask her what

4   she wants?

5            MR. BENNETT-SMYTH:  No.

6            MR. SWIFT:  She just answered the question.

7            MR. BENNETT-SMYTH:  No, she didn't.  She

8   didn't answer.

9            MR. SWIFT:  She did.  You want me to go up --

10           MR. BENNETT-SMYTH:  No.

11           MR. SWIFT:  What's your point here?  I'm

12  going to go up and talk to her and see if we can answer

13  this question.

14           MR. BENNETT-SMYTH:  Not till the question is

15  answered.

16           MR. SWIFT:  She just answered.

17           MR. BENNETT-SMYTH:  I want to make sure she's

18  entitled to assert that right at this point.

19           MR. SWIFT:  You don't have any right to say

20  what she can assert or not.

21           MR. BENNETT-SMYTH:  The statute explicitly

22  provides for it.

23           MR. SWIFT:  You don't have a right to decide,

24  she does.

25           MR. SMYTH: Go ahead, Mike (inaudible).

1          MR. SWIFT:  You're not the judge here.  Let's

2     get that one thing straight, Tim.  You're asking

3     questions.  That's it.  She's answered the question.

4          MR. BENNETT-SMYTH:  Counselor --

5          MR. SWIFT:  You want to make this difficult

6     or do you want to make it easy?  If I can go up and

7     consult with her for a minute, I can find out what her

8     problem is and I can let you know.

9          MR. BENNETT-SMYTH:  Counselor, she --

10          MR. SWIFT:  Then we can resolve it -- I can

11     resolve it right now.

12          MR. BENNETT-SMYTH:  Do you want me to get the

13     Judge, Don?

14          It's a simple question.

15          MR. SWIFT:  Right, I want to go ask her

16     something and I can find out then I can probably

17     resolve it.

18          MR. BENNETT-SMYTH:  Well, --

19          THE CLERK:  Counsel.  You can't all speak at

20     the same time.

21          MR. BENNETT-SMYTH:  Don, please have a seat

22     or ask for the Judge.

23          MR. SWIFT:  Oh, I'm going to stand right

24     here.  Go ahead and do what you want to do.

25          MR. BENNETT-SMYTH:  All right.

1            MR. SWIFT:  I'm not going to listen to you.

2            MR. BENNETT-SMYTH:  Okay.

3            Counselor, all I wanted to do is point out

4    that under the judgment debtor examination statutes

5    she's not permitted to not answer on the basis of the

6    Fifth Amendment.  She's required to answer.  Her answer

7    can't be used against her in a criminal proceeding

8    unless it's with respect to a perjury charge, but by

9    statute she's required to answer.

10   BY MR. BENNETT-SMYTH:

11   Q.   How do you know Mr. Mackie?

12           MR. SWIFT:  Don't answer that.  You've

13   asserted your privilege.  At the appropriate time I

14   will speak to you and we can resolve it when they let

15   me do it, but until then you've stated your position so

16   stay with that.

17   BY MR. BENNETT-SMYTH:

18   Q.   Are you refusing to answer the question?

19   A.   I assert my Fifth Amendment privilege.  I refuse

20   to answer on the grounds that it may tend to

21   incriminate me.

22           MR. BENNETT-SMYTH:  Go ahead, Don.

23       (Mr. Swift and the Witness confer.)

24           MR. SWIFT:  You can answer the question.

25           THE WITNESS:  Okay.

1    A.   He's my brother-in-law.

2    BY MR. BENNETT-SMYTH:

3    Q.   He's your brother-in-law?

4    A.   Correct.

5    Q.   How is he your brother-in-law?  Are you currently

6    married or is it through family?

7    A.   Through family.

8    Q.   Okay.

9         How many years have you known him?

10   A.   Seventeen.

11   Q.   And Mr. Pappas testified that he's worked with Mr.

12   Mack -- I'm sorry.

13        Mr. Mackie testified that he's worked with Mr.

14   Pappas over the years.

15        Is that how you came to know Mr. Pappas?  Was it

16   through Mr. Mackie or did Mr. Mackie come to know Mr.

17   Pappas through you?

18   A.   Mr. Mackie knows Mr. -- Charles because of me.

19   Q.   Okay.

20        And Mr. Mackie worked at -- My understanding is he

21   works with -- Well, his testimony was that he works

22   with septic tanks and things like that and --

23   A.   Yes.

24   Q.   -- he's a tradesman.

25        Is that a fair description of him?

1    A.   Yes.

2    Q.   Okay, and he also has a lien against Normandies

3    Park.

4         What, if anything, do you know about that lien?

5    A.   I do not know.  I do not discuss the work with

6    him.   That was between him and Charles.

7    Q.   Okay.

8         And do you know the current amount due on that

9    lien?

10   A.   No.

11   Q.   And have you made any attempt to find out?

12   A.   Not -- Yes, I did when you originally asked.

13   Q.   And do you recall, as you sit here today, what

14   that amount was?

15   A.   Not exactly.  I think it was like 80 -- Yeah, I

16   think it was like 80 grand.

17   Q.   And you've not produced any contract with Mr.

18   Mackie for any of the work he did at Normandies Park.

19        Do you know if one exists?

20   A.   No.  I was not involved in that.

21   Q.   Okay.

22        Is -- Do I understand you correctly, and tell me

23   if I don't, that you had nothing to do with Mr. Mackie

24   doing work at Normandies Park?

25   A.   I had nothing to do when it comes to any type of

1    construction work.

2    Q.   Okay.

3         That was all handled by Mr. Pappas --

4    A.   Yes.

5    Q.   -- and always has been?

6    A.   Yes.

7    Q.   And he's never told you anything about it with

8    respect to Mr. Mackie.

9    A.   I do -- We do not discuss that, no.

10   Q.   Okay.

11        And Mr. Mackie, your brother-in-law, has never

12   discussed it --

13   A.   No.

14   Q.   -- with you.

15   A.   We keep business separate from family relations.

16   Q.   Did Mr. Mackie, as far as you're aware -- And, Ms.

17   Delaney, for whatever it's worth, I understand this is

18   an uncomfortable proceeding.  It's uncomfortable for

19   all of us.  I have to ask you some questions that I

20   anticipate you don't know the answer to, but I have to

21   ask them anyway, okay?  And if your answer is you don't

22   know, then I'll move on to the next question.

23        Do you know if there were any invoices sent from

24   Mr. Mackie to Normandies Park for the work he did?

25   A.   I do not know.

1    Q.   Do you know any of the other employees of Mackie &
2    Sons, LLC, I believe, is the full name?
3    A.   Yes, my nephew.
4    Q.   Your nephew?  Okay.
5         So is that the Mr. Mackie that -- The Mr. Mackie
6    that testified at the trial, is that his son?  Is that
7    correct?
8    A.   No.
9    Q.   No.
10   A.   Not biologically.
11   Q.   How is -- So my understanding is that one of your
12   sisters is married to Mr. Mackie.
13   A.   Correct.
14   Q.   How is your -- How are you related to the nephew
15   that works?
16   A.   He's my sister's son.
17   Q.   He's your sister's son?
18   A.   Yes.
19   Q.   Same sister?
20   A.   Yes.
21   Q.   Okay.
22        Other than the two liens we've discussed, are you
23   aware of any other encumbrances on Normandies Park,
24   LLC?
25   A.   No.  Just this lawsuit.

1   Q.   All right.  I want to ask you now, about Northeast

2   Waste, LLC, which is another limited liability company.

3       As I recall at your prior testimony, you're a one

4   percent owner of that company?

5   A.   Yes.

6   Q.   Okay.

7       Was this a trash company?

8   A.   Yes.

9   Q.   So it collected trash.

10      Is that what it did?

11   A.   Yes.

12   Q.   Where did it take the trash?

13   A.   Transfer station?

14   Q.   Okay.

15      Where's that located?

16   A.   There are several.  I don't know, Connecticut,

17   Mass.  Haven't operated the trash company in years.

18   Q.   In how many years?

19   A.   The trash company?

20   Q.   Northeast Waste, LLC.

21   A.   As a trash company, I don't know.  I think it's

22   like nine years ago.

23   Q.   Nine years ago?  What did you operate it as after

24   nine years ago?

25   A.   Manure removal.

1   Q.   Manure removal.  Okay.

2        Where did you put the manure?

3   A.   We can spread it on our property because we're a

4   farm.

5   Q.   What is growing on the property?

6   A.   Growing?

7   Q.   What -- You said that you're a farm, you're --

8   A.   Well, we were -- We didn't operate as a farm.

9   We're just technically a farm.

10  Q.   Oh, okay.

11       So the manure was disposed of on the 241 Church

12  Street property?

13  A.   Yes.

14  Q.   How was it disposed of?  Was it used as

15  fertilizer?  Was it just dumped in a big pile?

16  A.   Yeah, it was used as fertilizer.

17  Q.   Okay.

18       Is there a big pile of manure on the property

19  currently?

20  A.   No, it's been spread all over the property.

21  Q.   Okay.

22       And how long ago did you stop operating that

23  business as a manure removal company?

24  A.   I haven't done anything with it -- Gosh, I don't

25  know.  This year.  I haven't for a while,  I wouldn't

1    even know.

2    Q.   Is it fair to say more than a year ago?

3    A.   I think maybe -- I don't know, like I really don't

4    know.  I honestly don't remember when I -- when the

5    last time I had -- did anything with it.

6    Q.   Okay.

7         You don't remember whether or not it was more than

8    a year ago?

9    A.   No, I don't.

10   Q.   Okay.

11        Do you know, as you sit here today, if there are

12   any encumbrances against Northeast, LLC?

13   A.   I do not know.

14   Q.   You don't know.

15        And to the extent there are encumbrances, you've

16   not provided any documentation concerning the current

17   balance of those encumbrances.

18   A.   I don't know of any.

19   Q.   Okay.

20        You're also a one percent member of Anna Alexis,

21   LLC.

22   A.   Yes.

23   Q.   Currently, what business does that entity do?

24   A.   Nothing.

25   Q.   Okay.

1       It used to own Normandies Park, the mobile home
2  park, correct?
3  A.   Yes.
4  Q.   Why did that business sell Normandies Park to
5  Normandies Park, LLC?
6  A.   Because we were no longer going to operate Anna
7  Alexis and we wanted it all under the same entity.   We
8  wanted Normandies Park under Normandies Park.
9  Q.   And you said that Anna Alexis currently is not
10  operating, correct?
11  A.   Has not operated since 2009.
12  Q.   Since 2009.
13       Does it currently have any expenses?
14  A.   I honestly don't know.
15  Q.   Does it have any rents?
16  A.   No.
17  Q.   Does it make any mortgage payments?
18  A.   No.
19  Q.   Does it pay any taxes?
20  A.   No, it doesn't.   It doesn't operate.
21  Q.   It has no employees?
22  A.   Correct.
23  Q.   And that limited liability company used to own 16
24  to 22 Center Street in Danielson, Connecticut, correct?
25  A.   Yes.

1   Q.   And that was sold at a tax sale, correct?

2   A.   Correct.

3   Q.   And that's one of the properties that you've

4   disclosed to secure the judgment in this --

5   A.   Yes.

6   Q.   -- case, correct?

7   A.   Correct.

8   Q.   Now, when we were here in December we also

9   discussed 347 Putnam Pike in Dayville, Connecticut.

10        Is that property owned by Anna Alexis LLC?

11   A.   It was.  I don't know if it still is.  I don't

12   know if it's been foreclosed on.

13   Q.   All right.

14        Do you know whether or not there's a pending tax

15   sale against that property?

16   A.   I thought it was sold at the tax sale in February.

17   Q.   Okay.  Okay.

18        Do you have any documentation concerning the tax

19   sale that occurred in February?

20   A.   No.

21   Q.   Were you provided any documentation from the

22   attorney for the tax collector?

23   A.   I don't know.  I don't even open any mail from

24   Anna Alexis.  I just throw it away.

25   Q.   And when did you stop opening mail from Anna

1    Alexis?

2    A.   Couple years ago.

3    Q.   Other than -- So we've talked about 1622 Center

4    Street and 347 Putnam Pike.

5         Does Anna Alexis own anything else?

6    A.   I don't -- No, I don't think so.

7    Q.   Okay.

8    A.   Not that I'm aware of.

9    Q.   Did Anna Alexis receive any cash from the tax sale

10   -- any money from the tax sale?

11   A.   No.

12   Q.   Did Anna Alexis, LLC receive anything at the tax

13   sale?

14   A.   No.

15   Q.   Did you attend the tax sale?

16   A.   No.

17   Q.   Did Mr. Pappas attend the tax sale?

18   A.   I don't think so.  I don't know.

19   Q.   You're also a one percent member of Crystal Creek

20   Farms, LLC, correct?

21   A.   Correct.

22   Q.   And Crystal Creek Farms, LLC owns the property

23   where you currently live?

24   A.   Yes.

25   Q.   And what, if any, business does Crystal Creek

1    Farms, LLC do?

2    A.    None.

3    Q.    Has it ever done any business?

4    A.    Yes.

5    Q.    What business did it do?

6    A.    In 2 -- I don't remember the year.  I think it was

7    maybe 2005, 2006, we sold mulch.

8    Q.    Did Crystal Creek Farms ever do any real estate

9    transactions, buy and sell properties?

10   A.    No.

11   Q.    So it was a mulch business for two years?

12   A.    I think so.  Around that, yeah.

13   Q.    Okay.

14   A.    Two summers.

15   Q.    How much money did that mulch business generate?

16   A.    I do not know.

17   Q.    More than $10,000?

18   A.    I do not know.

19   Q.    More than $100,000?

20   A.    I do not know.  I had back surgery and I wasn't

21   handling it.

22   Q.    Now, Crystal Creek Farms also owns the rental

23   properties with the address 9 to 11 Robin Way, correct?

24   A.    Yes.

25   Q.    Okay.

1        And the rent for -- And that's a duplex 9 to --

2   Yeah.

3   A.   Right.  Correct.

4   Q.   And there's tenants in each side?

5   A.   I don't know.

6   Q.   Okay.

7        Have you ever been aware of a tenant living there?

8   A.   Yes.

9   Q.   Okay.

10       Do  you know their names?

11  A.   No.

12  Q.   You don't know any of the tenants' names that have

13  ever lived there?

14  A.   First name is Becky.  I don't know her last name.

15  I don't even know if she still lives there.

16  Q.   Your response to Interrogatory Number 4, which was

17  Exhibit 5 last time we were here, it states that

18  Crystal Creek Farms has two mortgages, okay?  The first

19  mortgage is for roughly $400,000 from Landmark Lending.

20       Do you recall that Crystal Creek Farms has a

21  mortgage for about $400,000 from Landmark Lending?

22  A.   Yes.

23  Q.   What is the remaining balance of that loan?

24  A.   I do not know.  I tried to figure it out and I

25  think it's around 600.  But I don't know because I have

1   never spoken to them.  So I'm thinking 600 with

2   interest.

3   Q.   And when you say you tried to "figure it out,"

4   what did you do to try to figure it out?

5   A.   I just was trying to figure out at -- you know,

6   whatever -- I don't remember the amount.  Say 14

7   percent interest that we originally owed, say 400, and

8   we haven't made payments in like three or four years.

9   I was just trying to get a rough estimate --

10  Q.   Okay.

11  A.   -- what the payoff would be.

12  Q.   But you didn't look at the monthly statement from

13  the mortgage company?

14  A.   I've never received one.

15  Q.   Okay.

16       Have you ever asked the bank for one?

17  A.   I don't deal with them.

18  Q.   Have you ever attempted to obtain those monthly

19  statements in response to the interrogatories in this

20  case?

21  A.   I do not deal with them.  I've never even met

22  them.

23  Q.   I'm just going to ask you the same questions about

24  the other mortgage.  There's a mortgage for

25  approximately $230,000 with Hudson Savings Bank.

1   A.   Yes.

2   Q.   So these are going to be basically the same

3   questions, okay?

4        The first question is, do you know how much is

5   currently due on that loan?

6   A.   No.

7   Q.   Okay.

8        And do you receive monthly statements concerning

9   that loan?

10  A.   No.

11  Q.   Have you ever asked the bank for monthly

12  statements concerning that loan?

13  A.   The statements come in.  I do not receive them

14  anymore.

15  Q.   Okay.

16       When did you stop receiving them?

17  A.   Last October?

18  Q.   Okay.

19       Why did you stop receiving them?

20  A.   Because Charles handles it now.

21  Q.   Okay.

22       And did you produce the statements you received

23  before last October, in response to the interrogatories

24  and requests for production in this case?

25  A.   I do not remember.  I know I gave something to my

1   attorney, but I don't remember.

2   Q.   Have you attempted to determine the current

3   balance on that mortgage, in response to the

4   interrogatories and request for production?

5   A.   I did when you originally asked.

6   Q.   Okay.

7        And did you provide the current balance due, when

8   you responded to the interrogatories?

9   A.   I did when you originally -- Yes.

10  Q.   How did you determine the current balance when you

11  provided that to us?

12  A.   You know, I had to have sent a statement, is what

13  I'm -- they -- I don't remember.  It must have been

14  through a statement.

15  Q.   You did produce the mortgage deeds for those two

16  mortgages, the two we've just discussed.  You produced

17  those as an attachment to your third response to the

18  interrogatories, which was Exhibit 5, when we were here

19  in March.

20       You've still not produced any documents concerning

21  loan payments or the balances on those loans; is that

22  correct?

23  A.   I don't understand the question.

24  Q.   You produced the mortgage deeds, but you've not

25  produced any documents concerning any loan payments

1    made on those mortgages, or the balances currently due

2    on those mortgages.

3    A.   I did when I gave the -- If the statement was in

4    there, the payments were on the statement.  So, yes, I

5    did.

6    Q.   I want to ask you briefly about Max CT, LLC and

7    Otis Street.  I understand you're not a member in those

8    companies, but --

9    A.   I have nothing to do with that company, and never

10   have.

11   Q.   I understand that, and you're free to provide that

12   answer, but I want to ask you a few questions primarily

13   because Mr. Pappas has testified that you handled all

14   the bookkeeping for his businesses and --

15   A.   But that's not a business that --

16   Q.   -- and that you provided all the responses --

17   A.   Yes.

18   Q.   -- to the interrogatories.

19   A.   Yes.

20   Q.   So I have a few questions for you, okay?  This is

21   Max CT, LLC.

22        Is it your testimony that you never helped Mr.

23   Pappas with any of the paperwork for that business?

24   A.   He obtained the paperwork and I included it in the

25   package.

1   Q.   I'm saying when you were doing business with Mr.

2   Pappas.

3   A.   Never.

4   Q.   Never.

5        You never provided him help in managing that

6   business entity?

7   A.   No.

8   Q.   Okay.

9        You never worked on anything for that business

10  entity?

11  A.   No.

12  Q.   Okay.

13       Do you know what -- whether or not that business

14  entity does anything other than own land?

15  A.   I do not know.

16  Q.   There -- That business owns properties at 35, 47,

17  and 53 Attawaugan Crossing, and it's been disclosed by

18  you and Mr. Pappas that there's a mortgage for $300,000

19  on those properties, or mortgages totaling $300,000 on

20  those properties.

21  A.   Yeah, I do -- I do not really know.  I've just

22  gone by what he told me.  I don't -- I don't know.

23  Q.   And in your responses to the interrogatories, you

24  haven't produced any documents concerning payments on

25  the balance of those loans or the current amount due on

1    those loans, have you?

2    A.   I don't -- What- What are you asking?

3    Q.   You haven't produced any documents concerning

4    payments on those mortgages we just discussed with you.

5    A.   I don't have any documents.  I've never made a

6    payment.  I have nothing to do with it.

7    Q.   And you haven't produced any documents concerning

8    the current amounts due on those loans, have you?

9    A.   No, I do not have anything to do with them.

10   Q.   Otis Street, LLC is another business that Mr.

11   Pappas is a member, and I understand you're not a

12   member.

13        Did you have anything to do with the management of

14   Otis Street, LLC?

15   A.   No.

16   Q.   Did you do any work for Otis Street, LLC at any

17   time?

18   A.   Yes.

19   Q.   What did you do?

20   A.   Maybe like ten years ago, I rented property for

21   them and I managed, like getting the tenants into the

22   buildings.

23        And then I also -- I'm not sure if it was Otis

24   Street or Max that owned property, and I sold it as an

25   agent, like, I don't know, maybe six years ago.

1   Q.   And was -- when you sold those properties six

2   years ago, did you continue to manage the tenants after

3   that point, or were all the properties sold?

4   A.   I -- I sold one, two, three properties, and then

5   that was all I did.  I had nothing to do it with after

6   that.

7   Q.   Nothing to do, even with the tenants, after that?

8   A.   No.

9   Q.   Who managed the tenants after those sales?

10   A.   Korina Peltak.  Oh, I -- I don't know.

11   Q.   You don't know.

12   A.   I mean, if they were sold, I would assume the new

13   owners.

14   Q.   Oh, okay.

15   Were there any apartments still owned by Otis

16   Street and Max Street after those sales, approximately

17   six years ago?

18   A.   It -- Yes, I think State Ave., 144 State Ave. was

19   still owned by them.

20   Q.   How many -- About how many units were at 144 State

21   Ave.?

22   A.   It was a two-family with, I think, 23 storage

23   units.

24   Q.   Twenty-three storage units?

25   A.   Yeah.

1   Q.   And you said "144 State Ave."

2        Now, that's in Massachusetts?

3   A.   No, it's in Connecticut.

4   Q.   Where is that located?

5   A.   In -- It was in Rogers.

6   Q.   I've never even heard of Rogers, Connecticut.

7        Where is that?

8   A.   It's at a sub-area of Killingly.

9   Q.   Okay.  There's a lot of those.

10  A.   Yes.

11  Q.   All right.

12       And do you know when that property at State Street

13  was sold?

14  A.   I honestly don't.  I sold it in -- I think in

15  2007, 2008.  I don't know.

16  Q.   After 2007 or 2008, do you know whether or not

17  Otis Street or Max CT, LLC, do you know whether or not

18  they had any tenants at any property after 2008?

19  A.   Not that I'm aware of.  I didn't have any dealings

20  with their -- anything to do with them after that sale

21  of State Ave.

22  Q.   Have you ever met Korina Peltak?

23  A.   Yes.

24  Q.   How did you meet her?

25  A.   Through my ex-husband.

1   Q.   Through your ex-husband?  What was his name?

2   A.   John Delaney.

3   Q.   John Delaney.

4        And did you introduce Korina Peltak to Charlie

5   Pappas?

6   A.   No.

7   Q.   How did they come to know each other?

8   A.   He grew up with Korina.

9   Q.   Where did they grow up?

10  A.   Marlborough.

11  Q.   Now, one thing I've been confused by is originally

12  I thought that Max CT and Otis Street were owned by a

13  guy named Zisler with Mr. Pappas.

14  A.   They were owned by what?

15  Q.   The -- I -- My understanding was there were two

16  members.  There was Mr. Pappas.

17  A.   Yeah.

18  Q.   And then there was a guy named Zisler.

19  A.   Gunther, but Gunther died in December.  So now

20  everything is Korina's.

21  Q.   And what's the relationship between Gunther Zisler

22  and Korina Peltak?

23  A.   It's his daughter.

24  Q.   It's his daughter.  Okay.

25  A.   Yes.

1  Q.   Do you know how Korina Peltak became a member in

2  Otis Street, LLC or Max CT, LLC?

3  A.   I'm assuming her -- I don't know.  I'm assuming

4  her father put her on there because he was in very ill

5  health.

6  Q.   Okay.

7       Have you ever seen any documentation to that

8  effect?

9  A.   I don't have the LLC paperwork.  I think I -- I

10  provided it for the attorney though, when Charlie gave

11  it to me when you had asked for the -- but I didn't

12  read any of it.

13  Q.   And -- But are you aware of any document

14  evidencing a transfer of that membership interest from

15  Mr. Zisler to Ms. Peltak?

16  A.   No, I haven't even talked to Korina in, I don't

17  know, seven years.

18  Q.   So you didn't speak to her at all about responding

19  to this discovery.

20  A.   She -- No, she does not speak to me.

21  Q.   Okay.

22       Other than Elite Real Estate, LLC, have we

23  discussed all the LLCs that you're a member of today?

24  A.   That I'm aware of.

25  Q.   Were you ever a member in a business called

1  "Pappas Homes," LLC?

2  A.  Yes.

3  Q.  Okay.

4     Who were the members of that business?

5  A.  Charles and me.

6  Q.  And what was your membership interest?

7  A.  Fifty percent.

8  Q.  That -- And so that was 50/50.

9  A.  Yes.

10  Q.  Okay.

11     And did you do the paperwork for that LLC?

12  A.  Yes.

13  Q.  What kind of business did Pappas Homes, LLC do?

14  A.  It was basically a pass-through company that was

15  building homes with the money through -- from Anna

16  Alexis, and I closed it back in like 2009, when the

17  housing market crashed.  That is the company that built

18  the duplex on Crystal Creek Farms.

19  Q.  And when you say it was "a pass-through company"

20  from the money from Anna Alexis, and the money coming

21  in for Anna Alexis would have been the rents from the

22  tenants, correct?

23  A.  Correct.

24  Q.  Okay.

25     Did it ever own any land, Pappas Homes, LLC?

```
 1   A.   No.
 2   Q.   Did it ever sell anything?
 3   A.   It may -- It may have because we were -- we were
 4   buying and selling properties.  I honestly don't know.
 5   It may have purchased something under its name and sold
 6   it, but I don't know because it's been so long.
 7   Q.   Other than acting as a pass-through, did it do
 8   anything else?
 9   A.   No.
10   Q.   And does it still exist?
11   A.   No.
12   Q.   Other than you and Mr. Pappas being members, did
13   it have any employees?
14   A.   At one time, I think back in like 2006 when I had
15   my back surgery, we had -- I had a secretary.  And I
16   think I had her under Pappas Homes.  I don't remember.
17   Q.   Okay.
18        And she assisted with all the LLCs, but -- is that
19   right or --
20   A.   Is it what?
21   Q.   Did she assist you with all the different LLCs,
22   all your different business interests, or just the
23   Pappas Homes?
24   A.   Yeah.  Yeah.
25   Q.   What was her name?
```

1    A.   Tracy Barks.

2    Q.   Barks.

3    A.   Barks, yeah.

4    Q.   B-A-R-K-S?

5    A.   Yeah.

6    Q.   And do you still speak to her?

7    A.   No.  She stole money from me, like $10,000 while I

8    was out with back surgery.  That's why when you asked

9    me about the mulch, she was the one that was taking the

10   cash and she was embezzling my rent money and cashing

11   checks.  So no, I have nothing to do with her anymore.

12   Q.   So Pappas Homes, LLC basically just took rents and

13   then you would use that to -- you used it to build the

14   duplex, you said?

15   A.   No, Anna Alexis would take the rents.

16   Q.   Uh-huh.

17   Q.   And then Pappas Homes would use money or would

18   borrow money from like hard lenders and build houses

19   and sell them.

20   Q.   Okay.

21            (Pause.)

22            MR. BENNETT-SMYTH:   Court Reporter, can I

23   have a few paperclips?  I should have brought them with

24   me.

25            May I approach?

BY MR. BENNETT-SMYTH:

Q.   So I marked for identification purposes, Exhibit

18.   I'm starting -- I'm trying to keep up after the

exhibits that we had -- have last time, but -- so this

is a profit and loss summary from 2009 for Pappas Homes

LLC, correct?

A.   Yes.

Q.   Okay.

     Have you ever seen this document before?

A.   Yes.

Q.   Okay.

     So why did Pappas Homes have losses of $105,000 if

it wasn't doing anything other than passing money

through?

A.   Because there was more expenses.

Q.   Can you explain that?

A.   No, not without -- I mean, the expense sheet is

right here.   We had advertising.   That's when we closed

the business because we were losing money.   I mean, all

that Google and AceNet and Yahoo, that's all

advertising.

Q.   Why were you advertising if Pappas Homes wasn't

doing anything?

A.   I said we operated in 2009.   That was the last

year we operated.

1   Q.   I mean, what were you advertising for, if you're

2   using it to pass money through?  What were --

3   A.   We were advertising it to build houses.

4   Q.   Okay.

5       Do you know whether or not these expenses were

6   ever paid?

7   A.   If they were on here, they were paid because these

8   are actual transactions that came out of my bank

9   account.

10  Q.   Where did that money come from?

11  A.   I honestly couldn't tell you.  It either came from

12  rental income or it came from different properties.  He

13  would sometimes borrow money from Gunther, like hard

14  lender money, didn't have enough to build the houses.

15  So it would either come from the hard lender who would

16  get paid back at closing or it would come through Anna

17  Alexis.

18  Q.   Do you know what bank account the expenses for

19  Pappas Homes, LLC were paid from?

20  A.   Bank account?

21  Q.   What bank account?  Were they paid from the

22  Crystal Creek Farms bank account or --

23  A.   You know, I moved money around a lot on these

24  different accounts.  So they could have been paid

25  through Anna Alexis.  They could have been paid through

1    Crystal Creek.  And that's why there's like notations,

2    "Crystal Creek, Crystal Creek," so like when my

3    accountant did the bookkeeping --

4    Q.   Uh-huh.

5    A.   -- my taxes, she would know where the money went,

6    what account they were for --

7    Q.   So sometimes --

8    A.   -- because there were so many, it was just really

9    hard for me to keep up with it because it was just so

10   much.  Different accounts trying to -- if one account

11   didn't have enough money to pay the bill, I would just

12   take it out of a different account.

13   Q.   And is that your explanation for why Crystal

14   Creeks, or even your personal account were paying some

15   of these bills for Pappas Homes?

16   A.   Yeah, because at that time I was still doing at --

17   Up until probably 2008, maybe 2009, I was still doing

18   pretty well in real estate, so I was paying a lot of

19   the bills personally.  I would put my own funds into

20   the accounts to cover the expenses.

21   Q.   Is it fair to say that these expenses also went to

22   your other businesses?

23   A.   Yeah.

24   Q.   Yeah.

25   A.   Yeah.  Well, I mean, it -- because if they're on

1    there it would say that.  It would say "Crystal Creek"

2    with references to say where -- where they went.

3    Q.   Okay.

4        So that means that Pappas Homes was paying the

5    bill for Crystal Creek or paying the bill for

6    Normandies Park --

7    A.   Yeah, and then Crystal Creek might pay the bill

8    for Pappas Homes, yeah.  It's just --

9    Q.   Okay.

10   A.   It was very confusing.  I get confused looking at

11   it myself and I did this.

12   Q.   I'm going to get some water, Ms. Delaney.

13       Do you need any water or anything?

14   A.   Yes, please.

15           THE CLERK:  There some (inaudible) back here.

16           (Pause.)

17   BY MR. BENNETT-SMYTH:

18   Q.   So you were a 50 percent owner of Pappas Homes,

19   LLC, right?

20   A.   Yeah.

21   Q.   Could you look at pages 7 and 8 of the -- of

22   Plaintiff's Exhibit 18 for identification purposes, the

23   profit and loss detail for Pappas Homes, LLC?

24   A.   Yes.

25   Q.   There's handwritten notations basically in the

1   center of the page.  There was a whole bunch of them

2   that said "Charlie."

3       Do you see them on page 7 and page 8?

4   A.   Uh-huh.  I didn't do that.  I don't remember why I

5   did that.

6   Q.   Was that money that Mr. -- that was just being

7   paid to Mr. Pappas personally?

8   A.   No.  No.  But those were -- I must -- I honestly

9   don't remember why I did that except for probably those

10  were checks that Charlie wrote that I didn't is the

11  only thing I can think of.  I don't remember why I did

12  that because those are all people that like worked,

13  like contractors that he paid.

14  Q.   Do you see at the top of page 7 where it says,

15  "Expenses: Norma D'Amico"?

16  A.   Yeah.

17  Q.   And then, "Memo: 4044 Barbara Street"?

18  A.   Yeah, that was -- Yeah.

19  Q.   And so --

20  A.   That was --

21  Q.   -- Pappas Homes was paying part of the mortgage

22  debt on the Barbara Street property owned personally by

23  Mr. Pappas?

24  A.   Yes.

25  Q.   And did you approve those expenses, as a member in

1   Pappas Homes, or did Mr. Pappas do that without your

2   consent?  Were you aware of all these and fine with

3   them?

4   A.   Yeah.

5   Q.   Okay.

6   A.   I don't care where they came from as long as the

7   bills got paid.

8   Q.   Okay.

9        I mean, your last statement there, I mean, it just

10  seems to me like, from looking at all these --

11  A.   Yes, it was very difficult to do my taxes.  That's

12  why they're not done.

13  Q.   And you were using the money from one account to

14  pay directly -- Yeah.

15  A.   Yes, and that's why it's very difficult to do my

16  taxes, because I have to try to sort it all out.

17  Q.   Okay.

18       So some of this -- I'm done with 18.  I'm going to

19  take that back from you unless -- Are you finished with

20  it?

21  A.   Yeah.

22  Q.   All right.  I just want to quickly go over the

23  rents.  Crystal Creek Farms has a duplex.  There's two

24  apartments there.

25       This is the 9 to 11 Robin Way apartments, correct?

A.   Yes.

Q.   My understanding is that each apartment rents for approximately $900 a month?

A.   If they're still there.  I haven't even been over there in several months.

Q.   When -- The last time you were aware of tenants being there, was their rent $900 a month?

A.   Yes.

Q.   Okay.

And you don't know those tenants' names, correct?

A.   I don't remember Becky's last name and -- I don't remember the lady -- the -- I honestly don't remember.  I haven't dealt with them in so long that I don't remember.

Q.   And you don't --

A.   I think it was Phyllis.  I don't remember.

Q.   And do you receive any of the money they pay in rent?

A.   No.

Q.   No.  Okay.

How long have those two tenants been -- Let's start with Becky.

How long has Becky -- assuming she's still there?

A.   I think a year and a half.  I'm not sure, probably a year and a half or --

1   Q.   Was she at 9 or 11 Robin Way?

2   A.   Both of them have been there the same amount of

3   time.

4   Q.   Who lives at 9 and who lives at 11?

5   A.   Nine would be Becky, if she's still there.  And I

6   don't -- 11 -- I -- I don't remember what her name was.

7   Q.   You said "Phyllis" but are you not sure that's

8   correct?

9   A.   I'm not sure.  I don't remember what her name is.

10  Q.   And you don't know their last names?

11  A.   No.  I don't remember.

12  Q.   Does anyone live with those people or they're both

13  just single individuals that live there?

14  A.   They're both married.

15  Q.   Okay.

16       And so, do they -- do either of them have children

17  living there?

18  A.   Yes, one of them does.

19  Q.   Okay.

20       So please explain.

21  A.   Becky, 9.

22  Q.   Becky's married and has one child?

23  A.   Yes.

24  Q.   And Phyllis --

25  A.   Is married.

1    Q.   Is married with no children there?

2    A.   Not yet, that I'm aware of.  They're older.

3    Q.   Okay.

4         Now, what about the single family home owned by

5    Crystal Creek Farms where -- that's where you live?

6    A.   I live there.

7    Q.   Okay.

8         And you live there with whom?

9    A.   My son.

10   Q.   Your son.

11        How old is your son?

12   A.   Seventeen.

13   Q.   Seventeen.  Okay.

14        How long have you lived there?

15   A.   Since October of 2000.

16   Q.   Does anyone else live there, other than the two of

17   you?

18   A.   No.

19   Q.   Do you pay any rent to Crystal Creek Farms, LLC?

20   A.   No.

21   Q.   How much rent do you think you could get for that

22   property, 241 Church Street?  My understanding, it's a

23   four-bedroom home.  It's approximately 2500 square

24   feet.

25   A.   Yeah, but it needs a lot of work.  So I would

1    probably say 1800.

2    Q.   Can you describe the home for me, walking and --

3    So you pull up the driveway.

4    A.   Correct.

5    Q.   Go ahead.

6    A.   Very carefully, you pull up the driveway because

7    it's a mess, and its 900 feet long.

8        And it's a contemporary-style house, cedar sided

9    from 1986 with no updates since 1986.

10       You walk in, first floor: kitchen, living room,

11   den, half bath; second floor: three bedrooms, two full

12   bath -- no four -- four bedrooms, two full baths.

13   Q.   Is there a patio or a deck of any kind?

14   A.   Yes, there's a patio in the back.  I think I put

15   that in, in like 2005, 2006.

16       And the deck is the original to the house, off of

17   the kitchen.

18   Q.   And is there a garage?

19   A.   There is.  There is a detached garage we put up

20   when we moved there, I think back in like 2001.

21   Q.   Okay.

22       And how many car garage is that?

23   A.   It is a three-bay garage.

24   Q.   Bay garage.

25       You mean you could put a larger truck in there?

1  Is that what that means?

2  A.   No, just that's how they -- what they call it.

3  It's a -- It has three doors and it has an office on

4  the end that I don't use because it was flooded.  It

5  was actually a four-bay garage, and one of the bays was

6  turned into my office when I was in real estate.  But

7  it got flooded a couple years ago, when we had that big

8  rainstorm, and it got ruined.  And Charlie never fixed

9  it, so I don't use it, so basically storage.

10 Q.   And describe the property for me.  Mr. Pappas said

11 there's total -- with the Robin Way, there's total of

12 about 130 acres.

13 A.   Yes.  That parcel is 109 acres.

14 Q.   The parcel at 241 is?

15 A.   Yes.

16 Q.   Okay.

17 A.   And it has my home, the garage, and a barn that

18 Charlie used to use to like fix the equipment for the

19 farm and -- or, you know, like the -- the truck would

20 go in there and that's what he would use, it -- because

21 you had to store it in there in the winter so.

22 Q.   So Crystal Creek currently may or may not have two

23 tenants, but other than that it's not doing any

24 business?

25 A.   Correct.

1   Q.   Does it have any employees?

2   A.   No.

3   Q.   Okay.  There are two mortgages we've talked about

4   with Crystal Creek.

5        Are there any other monthly bills for Crystal

6   Creek?

7   A.   Just -- Not under Crystal Creek because the

8   utilities are in my name.

9   Q.   Okay.

10  A.   Except the electric bill at the barn, that's under

11  Crystal Creek.

12  Q.   The what?

13  A.   I think they just shut it off yesterday because

14  they didn't pay the bill.  Crystal Creek has an

15  electric bill at the barn.

16  Q.   Okay.

17  A.   But other than that, nothing.

18  Q.   So --

19  A.   And taxes.

20  Q.   Taxes.

21       Are the taxes current on the property?

22  A.   No.  I made some payments last year.  I think I

23  gave them like -- I don't remember.  I think I paid

24  them, last year, like $14,000 because they were going

25  to sell it at tax sale, so I gave them what I could and

1    paid them like installments, but I haven't paid
2    anything since.  So I don't know what we owe for taxes.
3    Q.   Okay.
4    A.   I mean, I gave it -- a statement to my attorney
5    when you guys asked, but I don't know like, what the
6    current balance is.
7    Q.   Since you gave that statement, have you paid any
8    more taxes?
9    A.   I don't -- No.  I don't collect any of that money,
10   so.
11   Q.   Do you know what Mr. Pappas does with that money?
12   A.   No.
13   Q.   Okay.
14        Until December 2011, Mr. Pappas owned 44 to 48
15   Barbara Street in Providence, Rhode Island.
16        Were you involved with this property in any way?
17   A.   I used to handle the tenants.
18   Q.   Until when?
19   A.   I don't know.  Probably over a year ago, closing
20   time.
21   Q.   So a year ago would be the summer of 2011.
22   A.   Last summer.  I think I was still doing it last --
23   I don't remember.  It's been a while.
24   Q.   Okay.
25   A.   There's like no tenants in it.

1    Q.    There is what?

2    A.    I don't think there was any tenants in it.  There

3    was like one tenant that wasn't paying rent.

4    Q.    How many units were at 44 to 48 Barbara Street?

5    A.    There were six.

6    Q.    And you were collecting the rents for several

7    years, or for just last year?

8    A.    No, I collected them up until, I believe, whenever

9    I stopped.  Initially, yes, I handled it.

10   Q.    Okay.

11         What were the rents for the units?

12   A.    Oh.  They were six -- I don't -- I don't -- Yeah,

13   I think they were 600 a unit, but I don't ever recall

14   having it fully rented.

15   Q.    Was it normally half occupied, or is it -- was it

16   just -- was it up and down?

17   A.    No, I think it was normally like four or five

18   units, and then out of that, one wouldn't pay the rent.

19   So I don't -- I don't recall ever having it fully

20   occupied.

21   Q.    What bank account did you put those rent checks

22   in?

23   A.    If -- The Savings Institute.  It's the only bank I

24   used.

25   Q.    You put them in your personal account?

1  A.   No.  I don't recall which account, but the bank

2  would have been the Savings Institute.  I do not recall

3  which account they went into.  I have no idea.

4  Q.   Okay.

5      Because that property was owned by Mr. Pappas,

6  correct?

7  A.   Correct.

8  Q.   And he doesn't have a bank account or does he have

9  a bank account?

10 A.   I don't know.

11 Q.   Okay.

12     Do you know whether or not Mr. Pappas has ever had

13 a bank account?

14 A.   I'm sure at some point he did.

15 Q.   Have you ever made any deposits in Mr. Pappas'

16 bank account?

17 A.   He didn't have a bank account like, they were

18 under the LLCs.

19 Q.   Do you -- Okay.

20     I thought you just said that you're sure he did

21 have a bank account.

22 A.   At some point.  Not when he was with me, he

23 hasn't.

24 Q.   All right.  So not since 2000.

25     You're not aware of him ever having a bank

1  account?

2  A.   Not that I'm aware of, not without me.

3  Q.   Okay.

4       And you don't know where you put those rent checks

5  that you collected?

6  A.   I don't.

7  Q.   Okay.

8       Are you aware of any other rental income that you

9  have or that Mr. Pappas has?

10 A.   No.

11 Q.   Are you a member of any other business entity that

12 has rental income of any kind, residential or

13 commercial?

14 A.   No.

15 Q.   Normandies Park, LLC, you used to collect the

16 rents there, correct?

17 A.   Yes.

18 Q.   So there's six tenants in the park itself; is that

19 right?

20 A.   Yes.

21 Q.   And they each pay $395 a month?

22 A.   Yes.  One only pays $325 because he's like the

23 manager, so he gets a discount, and he's like 100.

24 Q.   I'm sorry.

25 A.   I said he's like 100 years old, so he's like --

1    Q.   Oh, okay.

2    A.   You know fixed income, so.

3    Q.   And there's also a single-family home on that

4    property, correct?

5    A.   There's two.

6    Q.   There's two single-family homes.

7         And those are currently rented?

8    A.   I don't know.

9    Q.   When were --

10   A.   I have not been there since last year.

11   Q.   Were they rented last year?

12   A.   Yes.

13   Q.   How much?  Were they 900 each, or 850?

14   A.   No.  I think the house is like nine -- One of the

15   houses is nine, and the other one was going to be

16   rented for like seven.  It wasn't rented, but it was

17   getting rented.

18   Q.   Okay.

19        And you're not aware if they're still rented?

20   A.   I do not know.  I have not been there.

21   Q.   Okay.

22        Do you receive any of those rent checks currently?

23   A.   No.

24   Q.   When is the last time you received any of those

25   rent checks for the single-family homes or the park?

1    A.   I don't know.  I think last October, but I don't

2    know exactly.

3    Q.   So October 2011?

4    A.   I think so, yeah.

5    Q.   Okay.

6         But since then you have not?

7    A.   No.

8    Q.   Do you know -- Who does receive them?

9    A.   Charles.

10   Q.   And do you know what he does with that money?

11   A.   No.  I know part of it, I'm assuming, paid the

12   mortgage on Church Street and pays the electric bill

13   because I'm still living there, so I'm assuming he's

14   paid them.

15   Q.   So the Park -- Normandies Park has trash

16   collection expenses of about $170 a month?

17   A.   Yeah, kind of expensive, but yeah, I think that's

18   what it was.

19   Q.   Yeah.

20   A.   I don't take care of that anymore.

21   Q.   Sure.

22        And the individual trailer owners, they pay their

23   own electric bill, correct?

24   A.   Yes, but there is an actual electric bill for the

25   park.

1   Q.   Okay.

2   A.   In case --

3   Q.   Is that a street lamp or something?  Or what is

4   that is for?

5   A.   Runs the well.

6   Q.   It runs the well?

7   A.   Yeah.

8   Q.   Okay.

9        And what is that bill usually, a month?

10  A.   I think it runs like $50.

11  Q.   Fifty dollars?

12  A.   Yeah.

13  Q.   Okay.

14       Are there any other monthly bills for the park?

15  There's the trash collection and the electric.

16  A.   Just the maintenance of -- just like maintenance

17  itself, like -- and the -- and the taxes, like plowing,

18  the snow removal, if anybody has to go in and like cut

19  like the main entry and trim the trees, that -- not

20  like -- it's not like a monthly amount --

21  Q.   And does --

22  A.   -- because it's different, but there are expenses.

23  Q.   I'm sorry.  I didn't mean to -- Are you finished?

24  I didn't mean to cut you off.

25  A.   Yeah.

1    Q.   Mr. Pappas does the plowing, right?

2    A.   He does.

3    Q.   Okay.

4    A.   I'm not sure if he did it all last winter though,

5    because he wasn't around.  I don't know who did it last

6    year.  Maybe -- I think he might have paid someone

7    because he wasn't here.

8    Q.   Where was he?

9    A.   I don't know.  I think with his girlfriend.

10   Q.   Where does she live?

11   A.   His girlfriend?  Lives in Maine.

12   Q.   What part of Maine?

13   A.   I don't know.

14   Q.   What's her name?

15   A.   Her first name, I know, is Laurie.

16   Q.   Do you know her last name?

17   A.   I think it's Farrington, but I'm not sure.

18   Q.   Farrington or Varrington.

19   A.   Farrington.

20   Q.   Laurie Farrington.

21        Do you know if the taxes are current at Normandies

22   Park?

23   A.   I don't.  I mean, I know Charlie paid them, I

24   think, back in February, and I think he paid them to

25   current --

1    Q.   Okay.

2    A.   -- at that time.

3    Q.   Okay.

4         Other than the rents we've collected, you receive

5    $91 a week in child support?

6    A.   Correct.

7    Q.   Is that from John Delaney?

8    A.   Correct.

9    Q.   And what, if anything, do you do with that money?

10   Does that go to care for your son?

11   A.   That doesn't take care of my son.  That doesn't

12   even feed my son.

13   Q.   I understand that.  I didn't ask the question

14   properly.

15        Is it fair to say that you use that money for your

16   son?

17   A.   Yeah.

18   Q.   Okay.

19        Are you unemployed?

20   A.   No.

21   Q.   Where do you work?

22   A.   I just got a job.

23   Q.   Where do you work?

24   A.   It's called B-I-P.

25   Q.   What is BIP?

1   A.   It's -- You sell -- Completely different than what

2   I've done.  I go into like beauty salons and sell like

3   hair products.

4   Q.   Okay.

5        Is that a salary position?

6   A.   It is a very low salary position, yes.

7   Q.   What is the salary?

8   A.   Twenty-five hundred a month.

9   Q.   Okay.

10       Do you make commissions on top of that, or is

11  it --

12  A.   Yeah.

13  Q.   Yeah.

14  A.   But it varies.

15  Q.   Okay.

16       What is the actual name of your employer?

17  A.   I think that the -- I think it's B-I-P.  The

18  company -- The company is Alfaparf.

19  Q.   Is what?

20  A.   Alfaparf.

21  Q.   Alfa?

22  A.   Parf.  It's Italian.

23  Q.   Can you spell it, please?

24  A.   A-L-F-A-P-A-R-F.

25  Q.   Before getting the job with Alfaparf, or BIP, were

1  you unemployed?

2  A.   Yes.  Well, I was trying to sell real estate but

3  wasn't doing very good, and that's why I went out and

4  got another job.

5  Q.   And is that all the testimony you went through

6  last time, that you were trying to sell real estate and

7  I reminded you of a couple of homes that you sold, but

8  other than that, is it fair to say that you had no

9  income?

10  A.   Right.

11  Q.   Okay.

12      Have -- Since we last spoke, have you thought of

13  any other homes that you've sold since 2010?

14  A.   Yes.

15  Q.   Go ahead.

16  A.   I just sold one this month.

17  Q.   Okay.

18      Were you -- Did you receive any commission?

19  A.   I did, yes.

20  Q.   How much?

21  A.   I think it was like four grand.

22  Q.   And what bank account did you put that money into?

23  A.   It went into -- It didn't go into bank.  I cashed

24  it because I'm overdrawn and they closed my account,

25  that personal account.  So I just -- I didn't put it in

1   the bank because they were going to take my money.

2   Q.   Uh-huh.

3        When you say you cashed it, where did you cash it?

4   A.   At the Savings Institute.

5   Q.   Okay.

6        And did you get cash or a bank check when you did

7   it?

8   A.   No, I got cash.

9   Q.   Okay.

10       And do you have that cash?

11  A.   No.  I spent it.

12  Q.   What did you spend it on?

13  A.   I don't know, miscellaneous stuff.  I don't -- I

14  really can't tell you.

15       I took my son out for his birthday and, you know,

16  bought myself some new clothes and miscellaneous

17  expenses: food, gas.  My job is very expensive with

18  gas.  I spend probably 300 or $400 a week on gas.

19  Q.   Where was that property located that you sold?

20  A.   It was 212 Covell Road in Pomfret.

21  Q.   And that property was owned by Mr. DeAngelis,

22  correct?

23  A.   Correct.

24  Q.   And Mr. Pappas rehabilitated that property for

25  him?

1   A.   No, he didn't finish it.  That's why it only sold

2   for like $55,000.

3   Q.   But he had done some work on that apartment -- on

4   that house?

5   A.   He just got it in, got rid of the trash.

6   Q.   Was he paid for that work?

7   A.   No, and he doesn't know it closed.

8   Q.   Why would he need to know that it closed?  Did he

9   have an arrangement with Mr. DeAngelis, --

10  A.   No, because he wanted --

11  Q.   -- like your other properties?

12  A.   No, because (unintelligible) wouldn't have given

13  me the money for the electric bill or pay the mortgage.

14  Q.   Other than your new job, the sale of 212 Covell,

15  and the properties that we discussed last time you were

16  here, do you have any other income since 2010?

17  A.   I do not.

18  Q.   Okay.

19       Have you ever attempted to collect unemployment?

20  A.   I don't think so.

21  Q.   Have you ever attempted --

22  A.   Unless it was like 20 years ago when I was dental

23  assisting, I think I might have.  I applied for a

24  disability.

25  Q.   When did you apply for disability?

1   A.   I applied for disability after my back surgery.  I

2   went through like the whole appeals thing for like

3   three years, and they finally turned me down last year

4   because I didn't have enough points paid into the

5   system because I was self-employed.

6   Q.   Do you personally own anything of value?  Do you

7   own a car?

8   A.   Personally, no, I own nothing of value.

9   Q.   Okay.

10       Do you own any watches, rings, or chains of value?

11  Anything worth more than $500?

12  A.   No.

13  Q.   Now, a couple of times you've testified about your

14  surgery and other health issues.

15  A.   Yes.

16  Q.   Without going into any great detail, could you

17  just explain to me, the health issues you've had since

18  2009?

19  A.   I have a herniated disk in my neck that needs to

20  be operated on.  It needs to be removed.

21       I have a -- had a herniated disk in my back that

22  had fused itself to my sciatic nerve, had to be

23  removed, and now I have a titanium disk in my back.

24  Q.   When did that surgery happen?

25  A.   I had the first surgery in 2006, and I think the

1   second surgery in 2009.

2   Q.   Okay.

3   A.   I also have something called lupus anticoagulant

4   (phonetic) where I have a blood clotting disorder which

5   I've been on blood thinners for.

6   Q.   Are you currently --

7   A.   They just --

8   Q.   -- being treated for that?

9   A.   -- took me off them.

10  Q.   Okay.

11       And do you have a specialist that you see for --

12  A.   Yes.

13  Q.   -- that disorder?

14  A.   I have several at Yale.

15  Q.   Okay.

16       How many doctors appointments would you say you

17  have a month since -- Let's say since 2009?  How many

18  times a month do you go to the doctor?

19  A.   Not -- Now, I don't because I just got a clean

20  bill -- bill of -- Well, they took me off them

21  temporarily.  I was going quite a bit back in -- from

22  like 2009.  I was in the hospital in 2009 and I almost

23  died from a blood clot.  I was in intensive care in

24  Yale.

25       So I was going quite a bit, but most recently, no,

1    and that's why I was able to take this job, but I can't

2    sit for long periods of time.

3    Q.   Well, to that point, we can take a break whenever

4    you need to, and you can also stand if that helps, and

5    put the microphone up, whatever you prefer.

6    A.   Okay.

7    Q.   If there's a question pending, as we saw before,

8    I'll ask you to answer it before we take a break, but

9    other than that, just say you need a break.

10        You were in the hospital in 2009.  You had a lot

11   of doctor's appointments until very recently.

12        When did your health issues sort of become more

13   manageable, or when did you start having less doctor's

14   appointments?

15   A.   About a year ago.

16   Q.   About a year ago?

17   A.   Yeah.

18   Q.   Okay.

19        So that would be the summer of 2011?

20   A.   Yeah, maybe a little bit longer because, yeah,

21   because I got blood clot again in April.  So --

22   Q.   So -- Okay.

23   A.   I was going probably once every couple of weeks.

24   I would say maybe October of last year.

25   Q.   And when you say you were going once every couple

1   of weeks, where was that treatment --

2   A.   Perhaps I was going every -- I would go to Yale.

3   I go to Yale.

4   Q.   To Yale at -- in New Haven?

5   A.   Yeah.

6   Q.   Okay.

7   A.   And then every week I had to go in and have my

8   blood checked at Day Kimball.

9   Q.   Do you currently have medical insurance?

10  A.   I just got it.

11  Q.   Before -- When did you get it?

12  A.   I just got it on June 1st through the state -- No,

13  through the company that I work for.  And previously I

14  had gotten it through the State.

15  Q.   So before June 1st, 2012, you were on the -- Is it

16  called the Husky Plan?  Is that --

17  A.   Yeah.

18  Q.   You were on the Husky Plan?

19  A.   Yeah.

20  Q.   And does that require a contribution from you or

21  is it fully funded by the State?

22  A.   It was fully funded.  And before I was on that,

23  when I was doing real estate, I purchased my own

24  insurance.

25  Q.   When did you -- When were you were on Husky?  So

1    in June of this year, 2012, you became insured through

2    your employer?

3    A.    Yes.

4    Q.    Before that you were on Husky?

5    A.    Yes.

6    Q.    For how long were you on Husky?

7    A.    I think it was like a year and a half, two years.

8    Q.    So 'til --

9    A.    It was in between the real estate and this, so.

10   Q.    So roughly from June of 2010?

11   A.    Yeah, probably.

12   Q.    And before then you had private insurance?

13   A.    I bought my own insurance.

14   Q.    Bought your own insurance.

15   A.    Yeah.

16   Q.    So in -- Did you have your own insurance in 2010?

17   Do you know whether or not you did?

18   A.    No, I don't think I did in 2010.

19   Q.    Okay.

20         What about in 2009?

21   A.    I don't know when I got -- Yeah, because that's

22   when I had my back surgery.  I think -- No, I don't --

23   I don't even remember.  It's been so long.  It's been a

24   long time.

25         So I know when I had my back surgery I had private

1  insurance because I had to pay for it or I couldn't get

2  my surgery because the State wouldn't --

3  Q.   Okay.

4  A.   -- pay for that.

5  Q.   Okay.

6  A.   So I know I had insurance when I had my back

7  surgery.  I don't recall the dates.

8  Q.   Do you have medical bills or has the State

9  basically been able to --

10  A.   The -- I think I owe a couple grand.

11  Q.   Okay.

12  A.   I threw the bill out so I don't know.

13  Q.   Do you have any car insurance?

14  A.   I have nothing personally, no.

15  Q.   What does that mean, you have nothing personally?

16  Are you insured through one of the LLCs or are you --

17  A.   No, I have no car insurance.  No, none.

18  Q.   What car did you take here today?

19  A.   I took a car that was previously -- Is it okay?

20           UNIDENTIFIED SPEAKER:  Yeah.

21  A.   (Continuing.)  It was -- I took a car that was

22  previously owned by Pappas Homes.

23  BY MR. BENNETT-SMYTH:

24  Q.   What is that car?

25  A.   It's a 2005 Lexus.

1    Q.   Okay.

2         Who currently owns that car?

3    A.   Pappas -- Well, not Pappas Homes.  There's a typo

4    on the -- on the title.  It says like, "INP Realty."

5    Q.   I?

6    A.   Yeah, it's confusing.  Before Pappas Homes was

7    Pappas Homes, it was actually a company called TNP

8    Realty for my children: Tiffany, Nick, Pat.  And

9    Charlie didn't think it sounded professional enough to

10   build houses, so we just did like a name change on the

11   corporation.  So we -- I don't remember when we did

12   this, but we did like a name change from like "TNP

13   Realty" to "Pappas Homes."

14   Q.   Okay.

15        And is --

16   A.   And, no, I have no car insurance.

17   Q.   And was Mr. Pappas a member of TNP Realty or is

18   that just you?

19   A.   TNP Realty was the same entity as Pappas Homes,

20   so.

21   Q.   I know, but you created it and named it --

22   A.   No, he --

23   Q.   -- after your kids.

24        Was Mr. Pappas --

25   A.   No.  He created it.

1   Q.   Oh, okay.

2   A.   I created the name.

3   Q.   So he was a member of that one, as well?

4   A.   Yeah, we were both 50/50.

5   Q.   Okay.

6        Then you changed the name to "Pappas Homes, LLC"?

7   A.   Correct.

8   Q.   But the title on the car was the name on -- The

9   title to the car was never changed.

10  A.   The title on the car was under TNP Realty, but

11  registry made a typo and it says INP.

12  Q.   Okay.  Okay.

13       And do you know the license plate number on that

14  car?

15  A.   Have no idea.

16  Q.   Okay.

17       Do you know whether or not that car is insured by

18  Pappas Homes, LLC?

19  A.   It's not insured at all.  I have no insurance.

20  Q.   Okay.

21       So if Pappas Homes, LLC was dissolved, who owns

22  the car?

23  A.   Technically, I don't know.  I only know it's my

24  only vehicle.

25  Q.   Okay.

1       And did you meet a -- Okay.  Yeah.

2       Do you have any life insurance?

3   A.   Do I have life insurance?  No.

4   Q.   Do you have any general liability insurance, an

5   umbrella policy, or anything like that?

6   A.   No.

7   Q.   So until you got this job in June of 2012, how did

8   you pay for gas for your car?

9   A.   Well, up until October I was using some of the

10  rental income.

11  Q.   From which property?

12  A.   From Normandies Park and the properties in the

13  back.

14  Q.   And when you say "Up until October," is that when

15  you stopped collecting those rents?

16  A.   Yeah.

17  Q.   So when you were collecting those rents, did you

18  use that -- that's how you paid for -- to put gas in

19  your car, basically, was from that --

20  A.   Pretty much.

21  Q.   Do you have a cell phone?

22  A.   Yes.

23  Q.   How do you pay your cell phone bill?

24  A.   Now, I pay for it.  Up until a few months ago,

25  Charlie was paying for it.

1   Q.   And do you know where that money came from for him

2   to pay for it?

3   A.   I would assume the rental income.

4   Q.   And what is that bill, a month?

5   A.   My cell phone bill?

6   Q.   Yeah.

7   A.   $200.

8   Q.   $200?

9   A.   Yeah.

10  Q.   Okay.

11       So up until October, the rental income paid for

12  your gas -- gas for your car.  Since October of 2011,

13  how have you put gas in your car?  Well, let me say

14  this, between October of 2011 and June of 2012, how

15  have you paid to put gas in your car?

16  A.   I was using the child support, which wasn't paying

17  for all of it.

18  Q.   Okay.

19  A.   I wasn't going very far.

20  Q.   So your testimony earlier that that money went to

21  care for your son, --

22  A.   It did.  Well, caring for him --

23  Q.   -- that wasn't entirely true.

24  A.   -- and getting him to places he needs to go.

25  That's part of caring for him.

1    Q.    Okay.

2          And how did you pay for the gasoline to get you to

3    places that you needed to go?

4    A.    How did I what?

5    Q.    How did you pay for the gasoline to get you to the

6    places that you needed to go?

7    A.    I don't know.  I mean, I was not -- had basically

8    no money.  That's why I got a job.

9    Q.    When did Mr. Pappas stop paying your cell phone

10   bill?

11   A.    I don't know.

12   Q.    Did he pay it last month?

13   A.    No.  I know he hasn't paid it since I started my

14   job.  He's -- That's how -- He was giving me a little

15   bit of money until I started my job, and then as soon

16   as I started my job, that was it.

17   Q.    Do you have a television in your home?

18   A.    No.

19   Q.    Do you have cable?

20   A.    I just got it.  I didn't have it.  It was turned

21   off.

22   Q.    When was it turned off?

23   A.    A couple months ago.

24   Q.    And why was it turned off?

25   A.    Because the bill wasn't paid.

1    Q.   And how long had the bill not been paid for?

2    A.   I don't know.  I wasn't paying any of the bills.

3    Q.   Okay.  And -- Okay.

4         And you said that Crystal Creek pays the electric

5    bill or Mr. Pappas pays the electric bill?

6    A.   Charlie pays it.

7    Q.   Okay.

8         For the last two years how did you pay for food?

9    Were you on food stamps?

10   A.   Yeah.

11   Q.   When were you on food stamps?

12   A.   2000 -- Whenever I got my insurance, so.

13   Q.   You mean the Husky Insurance?

14   A.   Yeah.  And that all stopped in -- it's in March

15   when I took my new job.

16   Q.   Okay.

17        So between roughly 2010 and 2012 you collected

18   food stamps?

19   A.   Yes.

20   Q.   How much a month?

21   A.   I think it was like 400.

22   Q.   Do you have any pets?

23   A.   Yes, three cats.

24   Q.   On March 21st of 2012, your attorney filed a

25   fourth supplemental compliance to the first set of

1   interrogatories and request for production, and you

2   verified the truth of the -- of those documents.  That

3   was marked as Exhibit 6 the last time we were here.

4       In that document you disclosed the bank records

5   for Normandies Park, Northeast Waste, Crystal Creek

6   Farms.  And you also disclosed a personal bank account

7   for you, Ms. Delaney.

8   A.   Yes.

9   Q.   Is that a complete list of all the bank accounts

10  in which you, Mr. Pappas, or any LLC in which you are a

11  member, have signatory authority?

12  A.   At that time, yes, but since then I opened up an

13  account because of my new job, so I could cash my

14  checks because the Savings Institute was giving me a

15  hard time, and I'm not sure if it's called "Webster

16  First" or "Webster Five."

17  Q.   Okay.

18  A.   I don't think there's like maybe -- I don't even

19  know if there's any money in there.  There might be $50

20  in there --

21  A.   Okay.

22  Q.   -- but I did open up my own personal account.

23  Q.   Okay.

24      We would definitely like, you know, monthly

25  statements from that bank account.

1   A.   Okay.

2   Q.   And you can provide this through your attorney.

3   A.   Okay.

4   Q.   Do you know of any other bank accounts that you or

5   Mr. Pappas, or any LLC in which you or Mr. Pappas are a

6   member?

7   A.   No.

8   Q.   You know any others that exist?

9   A.   No.

10  Q.   Do you, Ms. Delaney, have any money invested in

11  stocks, bonds, mutual funds or any other type of

12  investment account or portfolio?

13  A.   No.

14  Q.   Have you ever had any of those --

15  A.   No.

16  Q.   -- types of investments?

17  A.   No.

18  Q.   Have you ever performed any work for money in the

19  State of Rhode Island?

20  A.   In the State of Rhode Island?

21  Q.   Uh-huh.

22  A.   Well, yeah.  I sold a couple of houses, probably

23  haven't for -- I don't know exactly when.  I think the

24  last one I sold out there was in 2009.  And I currently

25  have a listing out there, but he's going to probably

1   take it off the market and rent it.  So I -- I have a
2   real estate license there.
3   Q.   And when you say "He", is that Mr. DeAngelis?
4   A.   No.
5   Q.   Who?
6   A.   Just a regular listing.
7   Q.   Okay.
8   A.   I don't think he'd want his name --
9   Q.   Can you give me the address of that property?
10  A.   Yep.  I think it's 3 -- I think it's 348.  I'm not
11  exactly sure of the number.  I think its 348 Winnapaug
12  Road in Westerly.
13  Q.   Can you spell Winnapaug?
14  A.   W-I-N-N-A-P-A-U-G.
15  Q.   Have you done any work for money in Massachusetts
16  or Maine since 2009?
17  A.   No.  I sold -- I don't think I sold anything in
18  Mass.
19  Q.   Have you ever owned an interest in a timeshare
20  property?
21  A.   Yeah.  They foreclosed on it.  Charlie doesn't
22  even know that.  Yeah, we did.  We had a membership in
23  Hilton.  They like sold it for like $100 a couple of
24  months ago.
25  Q.   Did you have any other side business since 2010?

87

1    Is there any other source of income since 2000 -- I'm

2    sorry, since 2009, that we haven't discussed?

3    A.   No.

4    Q.   I'm going to show you your bank account and ask

5    you about some of the deposits.

6         Do you want to take a five-minute break?

7    A.   Yeah.

8              MR. BENNETT-SMYTH:  Yeah?  Is that all right,

9    Donn?

10             MR. SWIFT:  Sure.

11             MR. BENNETT-SMYTH:  Madam Reporter, take a

12   five-minute break.

13        (Recess at 12:00 p.m., until 12:30 p.m.)

14                   AFTER RECESS

15                EXAMINATION (CONTINUED)

16   BY MR. BENNETT-SMYTH:

17   Q.   Okay, Ms. Delaney, we're back on the record.

18        When we left off, I was asking you about your

19   employment between 2009 and presently, and we kind of

20   went over the income that you did have or didn't have

21   during that time period.

22        So one of the documents that was produced in this

23   case was your bank account, and that was produced and

24   it was entered as an exhibit last time, as Exhibit 6,

25   Attachment 4.  I'm going to approach you now and just

1    show you that account.

2        The basic question I have is during this time

3    period where you -- During the time period where you

4    have basically no income, your bank account, which is

5    Account Number 986000372593 continued to receive

6    considerable cash deposits, and I just want to

7    understand where those deposits came from.

8        On September 2, 2010, there was a deposit for $900

9    in your account.

10   A.    Yeah.    That must have been -- That had to be a

11   rent account, a rent check for -- It had to be a rent

12   check for Crystal Creek because those were 900.

13   Q.    Okay.   September 13, 2010.

14   A.    Yeah, that had to be a rent check, too.

15   Q.    Eight hundred dollar check, that's also a rent

16   check?

17   A.    Yeah.   Any deposits had to be from rental income.

18   Q.    Now, September 16, 2010, there's a thousand

19   deposit.

20   A.    Yeah.   I don't remember.   I mean, honest, I don't

21   know.   I don't know because I usually took the rent

22   because the bills were getting paid out of that

23   account, so I would put the rental income into that

24   account.

25   Q.    And September 20, 2010, there was a check of

1   $3,000.  Now, that that's --

2   A.   Yeah, I don't remember what that's for.

3   Q.   Then the very next day, September 21, 2010, there

4   was another deposit of $2950.

5   A.   I don't remember, but the numbers -- I don't

6   remember.  I don't remember the last time we had a

7   closing.  It was either from a closing or it was from

8   rental income.

9   Q.   Well, those numbers are rather large for rental.

10  A.   Yeah.  That looks like a number that would have

11  been like a combination of rental income from the

12  trailer park, but I don't -- Some of the checks used to

13  be written to me personally for the rent.  So I would

14  have deposited them.

15      Wait, the ones that were made to Normandies Park

16  had to go -- get deposited into Normandies Park, but if

17  they were made to me personally, then I put them in my

18  account.

19  Q.   So in September of 2010, there was roughly $9,000

20  of deposits into your account.  So that couldn't

21  (phonetic) have been rents.

22  A.   You know, I don't remember what that was.

23  Q.   I'm now looking at October of 2010, and if you

24  need help with the documents just let me know.

25      October 6, there's a deposit for $3600.

1   A.   I don't know what that's for.

2   Q.   October 7, there's a deposit of $1500.

3   A.   No, I -- I don't know.   I --

4   Q.   Yeah.   I'm going to read them to you and if you

5   can confirm that you don't know where they came from or

6   what account they came from that would be helpful.

7        On October 12, 2010, $245.73?

8   A.   I don't know.

9   Q.   October 19, 2010, $800 deposit?

10  A.   I don't know.   I don't want to assume, but I don't

11  know.   I -- That looks like a rent check, but I

12  don't --

13  Q.   Okay.   October 26, 2010, $4,000?

14  A.   Don't know.

15  Q.   October 29, 2010, $1,000?

16  A.   Don't know.

17  Q.   November 1st, 2010, $500?

18  A.   I don't remember any of these.

19  Q.   Okay.

20       And please tell me if I'm going too quickly

21  because you can take as much time as you need.

22       November 3rd, 2010, $1,000?

23  A.   I don't know.

24  Q.   November 29, 2010, $800.

25  A.   Don't know.

1   Q.   November 2000 -- You don't know?

2   A.   No, I don't know.

3   Q.   November 30, 2010, $3700 and then an additional

4   deposit of $25 -- $250?

5   A.   I don't know.

6   Q.   December 2nd, 2010, there was a deposit for $900.

7   A.   That's November.  That has to be a rent check.

8   Q.   Okay.  February 3rd 2011, $900.

9        You think that's a rent check?

10  A.   Yeah.

11  Q.   February 28, 2011, $900.

12  A.   Where are you?

13  Q.   February 28, 2011.  Take your time.

14  A.   Twenty-eighth.  February 8.  On February 9th

15  there's two.  One for four and one for five?

16  Q.   I'm sorry.

17  A.   I see --

18  Q.   February -- We already talked about February 3rd,

19  2011.

20  A.   Oh, okay.

21  Q.   A $900 check.  I believe you said you thought that

22  was a rent check.

23  A.   Uh-huh.

24  Q.   And then there's a check on February 28, 2011 for

25  $900.  Now that's --

1    A.   That would -- Yeah, that -- because there was two

2    properties, yeah.  That was a rent.

3    Q.   I'm now in March, on March 15th --

4    A.   I do not know.

5    Q.   -- there's a deposit of $1500.

6        You don't know what that --

7    A.   No.

8    Q.   On April 11th, the next month, 2011, there's a

9    deposit for $400.

10   A.   I don't know what those are for.

11   Q.   Okay.

12       May 6th, 2011, there's a deposit for $975.

13   A.   That had to be a rent check.  That may have been a

14   rent check for Normandies Park.  That might have been

15   when that new tenant moved in.

16   Q.   Okay.

17       May 6th, 2011, that would have been their first

18   rent check?

19   A.   It sounds about the right time.

20   Q.   And is that the rental now, $975?

21   A.   No, the rental amount is $900 but I think they

22   gave me extra for a dog.

23   Q.   Dog?

24   A.   I think so.

25   Q.   Is that a one time fee or is that each month?

1  A.   I think they're paying every month.  The rent --

2  Q.   (Unintelligible.)

3  A.   I think so.

4  Q.   So they pay --

5  A.   I don't remember.

6  Q.   So they -- maybe $975 a month?

7  A.   Yeah.  The rent is nine, but then if they keep the

8  pet -- if the pet goes because the pet was elderly,

9  then they don't pay that extra.

10 Q.   Okay.

11      So that's rent for Normandies Park, where they put

12 the rent to your personal account?

13 A.   Correct.

14 Q.   June 10, 2011, $826?

15 A.   That's an odd amount.  I don't know what that's

16 for.

17 Q.   June 21, 2011, $200?

18 A.   Don't know.

19 Q.   June 30, 2011, $220?

20 A.   Don't know.

21 Q.   July 27, 2011, $1900?

22 A.   Don't know.  I'm just trying to add the rent up in

23 my head and I don't know the exact numbers.  I don't

24 know what that one is for, the twenty-ninth.

25 Q.   July 29th?

1   A.   Yeah.

2   Q.   The check for $2978?

3   A.   I don't remember.

4   Q.   And that was last summer, right?  It's a year ago?

5   A.   Yeah.

6   Q.   September 19, 2011, $200?

7   A.   Don't remember.  I don't know.

8   Q.   October 16, 2011, and by this time you're not

9 collecting any rents, right, October of 2011?

10   A.   I'm not -- It was right around that time, anywhere

11 from October.  We had a big falling out around that

12 time, so it was around that time.  I'm not exactly sure

13 of the date.

14   Q.   Okay.

15      So there's a check for $983.30 on October 16,

16 2011.

17   A.   Wait a minute.

18   Q.   I'm sorry.  October 26th, not 16th.

19   A.   I'm trying to think of when I had that closing on

20 Daggett Street.  Wait a minute.  Hold on.  What was the

21 date?

22   Q.   October 26th, 2011.

23   A.   Yeah.  That was -- That had to be Daggett Street

24 because I also wrote a check for $737 because I didn't

25 keep that money.  When you questioned me last time

1    about that property on Daggett Street that I had forgot

2    about, I basically did that as a favor for another

3    agent and kept a little bit of the money.

4        So that must have been the closing from Daggett

5    Street because then the $737 check would have been the

6    check that I wrote them back.

7    Q.   And then all the way up to December of 2011 now.

8        December 9, 2011, there's a deposit for $950?

9    A.   That's probably -- Well, maybe that's when the

10   last time I took rent was.  I don't know what that is.

11   Q.   Okay.

12       January 4, 2012, $900?

13   A.   Yep.  That must be rent.

14   Q.   So you were still collecting rent.

15   A.   I must have been collecting a couple of them.

16   Q.   Okay.  This is just --

17   A.   That must have been what I was using it for my

18   gas.  I don't exactly remember, but I know I was taking

19   some of the rent money to survive, but not much.

20   Q.   Okay.

21       January 11, there's a $900 deposit?

22   A.   That had to be a rent check, yeah.  So that's --

23   Yeah, because I don't remember exactly when I --

24   Q.   On January 2012, you deposited $1950 in your

25   personal account.  There's three deposits; Jan 4, Jan 5

1   and Jan 11.

2        Do you think those are all from rent?

3   A.   What date?

4   Q.   January 4th, 2012; January 5th, 2012; January

5   11th, 2012.

6   A.   I honestly don't remember.

7   Q.   And then there's two deposits in February 2012.  I

8   believe you only have the accounts through February.

9        There's February 6, 2012, another $900, and then

10  $540 on February 17, 2012.

11       Do you know what those deposits were from?

12  A.   No.  I see I paid bills, so -- I don't know

13  because even if I wasn't spending the money, I know at

14  some point in time before I wasn't collecting any of

15  it, I would still taking checks, depositing them just

16  to pay some of the bills.

17  Q.   Does Mr. Pappas have access to this bank account?

18  Did he had signatory authority?

19  A.   He did.  He did.

20  Q.   Until when?

21  A.   He's always had access to it, up in -- I had it --

22  It's closed now.

23  Q.   Okay.

24       Do you know whether or not he ever made

25  withdrawals from this account?

1   A.   Withdrawals?

2   Q.   Did he ever take money out of that account?

3   A.   He took money out of the accounts.  I don't know

4   which ones.  He could have, and use -- I mean, we both

5   have debit cards.  As far as cash, I don't -- I don't

6   remember, but we both had access to every one of the

7   accounts.

8   Q.   Could you look in January and February of 2010

9   within that -- those bank account statements starting

10  on January 25th?

11  A.   What date in February?

12  Q.   January 25th, 2010.

13  A.   Okay.

14  Q.   And then if you could just review the entries

15  through February 1st, 2010.

16       You see those withdrawals in Massachusetts,

17  including Home Depot?

18  A.   The debit cards?  Yeah, those are debit card

19  transactions.

20  Q.   What business do you have in Massachusetts in the

21  winter of 2010?

22  A.   Business?  I didn't have a business.

23  Q.   So these are personal expenditures?

24  A.   Yeah.  This is a personal account.

25  Q.   I just assumed the Home Depot had to do with one

1    of your business ventures but that was my assumption.

2    A.   No (unintelligible), so I go to Massachusetts to

3    do all my shopping.

4    Q.   I'm going to take the -- I'm going to take that

5    attachment back now.

6         Ms. Delaney, I just want to show you the

7    Attachment 1 to Exhibit 6 from the last time you were

8    here, which is the bank account from Normandies Park.

9    That's Bank Account Number 9860004053880.

10        We were just talking, a few minutes ago, about

11   Attachment 4, which is your personal bank account, and

12   that's Account Number 9860003725183.  That's your

13   personal, and now you're looking at the Normandies Park

14   bank account.

15        Between November 19, 2010 and January 4, 2012,

16   your personal bank account had 26 transactions with

17   Normandies Park bank account, which resulted in you

18   withdrawing $10,000 from Normandies Park, and

19   depositing $465 into Normandies Park.

20        How do you explain that?

21   A.   I can't.  I don't remember what I did back in

22   2010.

23   Q.   Okay.  I'm going to take back Attachment 1.

24        Do you want to look at it further?

25   A.   No.

1   Q.   Ms. Delaney, I'm going to now show you Attachment

2   3 from Exhibit 6 from the last time we were here.  This

3   is the bank account for Crystal Creek Farms, LLC.

4   A.   Okay.

5   Q.   And that's account number 9860003682044.

6        Between June 8 of 2009 and September 20, 2010,

7   your bank account and the Crystal Creek Farms bank

8   account have nine transactions together, which resulted

9   in you withdrawing $7450 from Crystal Creek Farms and

10  depositing $650.

11       How do you explain that net withdrawal of $6800

12  from Crystal Creek Farms to your personal bank account?

13  A.   I would take money out of there to pay the bills.

14  Q.   The bills on Crystal Creek?

15  A.   Yeah, mortgage, insurance.

16  Q.   Why don't you just take those bills directly from

17  Crystal Creek?

18  A.   I don't know.  That's just how I did it.

19  Q.   I'm going to take that attachment back from you --

20  I'm sorry.

21       Do you want to add anything else?

22  A.   No.

23  Q.   I'm going to take that attachment back from you

24  and give you back Attachment 4, which is your personal

25  bank account.

1    A.   Okay.

2    Q.   Ms. Delaney, one of the things in this case that's

3    -- when we reviewed the bank -- your personal bank

4    account was -- there seemed to be an awful lot of

5    activity with certain accounts that weren't disclosed

6    in this case.

7         The first one was Account Number 9860002193026

8    A.   I don't know what that is.

9    Q.   Well, let's go through the transactions and maybe

10   you'll remember.

11   A.   Okay.

12   Q.   You start at June 16 in 2009, with the beginning

13   of the document.

14   A.   June 16th of 2009.  June 16th.  Okay.

15   Q.   That account -- I'm sorry.  You deposited $2500

16   into that account.

17        Why would you do that?

18   A.   I don't remember.  I had another -- I had a

19   Crystal Creek account before this one that they had

20   shut down for inactivity, and then I had to reopen it

21   because I hadn't used it for a while.  I don't know if

22   that was the old Crystal Creek account.  I don't

23   remember.

24   Q.   Okay.

25        On August 3rd 2009 you deposited another $1000

1   into that bank account.

2   A.   I don't know.  I don't have access to that

3   information online anymore, to find out if that was the

4   old Crystal Creek account.

5   Q.   When you say "Old Crystal Creek account", what do

6   you mean?

7   A.   Yeah, I had a bank account under Crystal Creek,

8   but what happened was I didn't use it for like, I don't

9   know, like six months, or something like that, and when

10   you don't have the account -- you don't like use it for

11   a certain amount of time, they shut it down for

12   inactivity.

13       I don't remember when they did that, but I

14   remember they had done that with my Crystal Creek

15   account.  So I don't know if that's the one.

16   Q.   Okay.

17       Well, at this time there is activity in the

18   account so it would have been an active account, right?

19   A.   It would have been, yeah.

20   Q.   You know when that account closed?

21   A.   I don't.

22   Q.   Okay.  Well, let me keep asking you about these

23   deposits and maybe it will help you refresh your memory

24   why you were depositing money into this bank account.

25   A.   Wait.  Did I give you the -- Did I have -- Was

1   that Pappas Homes?  No, because I gave you Pappas

2   Homes, right?

3   Q.   No, you didn't.  We got that from your accountant.

4   A.   Maybe it was Pappas Homes.

5   Q.   Do you have a bank account for Pappas Homes?

6   A.   I don't.  I haven't had one since like 2009.

7   Q.   Okay.

8   A.   That could have been --

9   Q.   Well, these deposits --

10  A.   If they're larger one, it would have been Pappas

11  Homes.

12  Q.   Okay.  Well, these deposits continued after 2009,

13  so.

14  A.   Then, it's not.  I don't know then.

15  Q.   December 8, 2009, you deposited $400 into this

16  bank account.  Another $2,000 on October 28, 2009.

17  A.   I don't really remember which account that was.

18  Q.   Another $400 on December 14, 2009.

19       On January 15, 2010, $1,000 deposited.

20       On January 19, 2010, another $600.

21  A.   I don't know what that account was.  It's not an

22  existing account, and I had so many accounts it's

23  really confusing for me to remember what came out of

24  what.

25  Q.   Is it fair to say that you don't have an

1   explanation for any of the deposits or withdrawals on
2   this account?
3   A.   I don't because I don't remember what that account
4   was.
5   Q.   Okay.  I'm just going to read the dates so the
6   record is clear.
7       There is another $500 withdrawn to Ms. Delaney's
8   account on February 16, 2010.
9       On February 23rd 2010, another $500 to Ms.
10  Delaney.
11      On February 25, 2010, $100 was deposited by Ms.
12  Delaney in this account.
13      On April 8, 2010, $900 was withdrawn to Ms.
14  Delaney's account.
15  A.   Maybe that was the Anna Alexis account because I
16  had stopped operating it in 2009, but I think I still
17  had the bank account opened the beginning of the year.
18  It could have been Anna Alexis.
19  Q.   Okay.
20      And then on July 13, 2010, $250 were transferred
21  to you, so that --
22  A.   Is that when you saw the last --
23  Q.   That account was --
24  A.   -- transaction?
25  Q.   That account was opened at least until July of

1   2010, correct?

2   A.   I don't remember when I closed it, but that's the

3   only thing that that number -- that I could think of

4   would be possibly Anna Alexis.

5   Q.   Okay.

6      And you haven't -- you haven't disclosed those

7   bank records in this case --

8   A.   I don't have any.

9   Q.   And you never made us aware that that account

10   existed, ever.

11   A.   No, because it was closed.  When you asked me for

12   them, it had already been closed.

13   Q.   In 2009, there's also three transactions with

14   Account Number 9860002935816.

15      On August 4, 2009, you deposited $1,000 into that

16   account.

17      On August 20, 2009, you deposited another $200.

18      And on November 3rd, 2009, you deposited $1200

19   into that account.

20   A.   I don't remember what any of that is.

21   Q.   From 2009 through 2011, you had transactions with

22   Account Number 9860003725141.  (Unintelligible) -- Let

23   me give you this thing.  Maybe it will help you

24   remember.

25   A.   What date?

1    Q.   So the most recent date was this account transfer,

2    $350 to your personal account, Ms. Delaney, on December

3    27, 2011.

4    A.   December --

5    Q.   This past year.

6    A.   -- 2011.  December 2011.

7    Q.   This is the account number.  I just read it, but

8    the last four digits are 5141.  If you look at

9    December, you'll see that deposit into your account for

10    $350 on December 27th.

11        Do you see it there in the records?

12    A.   December 27th.  December?

13    Q.   December 27th, 2011.

14    A.   Oh, that would be my escrow account.  That might

15    be, and actually, now that I remember, you asked how I

16    cashed my real estate commission check, I didn't cash

17    it.  I put it into my escrow account and then withdraw

18    it out of the escrow account because they wouldn't let

19    me cash any checks at the bank.

20    Q.   Okay.

21        So you'd never --

22    A.   That might -- Because that's not really,

23    technically like my bank account.  I can't like touch

24    the money in that account because when someone gives me

25    a deposit on a property, I have to deposit it into this

1    account, and I'm not allowed to commingle funds.  So

2    I'm not allowed to touch it, and then like the State

3    takes like -- It's hard to explain.

4         When you have a real estate (phonetic), you have

5    to open up what's called an "escrow account", and when

6    you get a deposit, say you're renting a property or

7    you're selling a property, you get a deposit, you have

8    to deposit that check into your escrow account.

9         You're not -- There had to be something with my

10   escrow account is the only thing I -- looks like -- the

11   $350 is a weird amount.  Oh, I been -- I don't know

12   what -- why I would have done that, though.

13        But the reason I didn't give you that was because

14   that's not really my account.  It's hard to explain.

15   You put the money in there.  It earns interest.  The

16   State takes the interest.  It goes into something like

17   soup fund, or something, and then you're not supposed

18   to touch the money unless there's a transaction, and I

19   don't remember why that -- why I did that.  I either

20   had money in there that I had forgot was in there and

21   took it out --

22   Q.   So when there is a transaction, the money goes to

23   you?  Is that how it works?

24   A.   No, it goes like, back to like either the tenant,

25   the buyer, the attorney.

1    Q.   Okay.

2         So why does this bank account evidence all these

3    transactions to your personal account?

4    A.   I don't know why I did that.  I really don't.

5    Q.   Okay.

6         So you don't really have an explanation for that

7    bank account.

8    A.   No.  I -- That -- I'll have to look and to see if

9    that is my escrow account.

10   Q.   Okay.

11   A.   Because I don't know the account number to it.

12   Q.   And then in 2009, there were also three

13   transactions from you, meaning you were depositing

14   money into Account Number 9860001867044.

15        On September 4, 2009, you deposited $600 in that

16   account?

17   A.   What date was that?

18   Q.   September 4, 2009.  And the last four digits of

19   that account is "7044."

20   A.   That may have been the old Normandies Park

21   account.  The Normandies Park, it was -- I think there

22   was some like automatic withdrawals that were coming

23   out of it that we couldn't afford to pay.  I don't

24   remember what they were.

25   Q.   Was that after Normandies Park owned the park

1     (inaudible)?

2     A.    Yes, because I remember I had to shut the bank

3     account down because it was like these automatic debits

4     coming out.  I don't remember what they were.

5     Q.    So Normandies Park became the owner of the Mobile

6     Home Park in 2010.  We're talking about 2009.

7     A.    I'm not sure.  I think I had opened up the bank

8     account though, before then.  I'm not -- I don't

9     remember.

10    Q.    (Inaudible.)

11    A.    It had to be an account that's since been closed

12    because I -- it's not an existing account.

13    Q.    Okay.

14          The last one is Account 9860002838862.

15    A.    I don't remember the account numbers.

16    Q.    Okay.  Well, let's look at the transactions.

17    Let's start in December of 2009.

18    A.    Okay.

19    Q.    Ninety dollars deposited into that account from

20    you, Ms. Delaney.

21          Do you know what that was for?

22    A.    What date are you in?

23    Q.    December 28, 2009.

24    A.    December 28, I'm seeing a withdrawal for $90.

25    Q.    Right, to Account 986000283 --

1    A.   I don't know because any accounts that you asked

2    me for that we have currently, I gave you, so I don't

3    remember what account that is, but it's not -- it can't

4    be an active account if I didn't give it to you.

5    Q.   The problem with this account, Ms. Delaney, and I

6    accept your answer that you don't remember what any of

7    these withdrawals and deposits concern, but the problem

8    with this particular account is there's roughly 20

9    transactions between your account and this account.

10   A.   Yeah, and it's --

11   Q.   And I'd like to read them to you and I'd like you

12   to try to provide some explanation regarding that

13   activity because this bank account was not disclosed.

14   A.   It can't be a bank account that I had then.

15   Q.   On February 23, 2010, $200 was deposited into your

16   bank account from this account.

17   A.   What date?

18   Q.   February 23rd, 2010.

19   A.   I don't remember.

20   Q.   May 26, 2010, $700 into your bank account --

21   A.   I don't remember, and I can't -- I can't like

22   access like, I don't get like paper statements like, I

23   do everything online.  So if I have an old bank

24   account, when you guys asked me to produce all of my

25   bank accounts, I went online and I printed this up from

1  the bank.

2      So if it's an old account that is no longer

3  existing, there's no way for me to like access that

4  account unless I go to bank and ask them for a

5  microfiche, and it's very expensive to do because they

6  charge you like per page.

7      So I gave you everything that we currently had at

8  that time that was open that I was able to access.

9  Q.  On July 12, 2010, $300 was deposited into your

10 account.

11 A.  Yeah, I don't know.

12 Q.  July 19th, 2010, $500.

13 A.  I don't know.

14 Q.  September 10, 2010, $300 more.

15 A.  I don't -- I don't know.

16 Q.  September 21, 2010, $400 from your account into

17 that account, meaning you're paying money into that.

18 A.  Yes, I don't know.

19 Q.  October 18, 2010, $35 to you from that account.

20 A.  I don't know.

21 Q.  November 24, 2010, $300 to you from that account.

22 That account being an account ending in digits "8862."

23 A.  I don't -- I don't know.

24 Q.  January 3rd, 2011, $1,000 deposited to your

25 personal bank account from that account.

1      January 4, 2011, $700 more deposited into your

2   personal bank account.

3   A.   I don't know.

4   Q.   January 10, 2011, $300 more.

5   A.   Don't know.

6   Q.   February 9, 2011, $400 more.

7   A.   Don't know.

8   Q.   March 14, 2011, $600 more dollars.

9   A.   I don't know.

10   Q.   April 14, 2011, you deposited $220 into that bank

11   account.

12   A.   I don't know.

13   Q.   April 29, 2011, you received $250 from bank

14   account ending in digits "8862."

15   A.   I don't know.

16   Q.   May 9, 2011, you received $1,000 from the bank

17   account ending in digits "8862."

18   A.   I don't know.

19   Q.   May 12, 2011, $500 into your personal bank account

20   from the account ending in digits "8862."

21   A.   I don't know.

22   Q.   May 16, 2011, $500 more into your account.

23   A.   I don't remember which account that was.

24   Q.   May 19, 2011, $500 more from that account ending

25   in digits "8862" into your personal account.

1  A.   Maybe that was the Northeast Waste account.  I

2  don't remember.

3  Q.   June 2nd, 2011, $750 more dollars transferred into

4  your personal bank account from Account 8862.

5  A.   I don't know.

6  Q.   June 14, 2011, $600 transferred into your personal

7  account from Account 8862.

8  A.   I don't know.

9  Q.   June 21st 2011, $200 more.

10  A.   I don't know.

11  Q.   July 18, 2011, $200 more.

12  A.   I don't know.

13  Q.   July 20, 2011, $200 more.

14  A.   Don't know.

15  Q.   July 28, 2011, you deposited $350 into that

16  account, meaning less than a year ago you were still

17  putting money into this account?

18  A.   Yeah, and I don't remember which account that was.

19  Q.   August 4, 2011, you deposited $1600 into that bank

20  account.

21  A.   I don't know.

22  Q.   August 3rd, 2011, you deposited $500 into that

23  bank account.

24  A.   I don't know.

25  Q.   August 22nd, 2011, $250 were deposited into your

1   bank account from Account 8862.

2   A.   I don't know.

3   Q.   August 14, 2011, $300 more were deposited into

4   your account from Account 8862.

5   A.   I don't know.  Did I give -- Didn't I give you

6   statements from Northeast Waste?  I don't know what

7   account that was.

8   Q.   You've never given us any bank statement for Bank

9   Account Number 9860002838862.

10  A.   Then I didn't have them when you asked because

11  when you guys asked me for my statements, I went online

12  to every account that I had and I printed everything up

13  back to the date that you guys had asked me.  So if you

14  don't have it, it's because I didn't have it and the

15  bank account had been closed.

16  Q.   Okay.

17       And you understand, we asked for all bank accounts

18  that you had or have since May of 2010, and we're

19  discussing transactions here, all the way up to 2011.

20  A.   I gave you everything that I had that -- available

21  to me.

22  Q.   Ms. Delaney, there's also a number of large

23  withdrawals from the Normandies Park bank account, and

24  I just want to ask you if you remember what any of

25  those concerned.

1        I'm going to show you Attachment 1 from Exhibit 6

2   from the hearing on the motion for sanctions that was

3   held in March of 2012.

4              MR. BENNETT-SMYTH:  Madam Reporter, it looks

5   like its 1:07.  Do you want to stop for lunch now?

6              THE ECRO:   (No audible response.)

7              MR. BENNETT-SMYTH:  And should we come back

8   on -- at 1:37, 1:45, whatever you want?

9              THE ECRO:  At 1:45.

10             MR. BENNETT-SMYTH:  Thank you.

11        (Recess at 1:08 p.m., until 2:16 p.m.)

12                      AFTER RECESS

13                   EXAMINATION (CONTINUED)

14  BY MR. BENNETT-SMYTH:

15  Q.   Ms. Delaney, I'm just going to ask you a few

16  questions about the Normandies Park bank account.

17        There are a number of large withdrawals from the

18  Normandies Park, LLC bank account.  I'm going to

19  approach and hand you Attachment 1 through Exhibit 6,

20  which is the Normandies Park bank account, and just to

21  reiterate my explanation from earlier, Ms. Delaney, I'm

22  asking you about specific withdrawals over the last

23  couple of years.  I'm hopeful that you'll be able to

24  provide an explanation.  If the explanation is that you

25  don't remember, then I'll move on to the next question.

1          If you could look in 2010, starting in June 2010,

2     so I guess what's interesting to me about these

3     Normandies Park withdrawals is this is money --

4     presumably the money in the account comes from the

5     rents, right?  That's only revenue that Normandies Park

6     has; is that correct?

7     A.   I don't remember.  There could have been other

8     money in it that I put in it.  I don't remember.

9     Q.   Okay.  And so I'm interested why money would be

10    leaving that account.

11         In June of 2010 there is a withdrawal of $700.

12         Do you know why that money was withdrawn from the

13    account?

14    A.   No.

15    Q.   In December of 2010, there was a withdrawal of

16    $5,361.60.

17    A.   I do not know what that's for.

18    Q.   It says that -- It says -- There's a notation that

19    says that the withdrawal was for an asset auction.

20    A.   I don't remember.  I don't remember.

21    Q.   January 3rd, 2011, there was a withdrawal of

22    $1,041.49?

23    A.   I don't remember.

24    Q.   August 10, 2011, there was a withdrawal of

25    $1,976.92?

1  A.   I don't remember.

2  Q.   October 11, 2011, there was withdrawal of

3  $2,008.62?

4  A.   I don't remember.

5  Q.   October 25th, 2011, there's withdrawal of $1334?

6  A.   I don't remember.

7  Q.   November 18, 2011, there was a withdrawal of

8  $1231.31?

9  A.   No, I do not know.

10  Q.   And January 18, 2012, there was a withdrawal for

11  $956.49?

12  A.   I do not know.

13  Q.   Does anyone have a -- Woo has access to the -- Who

14  had access to the Normandies Park bank account between

15  2010 and the present?

16  A.   Charlie and I both did.

17  Q.   I'm sorry.

18  A.   Charles and I both did.

19  Q.   Did anyone else?

20  A.   Not that I am aware of.

21  Q.   Okay.

22       There's also what appear to be a number of

23  expenses that have nothing to do with Normandies Park.

24  I'm sorry.  Just show you a different document.

25       I'm going to show -- I guess we should mark this

1    as Exhibit 19, for identification purposes.

2        On page 2 it looks like Normandies Park paid

3    interest on expense payments for 241 Church Street and

4    for 44 Barbara Street.

5    A.   Okay.

6    Q.   Do you see that?

7    A.   Yes.

8    Q.   Why was Normandies Park paying interest for Church

9    Street and for a property personally owned by Mr.

10   Pappas?

11   A.   Because a lot of this money that went into this

12   account wasn't from Normandies Park because there's an

13   -- and that's where -- wherever the money came from is

14   where we made the payment out of it.

15   Q.   Okay.

16       So the fact that it was in one account, you would

17   use it -- Wherever the bills were coming in you would

18   use the money --

19   A.   I did that with all the accounts.

20   Q.   Okay.

21       There's also some expenses on page 2 labeled

22   (unintelligible).  See if I can find those.  Oh, I see

23   them, and there's an address listed, 66 East Shore.

24   A.   I don't know where you are.

25   Q.   I'm sorry.  I'm on the document -- It's actually

1    the third page of what we marked as Plaintiff's Exhibit

2    19 for identification purposes.  In the bottom right

3    hand corner of that page, it says "Page 2."  If you

4    then look in the lefthand column you'll see in bold,

5    the word "Maine" like the state, Maine.  It's about

6    three-quarters of the way down that page that's marked

7    "Page 2."

8    A.   I don't know what that's for.

9    Q.   Are you familiar with the address, 66 East Shore?

10   A.   Yes.

11   Q.   What is that address?

12   A.   That was the property that we were going to buy.

13   Q.   That is the property you were going to buy with

14   the --

15   A.   Yeah.

16   Q.   -- that you entered into the installment contract

17   that we discussed --

18   A.   Yeah.

19   Q.   -- last time?

20   A.   Yeah.

21   Q.   Okay.

22        And you did, in fact, make a payment for $15,000

23   when you entered into that installment contract,

24   correct?

25   A.   I don't remember.  It's been a long time.

1    Q.   Okay.

2         And then these are other payments that were made

3    on that property; is that correct?

4    A.   I don't know what -- I don't know any of -- who

5    those are.

6    Q.   Okay.

7         There's also payments -- If you turn to the fourth

8    page of the document which has a page number "3" in the

9    bottom, right-hand corner, it looks like Normandies

10   Park also made some payments to the Central Maine Power

11   Company, and the memo says "Electric."

12        Do you see that under the subheading "Utilities"?

13   A.   (No audible response.)

14   Q.   Why was Normandies Park paying a power bill in

15   Maine?

16   A.   That was from probably the first month or so that

17   we were there.  We utilized it a little bit and I must

18   have paid it out of that.  I don't remember.

19   Q.   So is it correct that for a period of time you on

20   again/off again lived in Maine --

21   A.   No, never.

22   Q.   -- or on again/off again visited Maine?

23   A.   Never.  I never lived to Maine.

24   Q.   Okay.

25        So you would visit the property in Maine for a

1    period of time; is that correct?

2    A.    Yeah.

3    Q.    And how long a period of time was that?

4    A.    I don't remember.

5    Q.    Do you think you were there more than three times?

6    A.    Probably not, no.

7    Q.    Okay.

8          More than once?

9    A.    I've only been there a couple of times.

10   Q.    Okay.

11   A.    I don't remember.

12   Q.    Okay.

13         Ms. Delaney, do you remember earlier today when I

14   was asking you about the transactions between your

15   personal account and those unidentified accounts, and

16   you were generally saying that either you didn't

17   remember, you thought they were accounts that had since

18   been closed?  Do you remember that?

19   A.    Yes.

20   Q.    When you're going over that?

21         There also seemed to be a great number of

22   transactions between the Normandies Park account and

23   unidentified bank accounts.  So I'd like to go through

24   those with you.

25   A.    Okay.

1    Q.   I'm going to come up and get Plaintiff's Exhibit

2    19 for ID and I'm going to bring you Exhibit 6,

3    Attachment 1 from the motion for sanctions.   This is

4    the Normandies Park bank account.

5         Exhibit 6, Attachment 1, the Normandies Park bank

6    account shows a total of 15 transactions between

7    December 13, 2010 and August 29, 2011, between

8    Normandies Park and Bank Account 9860002838862.   These

9    transactions resulted in that account, the 8862

10   account, withdrawing $6,175 from Normandies Park and

11   depositing $11,925 into Normandies Park, resulting in

12   Normandies Park taking a net of $5750 from this

13   unidentified bank account.

14        You've already testified that you're not familiar

15   with that bank account, or you -- you're not sure what

16   bank account that is.

17        Do you have anything to add to that testimony?

18   A.   It's a non-existing account because if it was

19   existing I would have given it to you.

20        You're asking -- What is the question?

21   Q.   The question is, other than saying that it's a

22   non-existing account, do you have any explanation as to

23   why that money was put in --

24   A.   No, because I would take -- If Normandies Park

25   didn't have enough account money in it, I would take

1    out of other accounts and put it in Normandies Park,

2    and then money would come back out of Normandies Park

3    to go back into the other accounts to cover the money

4    that Normandies Park was given from the other accounts.

5         So it wasn't necessarily taken out of Normandies

6    Park income.  It was money that may have come from

7    another account.

8    Q.   There's also a number of deposits into the

9    Normandies Park account with no explanation as to where

10   it came from.

11   A.   Right.  That might mean that they came from

12   another account.  I mean, it wasn't Normandies Park

13   income because the only income Normandies Park has is

14   the rents.  That's it.

15   Q.   Okay.

16        I'm trying to understand how Normandies Park is

17   getting all this money from some unidentified place.

18   That's what I'm trying to understand.

19   A.   It was not -- It's not unidentified.  It's either

20   one of the businesses that we had that is no longer in

21   existence, or was money that before this happened, when

22   I was making real estate, I would put money in to cover

23   expenses because Normandies Park did not make enough

24   money to cover itself to operate, --

25   Q.   So in addition to the --

1   A.   -- to pay the taxes.

2   Q.   -- in addition to the deposits from the account

3   8862, there was also additional deposits.

4   A.   I don't know where they came from.  It's been a

5   long time.  I have no idea where these came from.

6   Q.   Okay.

7        I'm going to read you the additional deposits that

8   have no bank account and then I'll ask you whether you

9   know where they came from, okay?

10       May 17, 2010, $5,000.

11  A.   I don't know.

12  Q.   July 19, 2010, $1200?

13  A.   I don't know.

14  Q.   September 28, 2010, $920?

15  A.   I don't know.

16  Q.   November 1, 2010, $1,000?

17  A.   I don't know.

18  Q.   November 2, 2010, $900?

19  A.   I don't know.

20  Q.   December 13, 2010, $1200?

21  A.   don't know.

22  Q.   December 14, 2010, $200?

23  A.   I don't know.

24  Q.   December 15, 2010, $300?

25  A.   I don't know.

1    Q.   December 16, 2010, which I believe is the day

2    after you appeared in this lawsuit.

3    A.   I don't know what that's for.

4    Q.   $16,311.26?

5    A.   I don't know.

6    Q.   December 29, 2010, $7,771.44?

7    A.   I don't know.

8    Q.   April 25th, 2011, $1580?

9    A.   I don't know.

10   Q.   June 10, 2011, $2180?

11   A.   I don't know.

12   Q.   June 29, 2011, $2290?

13   A.   I don't know.

14   Q.   September 7, 2011, $2,015?

15   A.   I don't know.

16   Q.   By our calculations, in 2010 there are deposits,

17   in addition to all the rental deposits indicated in

18   Exhibit 19, which I'm happy to show you again, There

19   are deposits of $34,802.70.

20        You don't know where any of that came from?

21   A.   I do not know right now, no.

22   Q.   All right.  I'm going to bring you Attachment 2 in

23   Exhibit 6, from the motion for sanctions, hearing on

24   March 27th.  This is the bank account from Northeast

25   Waste, LLC.

1       Do you know when Northeast Waste began operations

2  as a business?

3  A.   No.

4  Q.   We were provided -- Are you familiar with the term

5  "K-1", a tax document for a partnership or a limited

6  liability company?

7  A.   Yes.

8  Q.   Okay.

9       You were provided with K-1s from Northeast Waste

10  from 2009 and 2010.

11  A.   Okay.

12  Q.   And also profit and loss details for 2009 and 2010

13  from Northeast Waste.

14       Is Northeast Waste currently doing business?

15  A.   No, I haven't done any -- No.

16  Q.   When is the last time Northeast Waste did any

17  business for income?

18  A.   I don't know.

19  Q.   Was it in 2012?

20  A.   I don't remember.

21  Q.   Was it in 2011?

22  A.   Yeah.

23  Q.   Now, we have the K-1s from 2009 and 2010.

24       Is it fair to say that Northeast Waste was

25  operating at least in 2009?

A.    Yes.

Q.    Maybe even earlier?

A.    I don't know.  I'd say maybe 2000.  I don't know.

Q.    Okay.

The bank account that you produced from Northeast Waste was not opened until October 18, 2011.

A.    That might have been that other bank account that you were asking me where -- where the money -- what that account was.  That might have been the old Northeast Waste account.

There was a reason I shut it out.  I don't remember which account it was, but there was something that was automatically coming out.  I don't know if it was a loan or something, but I closed -- I think that's why I closed it down and then reopened it under -- so that the debits couldn't come out because there was no money in there and they were debiting the account and it was always negative.

So that might have been that account that you were questioning on -- might have been the old Northeast Waste account.  It's been a while so I don't remember.

Q.    I'm going to come get that attachment from you and I'll bring you Attachment 3 to Exhibit 6, which is the bank account for Crystal Creek Farms.

I've just provided you the Attachment 3 to Exhibit

1   6, which is the bank account you provided,

2   98600003682044.  I think I added a 0 in there.  Let me

3   try that again.  9860003682044.  There are a few large

4   withdrawals from this account.

5        Do you have any personal memory of withdrawing

6   large sums of money from the Crystal Creek Farms

7   account?

8   A.   Large sums of money, no.

9   Q.   On April 2nd, 2010, there's a $1,000 withdrawal.

10       Do you know what that was for?

11  A.   No.

12  Q.   On April 12, 2010, there was a withdrawal for

13  $6160.

14  A.   No, I don't remember.

15  Q.   Okay.

16       There's a description that that was a wire to Bank

17  of America.

18  A.   I don't -- I have no idea what that is.

19  Q.   Do you have a Bank of America bank account?

20  A.   No, never have.

21  Q.   Have you ever had authority over any Bank of

22  America bank account?

23  A.   No.

24  Q.   What about Mr. Pappas?

25  A.   Not that I'm aware of.  I don't know.

1    Q.   On August 17, 2010, there's a withdrawal of

2    $13,815 from the Crystal Creek Farms bank account.

3         Do you know what that was for?

4    A.   When was it?

5    Q.   August 17, 2010.

6    A.   No, I don't remember that.

7    Q.   Are you and Mr. Pappas the only ones who have

8    signatory authority over the Crystal Creek --

9    A.   Yes.

10   Q.   -- Farms bank account?

11   A.   Yes.  Yes.

12   Q.   Has anyone else ever had authority?

13   A.   No.

14   Q.   And like the other bank accounts, it looks like

15   you used the Crystal Creek bank account at times to

16   fund your other businesses, and for personal expenses

17   like --

18   A.   Yes, I did it with every account.

19   Q.   -- like Barnes & Noble and American Eagle.

20   A.   Yep.

21   Q.   Yeah.  After September 26, 2010, all activity on

22   the  Crystal Creek Farms account stopped.

23        Did Crystal Creek Farms open a new bank account?

24   A.   No.

25   Q.   Then there was suddenly activity again, in August

1    2011 --

2    A.    Because the two --

3    Q.    -- for two days.

4    A.    -- the only income that Crystal Creek had was the

5    rental properties, and it was only one property that

6    had been being rented, that was rented and it was --

7    and then it went vacant.

8         So the activity stopped because there was no money

9    coming in.

10   Q.   And that's in the -- the end of 2010, beginning of

11   2011?

12   A.   Yeah.  Yeah.  And that's one of the reasons that

13   the account had to be reopened, because they had shut

14   me down because it was inactive.

15   Q.   In 2009, there are five transactions between the

16   Crystal Creek Farms account and an unidentified account

17   number, 9860002935816.  That account withdrew $3150

18   from Crystal Creek Farms.

19        Do you know anything about that bank account

20   ending in digits "5816"?

21   A.   I think that was Pappas Homes, but I don't

22   remember.  I don't keep track of like, account numbers.

23   Q.   There are ten more transactions between Crystal

24   Creek Farms and unidentified account 9860002193026

25   between July 8, 2009 and August 9, 2010.

1    A.    I don't remember what that one was.  That's the

2    one you asked me on earlier and I did not remember.

3    Q.    Yes.  Some of these numbers are the same.  These

4    are withdrawals from the Crystal Creek accounts --

5    A.    Yeah.

6    Q.    -- that's posted to your account so.

7          There are seven transactions between Crystal Creek

8    and unidentified account 986002838862.  We spoke at

9    length about the 8862 account.  It looks like Crystal

10   Creek was also transferring money to that account.

11         Do you have any explanation for those

12   transactions?

13   A.    No.

14   Q.    Do you have any knowledge about the K-1 tax

15   returns or the capital account for Otis Street, LLC?

16   A.    No.

17   Q.    On April 4, 2012, you filed an eighth supplemental

18   compliance to the interrogatories.  You sent us more

19   answers to the interrogatories, and you attached a bank

20   statement from February 2012 for Otis Street, LLC.

21         Did you obtain that bank statement?

22   A.    No.

23   Q.    Where did it come from?

24   A.    Charles must have got it from Korina.

25   Q.    Okay.

1      And did you look at it, or not?

2   A.   No.

3   Q.   Okay.  It's just essentially the one statement

4   from February 2012.

5      Why weren't statements produced for the time

6   period between May 20, 2010 and February of 2012?

7   A.   Because she didn't give them to him.

8   Q.   And do you know whether or not your attorney

9   subpoenaed those documents?

10  A.   No.

11  Q.   Do you know whether or not a letter was ever

12  written demanding those documents?

13  A.   No.

14  Q.   Do you have any knowledge or information

15  concerning the K-1 accounts or the capital accounts for

16  Max CT, LLC?

17  A.   No.

18  Q.   The same question.  The only bank account

19  statement produced by you from Max CT, LLC was from

20  February 2012.

21     Do you know why the earlier bank statements were

22  not produced?

23  A.   No.  I do know that I haven't talked to Korina in

24  probably in six years, but I know previously I had

25  asked for them and she did not produce them.

1   Q.   Okay.

2       And do you know whether or not the Max CT, LLC

3   bank account statements were ever subpoenaed or letters

4   ever written demanding them?

5   A.   I know Charlie asked for them.  I don't remember

6   if we put it in writing.  I think we may have, but I

7   don't remember when I did that.

8   Q.   Do you remember the last time we were here -- Well

9   actually, it was after you left last time.

10      After you left last time, Mr. Pappas answered some

11  questions about 44 to 48 Barbara Street.  Apparently,

12  he sold that property in December of 2011.

13      Did you know that?

14  A.   Did I know he sold it?

15  Q.   Yes.

16  A.   I was aware that he had sold it.

17  Q.   Okay.

18      Did you -- Do you know that it was never disclosed

19  in any of the interrogatory responses?

20  A.   I don't know anything about the transaction.  I

21  was not involved in the transaction.

22  Q.   Okay.

23      You know it existed and that it was sold, right?

24  A.   I did know after it had been sold.

25  Q.   Okay.

1      And did you know that Mr. Pappas walked away from

2  that closing with more than $47,000?

3  A.   I do not.  I was never provided any.

4  Q.   Do you know anything else about the sale of 44 to

5  48 Barbara Street?

6  A.   No.

7  Q.   Do you know what Mr. Pappas did with that $47,000?

8  A.   No.

9  Q.   What, if any, business have you done with Mr.

10 DeAngelis, Joseph DeAngelis, the attorney in Rhode

11 Island?

12 A.   What do you mean?

13 Q.   What business have you done with him?

14 A.   Just real estate.

15 Q.   Have you ever -- Other than your real estate

16 commission, have you ever profited from the sale of a

17 property with -- that Mr. DeAngelis was involved in?

18 A.   Personally, no, but some of our businesses have.

19 Q.   Okay.

20      So I'm just going to ask you about some of those

21 sales, all right?  There was a property at 855

22 Riverside Drive in Thompson, Connecticut.

23      Do you recall that property?

24 A.   Yes.

25 Q.   And a law firm called "Jackson Harris Burlingame &

1   Hubert, LLC" (phonetic)?

2   A.   Yes.

3   Q.   Sent a check for $31,959.54; is that correct?

4   A.   I don't remember the amount.

5   Q.   Did you personally profit at all from the sale of

6   855 Riverside Drive in Thompson, Connecticut?

7   A.   No.

8   Q.   Do you know anything about the profits from that

9   sale?

10   A.   No, it's been a long time.  That was like in 2009,

11   I think.

12   Q.   March 19, 2010.

13   A.   Yeah, I don't remember.  That's been a long time.

14   Q.   Are you familiar with Jackson Harris Burlingame &

15   Hubert, LLC?

16   A.   Yes.

17   Q.   Who are they?

18   A.   They're real estate attorneys.

19   Q.   Where are they?

20   A.   In Main Street, Danielson.

21   Q.   And do they represent Mr. Pappas in any of his

22   business dealings or --

23   A.   Yes.

24   Q.   Is there an attorney at that law firm that Mr.

25   Pappas has worked with?

1    A.   I don't know who he speaks with now.  I --

2    Q.   Do you know who he spoke with in the past?

3    A.   Attorney George Jackson.

4    Q.   Have you ever spoken to Attorney George Jackson?

5    A.   Yes, I used to give him all my real estate

6    transactions.

7    Q.   He would handle the closings?

8    A.   Yeah.

9    Q.   And is that generally true for the LLCs that --

10   that you or Mr. Pappas --

11   A.   Yeah.

12   Q.   -- remembers him?

13   A.   Yes.

14   Q.   And that $31,959 was deposited into the Crystal

15   Creek Farms account, correct?

16   A.   I don't remember.

17   Q.   Show you the bank accounts.  I think it's

18   Attachment 4?

19   A.   Yeah, I have 3.  No, I have 3.

20   Q.   Three?  I think you have it there, yeah.

21        So this is March 19, 2010.  I believe there's a

22   deposit of $31,959.54?

23   A.   I don't remember.

24   Q.   Could you confirm that that there was, in fact,

25   that deposit?

1    A.   Yes, I see it.

2    Q.   Why did Crystal Creek Farms profit $32,000 from a

3    property sold by Mr. --

4    A.   I don't know why I put it in that account.  Like I

5    told you, we moved money from accounts to accounts.  I

6    don't -- cannot explain why it went in that account.

7    Q.   Do you recall the sale of 43 Horizon Drive in

8    Windham, Connecticut?

9    A.   Yes.

10   Q.   Did you personally profit from the sale of that

11   property?

12   A.   No.

13   Q.   And when I say "personally", I also mean did any

14   LLC in which you're a member profit from the sale of

15   that property?

16   A.   I don't know.  I don't know where the profits to

17   that went.  I'm not sure if they went to an LLC, if

18   they went to Charles.  I have no idea.  I don't

19   remember.

20   Q.   On March 31, 2010, there's a deposit in the

21   Crystal Creek Farms account for $21,139.03.

22        Do you know whether or not that deposit is related

23   to the sale of 43 Horizon Drive?

24   A.   I do not know.

25   Q.   Do you recall the sale of 24 Bunny Trail

1    (phonetic) in Hope, Rhode Island?

2    A.    Yes.

3    Q.    What do you recall about it?

4    A.    It was purchased, it was fixed, and it was sold.

5    Q.    And there's a deposit on August 4, 2010, I'm

6    sorry, August 9, 2010, in the Crystal Creek Farms bank

7    account for $20,465.56.

8          Was that the payment for the sale of 24?

9    A.    I don't know.  I don't remember.

10   Q.    And do you know why that check was put into

11   Crystal Creek Farms?

12   A.    No, I do not.

13   Q.    So was Crystal Creek Farms involved in the

14   business of buying and selling houses and --

15   A.    No.

16   Q.    -- flipping houses?

17         No, okay.

18   A.    It must have been put in there for operating

19   expenses.

20   Q.    Okay.

21   A.    I do not know why I put it in there.

22   Q.    Okay.

23         Do you recall the sale of 18 Town Street in

24   Norwich, Connecticut?

25   A.    Yes.

1   Q.   And did you deposit the profits from that sale in
2   the Crystal Creek Farms account?
3   A.   I don't know where the money went.
4   Q.   Okay.
5        Could you look at August 4, 2011 in the Attachment
6   you have there, Attachment 3 from Exhibit VI?  August
7   4, 2011, there's a deposit of $11,754.61.
8   A.   Yeah, I don't know.  I don't remember.  I don't
9   see any deposit in there for 2011 for that amount of
10  money.
11  Q.   Did I mis-speak?  It may be 2010, I believe it is
12  August 4, 2010, $11,754.61.
13  A.   Okay.
14  Q.   Sorry, I apologize.
15  A.   Yes, I don't know.
16  Q.   Okay.
17  A.   It's a long time ago.
18  Q.   Uh-huh.
19       The last time you were here you stated or you
20  confirmed what's in the interrogatory responses, that
21  Northeast Waste is no longer an active business, but I
22  think you said earlier today you're just not sure when
23  it stopped being a business?
24  A.   No, I'm not.
25  Q.   Do you think it was still operating in the summer

1    of 2011?

2    A.   Yes, not much, but yeah.

3    Q.   There's an invoice from July 8, 2011 for $10,917

4    which was sent to Mr. DeAngelis for Freedley Road from

5    Northeast Waste.  What work did Northeast Waste do at

6    Freeley Road?

7    A.   Did the cleanup in the house.

8    Q.   $10,900 for cleanup?

9    A.   I don't -- I didn't do the job, Charlie did.

10   Q.   Okay.

11        Do you know whether or not that invoice was ever

12   paid?

13   A.   I think it was paid at the closing.  I don't

14   remember.

15   Q.   Okay.  Do you know what bank account that money

16   went into?

17   A.   I don't know which one it went into.  If it was --

18   If the check was made out to Northeast Waste, it had to

19   go into the Northeast Waste account.

20   Q.   Okay, but it did not.

21   A.   I don't know then.  I really don't, because I

22   don't know where else it would have gone.

23        MR. BENNETT-SMYTH:  Madam Reporter, I have

24   less than half hour questioning left.  We could go off

25   the record if you want.

1       Is that all right, Tom?

2           MR. SWIFT:  Yeah.

3       (Recessed at 2:54 p.m., until 3:02 p.m.)

4                   AFTER RECESS

5               EXAMINATION (CONTINUED)

6   BY MR. BENNETT-SMYTH:

7   Q.  Ms. Delaney, to get back to it, (unintelligible)

8   2009, Mr. Pappas has had some tax problems with the

9   IRS.

10      What, if anything, do you know about that?

11  A.  I don't.  I just know that we haven't filed our

12  taxes and that's probably why.  I don't know.

13  Q.  Do you know anything else about that?

14  A.  No.

15  Q.  Have you assisted him in trying to clear up any of

16  his tax problems with the IRS?

17  A.  Nope.

18  Q.  Do you know whether you have personally failed to

19  report income to the IRS?

20  A.  I haven't failed to report income, no.

21  Q.  Okay.

22  A.  I haven't filed my taxes.

23  Q.  Since?

24  A.  I think the last year I did them was 2008.  I

25  don't remember.

1   Q.   Okay.

2        Have you ever met Todd Fay or Jennifer Fay?

3   A.   No.

4   Q.   Do you know who they are?

5   A.   Yeah.

6   Q.   Who are they?

7   A.   They own 866 (phonetic) East Shore.

8   Q.   And is that the Maine property that you and Mr.

9   Pappas entered into an installment contract --

10  A.   Yeah.

11  Q.   -- for?

12       Did you ever give him any money, other than the

13  original $15,000 payment?

14  A.   There was a couple payments I had made when we

15  first got into the agreement, yeah.  I haven't -- You

16  know, I don't even know when.  I've never even spoken

17  to them.

18  Q.   And my understanding of that agreement, the

19  installment contract was that you all were going to

20  make payments on an existing mortgage that they had; is

21  that correct?

22  A.   Yes.

23  Q.   Did you intend for the Maine property to be a

24  vacation home or did you want to move there?

25  A.   We wanted to move there.

1  Q.   And you testified this morning that Mr. Pappas,
2  you believe, is currently living in Maine?
3  A.   I don't know where he's living.  Honestly, I don't
4  know.
5  Q.   But you know he's been spending time in Maine.
6       That's what you said this morning, right?
7  A.   Yes.
8  Q.   Do you know what Mr. Pappas is doing up there?
9  A.   No.
10  Q.   We spoke this morning about your car.  It's a 2005
11  Lexus you said, right?
12  A.   (No audible response.)
13  Q.   And is that registered here in Connecticut?
14  A.   Yes.
15  Q.   Okay.
16       But you don't know the license plate number.
17       Do --
18  A.   No.
19  Q.   -- you have a driver's license?
20  A.   Yeah.
21  Q.   What is your driver's license number?
22  A.   I have no idea.
23  Q.   Do you have your driver's license with you?
24  A.   No.  My wallet's in my car.
25  Q.   Okay.

1          What is your date of birth?

2     A.   05/02/67.

3     Q.   Were you ever known by any other name, other than

4     "Robin Delaney"?

5     A.   Yes.

6     Q.   What was your maiden name, as they say?

7     A.   DiPasquale.

8     Q.   Can you spell it?

9     A.   D-I-P-A-S-Q-U-A-L-E.

10    Q.   And do you have a middle name?

11    A.   Lee, L-E-E.

12    Q.   So Robin Lee DiPasquale, and did you have that

13    name until you married Mr. John Delaney?

14    A.   No.  I was married before him.

15    Q.   What was your name when you're married before Mr.

16    Delaney?

17    A.   Sciascia.

18    Q.   Go ahead, please, spell it.

19    A.   S-C-I-A-S-C-I-A.

20    Q.   Robin Lee Sciascia, and then after Robin Lee

21    Sciascia, what was your name?

22    A.   Delaney.

23    Q.   Delaney.

24         And did you legally change your name to Delaney or

25    you're just known as "Robin Delaney"?

1   A.   Isn't it legally changed when you get married?  I

2   don't know.

3   Q.   You don't know?

4   A.   I don't know how that works.  I was married and

5   that was my name.

6   Q.   Do you use any other name currently, other than

7   Robin Delaney?

8   A.   No.

9   Q.   You don't go by Robin Sciascia or Robin

10  DiPasquale?

11  A.   No.

12  Q.   Okay.

13       Do you have any nicknames or aliases?

14  A.   No.

15  Q.   You're current -- You're represented by Attorney

16  Donn Swift and his law firm in this case; is that

17  correct?

18  A.   Yes.

19  Q.   And you retained him to be your attorney in

20  December 2010; is that correct?

21  A.   Yes.

22  Q.   The profit and loss report for Normandies Park we

23  marked for ID as Exhibit 19, indicates that Normandies

24  Park paid Attorney Swift on December 15, 2010, $3,000.

25  The memo line states that that was a "Retainer."

1    A.   Okay.

2    Q.   Is that -- Did you pay a retainer?  Did Normandies

3    Park pay a retainer for Mr. Swift's services?

4    A.   Yes.

5    Q.   Okay.

6         Since paying that initial retainer, have you or

7    any other Defendant in this case paid Attorney Swift

8    any money?

9    A.   I haven't.

10   Q.   Has Normandies Park?

11   A.   No, I don't think so.

12   Q.   Has Mr. Pappas?

13   A.   I don't know.

14   Q.   Has Anna Alexis, LLC?

15   A.   No.

16   Q.   Has any other business entity that you or Mr.

17   Pappas are a member of?

18   A.   Not that I'm aware of, no.

19   Q.   You're not aware of any other payment at all?

20   A.   No.

21   Q.   As far as you know, Mr. Swift, since that initial

22   retainer, has worked for no income?

23   A.   Absolutely.  Yes.

24   Q.   Do you owe Attorney Swift any money for his

25   representation?

1   A.   Yes.

2   Q.   How much?

3   A.   I don't know.  I don't even look at it when it

4   comes in.

5   Q.   Have you ever looked at it?

6   A.   I think a year ago I did.

7   Q.   How much did you owe him a year ago?

8   A.   It was like, I think, $21,000 at that time.

9   Q.   But since then you've never looked at it?

10  A.   No.

11  Q.   And do you get those bills on a monthly basis?

12  A.   Yes.

13  Q.   And have you entered into any arrangement to pay

14  those bills in the future?

15  A.   I did not enter into any arrangement.  We're

16  hoping to get the money from the lawsuit against

17  Attorney Lonardo.

18  Q.   Okay.

19       And is there any written documentation expressing

20  that plan?

21  A.   I don't know.

22  Q.   Have you ever signed anything --

23  A.   You'd have to ask my --

24  Q.   -- that says you'll do that?

25  A.   I don't know.  I don't remember.

1   Q.   You don't remember.

2        Have you ever signed an agreement with Attorney

3   Swift?

4   A.   Yes.

5   Q.   Have you signed more than one agreement with him?

6   A.   I think I signed one -- something six months ago

7   that may have been.  I think I did.  I think I signed

8   something again.

9   Q.   Okay.

10       And as best as you can remember, was that an

11  agreement to pay him from the proceeds from the

12  malpractice action?

13  A.   I think so, but I don't remember.

14  Q.   And what about the appeal in this case, did you

15  enter into an agreement for Mr. Swift's services for

16  the appeal in this case?

17  A.   Yes.

18  Q.   Was that a separate agreement?

19  A.   Yes.

20  Q.   And did you pay him any money?

21  A.   No.

22  Q.   And did you agree --

23  A.   Honest -- I don't think I did.  I don't remember.

24  Q.   Did you agree to pay him for the appeal from

25  proceeds from your malpractice action?

1    A.   Yes.

2    Q.   Did you ever pay any other attorney to represent

3    you in this case?

4    A.   In this case?

5    Q.   Yes.

6    A.   No.  Well, except Attorney Lonardo at the

7    beginning.  So no, that's incorrect.  Yes, I did, but

8    that --

9    Q.   Exhibit 19 for identification purposes lists a

10    payment on November 1st 2010 to Attorney Lonardo for

11    $2360.

12    A.   Yes.

13    Q.   What was that payment for?

14    A.   That was a retainer.

15    Q.   For what?

16    A.   To defend us.

17    Q.   In what case?

18    A.   In the case from Donna Parris.

19    Q.   In this case?

20    A.   Yes.

21    Q.   Okay.

22    That wasn't payment for the eviction action?

23    A.   No, that was -- No.

24    Q.   Did you write -- Was that a check that you gave

25    him?

1    A.   Yes.

2    Q.   Did you write anything in the memo line of the

3    check?

4    A.   I think I wrote "Retainer for Parris."

5    Q.   Do you, Ms. Delaney, or any of the limited

6    liability company (phonetic) of which you are a member

7    have a bank account in Chantilly, Virginia?

8    A.   No.

9    Q.   Within the last three years have you personally,

10   at any point in time, had a bank account in Chantilly,

11   Virginia, or signatory authority for a bank account in

12   Chantilly, Virginia?

13   A.   No, never banked in Virginia.

14   Q.   Have any of your companies, at any point, ever had

15   a bank account in Chantilly, Virginia?

16   A.   No.

17   Q.   Why are the bank accounts that you have disclosed

18   in this case transferring money to an account in

19   Chantilly, Virginia?

20   A.   I have no idea what you're talking about.

21   Q.   All right.  Let's look at -- I'll bring you the

22   attachments again.

23        Do you still have Attachment 3 up there, Ms.

24   Delaney?

25   A.   Yes.

1    Q.   Okay.  I'm going to bring you 1 and you have 3.  I

2    think that's -- and 4.

3         If you could look at Attachment 1 from Exhibit 6

4    for the motion for sanctions on March 27, 2012.

5    A.   March.

6    Q.   This is Attachment 1.

7    A.   March 2012.  I only have 'til February on

8    Attachment 1.

9    Q.   I'm sorry.  The exhibit itself is from March 27,

10   but I'll tell you the dates.  December 14, 2011.

11   A.   December 14, 2011.

12        On Exhibit 1?  Attachment 1?

13   Q.   Attachment 1, yes.

14   A.   What date?

15   Q.   December 14, 2011.

16   A.   Okay.

17   Q.   Do you see the bill payments, electric from

18   Normandies Park and Church Street, and bill payment

19   withdrawal barn business, bill pay?

20   A.   Yeah, that must be Northeast Utilities.  That's

21   Northeast Utilities.  That must be where their bank

22   account is.

23   Q.   If you look at Attachment 3, the Crystal Creek

24   Farms account?

25   A.   Yeah.

1   Q.   Mach 31, 2010, bill payments for Charlie Electric

2   241, Electric Farm --

3   A.   Wait a minute.

4        What month are you on?

5   Q.   March 31, 2010.  This is a Crystal Creek Farms

6   account, which is Attachment 3 to Exhibit 6.

7   A.   Okay.

8   Q.   There's bill payments for Charlie Electric 241.

9   A.   Yeah.

10  Q.   Electric farm fuel, Hilton yearly, cell phone and

11  CL&P for Normandies Park.  Those are all transfers to

12  Chantilly, Virginia from the Crystal --

13  A.   I don't know where Northeast Utilities has their

14  bank accounts.

15  Q.   But why would --

16  A.   I -- This is because this is online bill pay.  So

17  I pay the bill.  Wherever the person is that I pay,

18  that's where it goes.

19  Q.   When you say, "It's on my bill pay", do you mean

20  you use a service to pay various --

21  A.   I use -- No.  I just used to go online and you

22  could pay through your bank account.

23  Q.   Okay.  So what -- So if you think it's Northeast

24  Utilities, why would there be payments for Hilton

25  yearly and your cell phone, as well, in Chantilly,

1    Virginia?

2    A.   I don't understand what you -- what your question

3    is.

4    Q.   I'm trying to understand why all this money is

5    going to Chantilly, Virginia.

6    A.   I have no idea.

7    Q.   Okay.

8         Still in the Crystal Creek Farms bank account, on

9    April 6, 2010, there are transfers to Chantilly,

10   Virginia for Gold Card 4772.

11   A.   That must be where CitiBank had their -- That must

12   be where Citibank accepts their payments because all

13   these companies have like a -- lock box addresses.

14   Q.   What about there's also payments for a Platinum?

15   What is that?

16   A.   That was my credit card.  That was my Capital One

17   card.

18   Q.   Okay.

19        What about Staples, Trash Center, Normandies Park

20   trash, why are those payments being made in Virginia?

21   A.   Because these are all sent online bill pay.  They

22   go to a lock box address.  I do not even put that

23   information in there.  That's information that is

24   transferred from the bank.  I did not enter that

25   information.  Those are bank references.  They entered

1    that information.

2    Q.   I'm sorry.

3        Do you have an explanation for why Normandies Park

4    trash should be paid in Virginia?

5    A.   I don't know.  Maybe my bank does it.  I don't

6    know.

7    Q.   You don't know?

8    A.   No.

9    Q.   Okay.

10       Do you still have the CitiBank card?

11   A.   No.

12   Q.   No?  When did you last have it?

13   A.   I never had a CitiBank card.  That was Charlie's.

14   I had Capital One.

15   Q.   When did you last have the Capital One?

16   A.   I don't know.  I haven't used my cards in a couple

17   of years.  They're all sent to collections.  I've been

18   getting notices in the mail.  They have all taken civil

19   action against me to collect their money.  I haven't

20   used cards in a couple of years.

21   Q.   Ms. Delaney, a couple of times today you've

22   referenced the malpractice action that you have filed

23   against Attorney Lonardo.  The last time that we were

24   here Mr. Pappas also stated that he hoped to be able to

25   pay the judgment in this case from the proceeds from

1    that case; is that correct?

2    A.   Yes.

3    Q.   Your hope is that the Court will find in your

4    favor in that case and there'll be enough money to pay

5    off --

6    A.   Yes.

7    Q.   -- the debt you've incurred in this case?

8    A.   Yes.

9    Q.   I've given you what we marked for identification

10   purposes as exhibit -- Plaintiff's Exhibit 43.   That is

11   the revised malpractice Complaint.   Your attorney --

12   Strike -- That's not right, actually.

13        We obtained a copy of the revised Complaint filed

14   against Attorney Lonardo.   It's dated June 22nd, 2012.

15        Have you seen this document?

16   A.   No.

17   Q.   Paragraph 25 states that on August -- on or about

18   August 3rd, 2010, Attorney Lonardo forwarded

19   correspondence to you and Mr. Pappas informing you

20   that, "Attorney Lonardo will not consider defending

21   this case," the federal court case, "without a

22   substantial retainer," and he also suggests that "the

23   Plaintiffs make a decision to the federal court case by

24   August 20, 2010 or you would be defaulted."

25   A.   Okay.

1    Q.   Did you receive that correspondence from Attorney

2    Lonardo?

3    A.   No.

4    Q.   You never saw it?

5    A.   No.  I don't recall, no.  I know that we talked to

6    him and that's why we retained him.  That's why we gave

7    him a check.

8    Q.   Have you ever seen a letter from Attorney Lonardo

9    saying these things?  You can look at paragraph 25?

10   A.   I don't recall.  All I -- I do recall talking to

11   him on the phone, --

12   Q.   Uh-huh.

13   A.   -- and him telling me that he needed a retainer,

14   and him telling me that he was meeting with you in

15   Danielson and that he was going to try to make an

16   agreement.  He didn't --

17   Q.   Can you read paragraph 25?

18   A.   I am reading it.  I -- That's not -- No.

19           (Pause.)

20   A.   (Continuing.)  When did I give him the retainer?

21   Q.   I'm sorry?

22   A.   I don't recall.  When did I give him the retainer?

23   Q.   I don't think that's what that says.

24   A.   No, but I gave him the retainer for this.

25   Q.   Okay.  So you're saying that's not true, paragraph

1   25?  Because this document was filed on your behalf by

2   your lawyer.

3   A.   No.  I -- I'm -- I don't remember.  It's been a

4   long time.  All I know is that I gave him a retainer.

5   I do not remember.  I do remember speaking with him,

6   and if there was a letter, then I'd have it in the file

7   and I gave it to my attorney, but it's been a long

8   time.  If there was a letter then I would have given it

9   to my attorney that I had retained for the case.

10  Q.   Could you look at paragraph 28?

11  A.   Oh.

12  Q.   Is that paragraph correct?

13  A.   Yes.  Now I remember.  That's when I gave him the

14  retainer because he said he was going to Italy and that

15  he needed the retainer before he would meet with you

16  and --

17  Q.   Okay.

18  A.   -- before he went to Italy, yes.

19  Q.   Okay.  We would like copies of those letters,

20  okay?  We haven't seen them yet.  That's one of the

21  documents that we've requested in the interrogatories.

22       Do you have copies of those letters from Attorney

23  Lonardo?

24  A.   I honestly don't know.  I'd have to check.  I

25  don't know.  Honestly, I would -- I -- If I had them, I

1   would have given them to the attorney for this lawsuit

2   and they could be in a box somewhere.  I don't know.

3   I'd have to ask the --

4   Q.   If they've been given to the attorney then you can

5   ask your attorney that you'd like a copy of them.

6   A.   Yeah.

7   Q.   And you can give us a copy.

8   A.   Yes.

9   Q.   That's part of your obligation in discovery.  So

10  your Complaint, it looks like there's two letters.

11  We'd like copies of those letters.

12  A.   Okay.

13       He had his retainer before he met with you.

14          MR. BENNETT-SMYTH:  Donn, I think I'm done.

15          Since the judge isn't here, can we take a

16  couple of minutes so I can go over my notes?

17          MR. SWIFT:  Absolutely.

18          MR. BENNETT-SMYTH:  Thanks.

19          Thank you, Ms. Delaney.  I'm going to come

20  and get that exhibit from you.

21       (Recess at 15:25 p.m., until 15:31 p.m.)

22                       AFTER RECESS

23                       EXAMINATION

24  BY MR. BENNETT-SMYTH:

25  Q.   Ms. Delaney, we've spent a lot of time today

1    talking about your various bank accounts, your various

2    limited liability companies, your various financial

3    obligations.

4         Is there any income of any kind, any wealth of any

5    kind, any money of any kind that you've not disclosed

6    in this case?

7    A.    No.

8    Q.    That you possess or any business entity in which

9    you're a member or a partner possess?

10   A.    No.

11   Q.    Are you aware of any money or wealth or income of

12   any kind, that Mr. Pappas has not disclosed to us?

13   A.    No.

14            MR. BENNETT-SMYTH:  All right, Donn, we'd

15   like to try again an order from the Court on some of

16   this stuff, but I don't have any more questions for Ms.

17   Delaney.

18            MR. SWIFT:  Okay.

19        (Proceedings concluded at 3:32 p.m.)

20

21

22

23

24

25

C E R T I F I C A T E

I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings
in the above-entitled matter.


/s/_____          August 16, 2012
STEPHEN C. BOWLES